## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| U.S. ELECTRONICS, INC.<br>105 Madison Avenue<br>New York, NY 10016<br><br>    Plaintiff,<br><br>    v.<br><br>FEDERAL COMMUNICATIONS COMMISSION<br>445 12th Street, S.W,<br>Washington, DC 20554<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No.:_____<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR INJUNCTIVE RELIEF FOR VIOLATION
## OF THE FREEDOM OF INFORMATION ACT

Plaintiff U.S. Electronics, Inc., for its Complaint against the defendant, the Federal Communications Commission, states as follows:

### JURISDICTION AND VENUE

1.    This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, *et seq.,* as amended, to require the disclosure of agency records requested and for other such relief as the court deems appropriate.

2.    This Court has both subject matter and personal jurisdiction over this action pursuant to 5 U.S.C. §§ 552(a)(4)(B) and (a)(6)(E)(iii).

3.    Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

### PARTIES

4.    Plaintiff U.S. Electronics, Inc. ("USE") has its principal place of business at 105

Madison Avenue, New York, NY 10016.

5.    Defendant Federal Communications Commission ("FCC" or "Commission") is an agency of the United States within the meaning of 5 U.S.C. § 552(f)(1) headquartered in the District of Columbia.

6.    The Commission has possession of and/or control over the records requested by the USE in its FOIA Request and is a proper party under the FOIA, 5 U.S.C. §§ 552(a)(4)(B) and 552(f)(1).

## STATEMENT OF FACTS

7.    XM Satellite Radio Holdings Inc. ("XM") and Sirius Satellite Radio Inc. ("Sirius") are the nation's only Satellite Digital Audio Radio Service (SDARS) licensees.

8.    FCC granted XM and Sirius their respective SDARS licenses in 1997.

9.    Each license expressly prohibited one licensee from acquiring or combining the satellite radio spectrum of the other.

10.    Each license was expressly conditioned on "their systems includ[ing] a receiver that will permit end users to access all licensed SDARS systems that are operational or under construction." (The "interoperability mandate").

11.    On February 16, 2000, XM and Sirius entered into a Joint Development Agreement to develop the receiver allowing end users to access all licensed SDARS systems that are operational or under construction.

12.    As part of the Joint Development Agreement, XM and Sirius exchanged their respective proprietary information with each other.

13.    On October 6, 2000, Sirius and XM filed a letter with the FCC announcing their agreement to develop a unified standard for satellite radios and stated that inoperable chips

2

capable of allowing end users to receive both XM's and Sirius' services would be produced in volume by mid-2004.

14.    According to Sirius' SEC S-4 filing at pp. 20-21 with the Securities and Exchange Commission (SEC) in late 2002 and early 2003, representatives of Sirius contacted representatives of XM, and despite the FCC's restriction imposed on their licenses, engaged in discussions about the possibility of a business combination between the two licensees.

15.    These initial discussions ended without any agreement to further pursue the possibility of combining Sirius' and XM's operations.

16.    On January 28, 2005, the Chief of the FCC's Satellite Division of its International Bureau, Thomas S. Tcyz, wrote and asked the licensees to update the status of their efforts to develop an interoperable radio receiver.

17.    Responses to Mr. Tcyz's letter were due March 14, 2005, yet as stated below EB implausibly claims there are no responsive documents. See ¶ 62 infra.

18.    In early 2006, Sirius contacted XM once again, and renewed its proposal to discuss "a variety of topics of interest to the two companies" including a merger with XM.

19.    XM then informed its board of directors of the possibility of merger discussions with Sirius.

20.    Over the next several months, XM and Sirius engaged experts to conduct the necessary due diligence required in the exploration of a business combination with XM and Sirius. Id.

21.    On February 19, 2007, XM and Sirius entered into an Agreement and Plan of Merger ("Merger Agreement").

22.     Pursuant to this Merger Agreement, on March 20, 2007, Sirius and XM submitted applications to the FCC seeking consent to transfer control of Commission licenses and authorizations held by Sirius, XM, and their subsidiaries pursuant to Section 310(d) of the Communications Act of 1934, as amended, and waiver of the restriction on combining their licenses or alternatively a declaration that due to changed circumstances the restriction was no longer operative.

23.     XM's and Sirius' applications were docketed by the FCC in *Applications of XM Satellite Radio Holdings, Inc., Transferor, and Sirius Satellite Radio Inc., Transferee, Consolidated Applications for Authority to Transfer Control of XM Radio and Sirius Satellite Radio Inc.,* MB Docket No. 07-57 (March 20, 2007). (Hereinafter, "MB 07-57" or "Merger Docket").

24.     Section 310(d) of the Communications Act requires the Commission to determine whether the public interest will be served or harmed by a grant of merger applications by Commission licensees.

25.     Section 310(d) of the Communications Act requires the Commission to determine whether the public interest will be served or harmed by a grant of XM's and Sirius' merger applications in MB 07-57.

26.     This Complaint arises out USE's FOIA requests for the disclosure of records and information about the Applicants' history of compliance with Commission mandates that are directly relevant to the FCC's determination whether the public interest will be served or harmed by a grant of XM's and Sirius' merger applications in MB 07-57.

27.     USE's FOIA requests cover a number of incidents involving the Applicants' history of compliance with Commission rules and orders.

28.     USE's FOIA requests cover (1) the Applicants' history of compliance, *vel non,* with the Commission's mandate that Sirius and XM develop an interoperable radio that can

4

receive the signals of both SDARS licensees, (2) the Applicants' dealings with the Commission in connection with inquiries from the Commission about whether Sirius' radios that contained FM transmitters complied with applicable emissions limits, and (3) the Applicants' construction of terrestrial repeaters at unauthorized locations.

29.    USE's FOIA requests, if processed by the Commission in compliance with the law, are calculated to provide documents that shed light on (1) whether the Applicants have been cooperative and forthcoming in connection with enforcement of Commission regulations and mandates including license conditions to which the Applicants agreed at the time their licenses were granted; (2) if not, why; (3) who was responsible for the non-compliance; and (4) whether different or better crafted conditions for approval of the merger are necessary or could be more effectively enforced.

30.    Ascertaining whether conditions may be differently or better crafted and therefore might be better enforced is squarely in the Commission's decisional path on the merger, as in addition to USE, other parties of record have proposed conditions on the merger if approved.

31.    The Commission cannot discharge its duty to ascertain whether the merger is in the public interest, even if conditioned, without public disclosure of documents that will illuminate how to craft meaningful and enforceable conditions.

FOIA Request

32.    On January 25, 2008, USE filed an FOIA request with the Commission pursuant to 47 C.F.R. § 0.461, a copy of which is attached as **Exhibit A**.

33.    USE also sought expedited action because "the documents and information are relevant to the record being made in MB Docket 07-57."

34.    USE's FOIA Request sought the production of the following documents:

5

1.  For the period January 1, 2005 to date, each non-privileged, non-exempt document relating to the "Petition for Declaratory Ruling to Clarify the Lack of Enforcement and Implementation of the Interoperable Mandate, FCC Rule 47 CFR sec. 25.144(a)(3)(ii)" filed July 5, 2007 in MB Docket No. 07-57 ("Petition").

2.  For the period 2005 to date, each non-privileged, non-exempt document relating to each document relating to the certifications required of the Satellite Digital Audio Radio Service (SDARS) operators "that their systems include a receiver that will permit end users to access all licensed SDARS systems that are operational or under construction." (See, Letter of Thomas S. Tcyz, Chief, Satellite Division to Patrick Donnelly, Executive Vice President and General Counsel, Sirius Satellite Radio, January 28, 2005, a web posted copy of which is attached for reference.)

3.  For the period January 1, 2003 to date, each non-privileged, non-exempt document relating to Interoperable Technologies, LLC.

                                    ***

5.  For the period January 1, 2005 to date, each non-privileged, non-exempt document relating to Sirius' and XM's compliance with the equipment authorization rules governing emission limitations for satellite radio receivers, including without limitation, those matters raised and considered in connection with File No. EB-06-SE-250.

6.  For the period January 1, 2005 to date, each non-privileged, non-exempt document relating to Sirius' and XM's compliance with the equipment authorization rules governing emission limitations for satellite radio receivers.

7.  For the period January 1, 2006 to date, each non-privileged, non-exempt document relating to XM's and Sirius' compliance with their respective authorizations for terrestrial repeaters.

                                    ***

35.  Upon receipt of USE's FOIA Request, the FCC assigned it FOIA Control Number 2008-190 (hereinafter referred to as "FOIA 2008-190").

36.  On February 4, 2008, the Commission's Enforcement Bureau ("EB") denied USE's request for expedited treatment claiming that no compelling need for such action had been certified.

37.    The EB's ruling, attached at **Exhibit B,** defined a "compelling need" in part as "when a requester is primarily engaged in disseminating information, there is an urgency to inform the public concerning actual or alleged Federal Government activity."

38.    The EB denied the request for expedited action ruling "we have determined that you have not fulfilled either requirement for expedited processing of your FOIA request." *Id.*

39.    The EB did not address or explain why the relevancy of the documents and information to the record in MB Docket 07-57 did not qualify as information that needed to be disseminated due to the urgency to inform the public about the actual or alleged Federal Government activity of approving a merger. *Id.*

40.    The EB did not address why the Applicants' qualifications and their record for compliance with Commission rules and policies was not relevant to the Commission's determination whether to approve the Merger.

41.    On February 25, 2007, the FCC sought a ten working day extension to respond to FOIA 2008-190 pursuant to 5 U.S.C. §552(a)(6)(B)(i).

42.    On March 6, 2008, the FCC requested an additional 10 business days to respond to FOIA 2008-190.

43.    USE did not consent to the March 6th request for another extension to respond to FOIA 2008-190.

44.    On February 14, 2008, pursuant to 47 C.F.R. § 0.461(d)(3), the Commission asked XM and Sirius if they wished to supplement their previous requests for confidential treatment of submissions they had made pursuant to an FOIA request by the National Association of Broadcasters ("NAB") in 2007.

45.    On February 29, 2008, XM and Sirius submitted supplemental confidentiality requests.

46.    On March 5, 2008, USE responded to XM's and Sirius' supplemental confidentiality requests by Letter from Charles H. Helein, Esq. Helein and Marashlian, LLC, to Kathryn S. Berthot, Chief Spectrum Enforcement Division, Enforcement Bureau, attached as **Exhibit C**.

47.    On March 21, 2008, the EB granted in part and denied in part USE's requests for the documents and information specified in FOIA 2008-190 by Letter from Karthryn S. Berthot, Chief Spectrum Enforcement Division, Enforcement Bureau to Charles H. Helein, Esq., Helein and Marashlian, LLC, attached as **Exhibit D**.

48.    In partially denying USE's Request, the EB held that XM and Sirius demonstrated that substantial competitive harm was likely to result from the release of the requested information and therefore were exempt from disclosure pursuant to Exemptions 4 and 7 of the FOIA, 5 U.S.C. § 552(b)(4) and (7).

<u>Application For Review</u>

49.    Pursuant to Section 0.461(i)(2) of the Commission's Rules, on March 31, 2008, USE filed an Application for Review of the EB's March 21, 2008 decision to the extent it denied USE's Request ("USE AFR ") attached as **Exhibit E**.

50.    The EB's partial denial of USE's Request fails to articulate any basis for balancing the rights of the public and the need for the Commission to have the documents and information in the record in the Merger Docket against the merger Applicants' claims for confidentiality.

51.     The EB's partial denial of USE's Request fails to articulate any basis to reject the fact that the relevancy of documents and information to the merits of the merger and the public interest issues raised defeats any interests XM and Sirius have in preventing disclosure.

52.     The EB's partial denial fails to consider that public filings made with the SEC undercut claims by Sirius and XM that they will be competitively harmed by the disclosure of the requested documents and information to the extent such SEC filings contain information similar to the information sought by USE in its FOIA requests.

53.     For example, in Sirius' SEC 10-K filing made by Sirius on March 28, 2003 at pp. 7-8, it identified its consumer electronics manufacturers, the receiving devices for automobiles available to its subscribers, the identity of its manufacturers and the retailers of the FM modulated radios, the three-band radios and its price and cost factors.

54.     The EB's citation to SEC filings by the Applicants as grounds for partially granting USE's Request because the information has been publicly disclosed by such filings cannot be reconciled with its ignoring other SEC filings such as that cited in the preceding paragraph in partially denying USE's Request based on claims of competitive harm.

55.     In partially denying USE's Request, the EB ignores the facts that since February 2000, when XM and Sirius in their SEC filings designated each other as sole competitors in the satellite radio market, nevertheless worked together to develop a unified standard for satellite radios to enable consumers to purchase one radio capable of receiving both Sirius and XM Radio's services, they cross-licensed their intellectual property to each other. *Id.* at p. 7.

56.     In partially denying USE's Request, the EB ignores the fact that XM and Sirius have been engaged in merger discussions since early 2006 and exchanged each party's detailed information including trade secrets, and commercial and financial information to their direct

competitor, i.e., each other.

57.    In partially denying USE's Request, the EB has not addressed why disclosure of documents and information on the Applicants' noncompliance with the interoperability mandate sought by USE's Category 2 request should be denied under Exemption 7 (the "law enforcement" exemption).

58.    The EB assertion that no responsive documents were found on USE's Category 1 request about the Commission's refusal to deal with the issue of interoperability despite being specifically requested to do so begs the question of whether there are no "nonexempt or non-privileged" responsive documents or simply no documents.

59.    USE's AFR also sought Commission review of the EB's conclusion that there "are no responsive documents" to Categories 1 through 4 of the FOIA Request.

60.    The EB's conclusion that there are "no responsive documents" begs the question considering the following:

• Category 1 sought documents about the Petition for Declaratory Ruling on the meaning of the interoperable radio mandate that was ordered handled as a "complaint," an unprecedented or at least rare action that it would seem would require some documentation between Commission offices to execute.

• Category 2 that sought documents about XM/Sirius' certifications about the interoperable radio had attached a copy of an FCC letter dated January 28, 2005 raising an issue about the thoroughness of the search of Commission records on this matter.

• Categories 3 and 4 asked about a company, that on information and belief has something to do with the interoperability mandate, Interoperable Technologies LLC. The EB's response that there are no responsive documents in regard to this company is incomplete. It does

not inform USE that there are in fact no such documents in the FCC's records, versus there are such documents but they are all considered exempt or privileged.

61.    On information and belief, Interoperable Technologies LLC is the company formed by XM and Sirius under their Joint Development Agreement they entered on February 16, 2000 to develop an interoperable radio as mandated by the Commission's condition imposed on the grants of the licenses to each company.

62.    If this is the case, it is implausible that the Commission would have no documents, not even an email; regarding this aspect of the Applicants' supposed effort to address the interoperability mandate after the Commission itself had made inquiries of the Applicants about the status of those efforts. See ¶¶ 16-17, Supra.

63.    Among others,[1] USE has urged the Commission to condition its approval on requiring open access to the satellite radio network, *i.e.*, to prevent the merged entity from extending its control of the network services to the devices that are required by the public to access those services.

64.    The condition proposed would require the Applicants to make their proprietary chipsets available on reasonable and nondiscriminatory terms to consumer electronics manufacturers so that they could provide competitive choices in satellite radio receivers.

65.    In order to craft meaningful, enforceable conditions that will ensure open access, it is essential that the documents USE has requested and been denied access to, as well as the

---

[1] Chairman John Dingell of the House Energy & Commerce Committee and Chairman Edward Markey of the Subcommittee on the Internet and Telecommunications of the House Energy & Commerce Committee wrote the Commission on May 1, 2008 urging adoption of such a condition. Public Knowledge, the National Association of Telecommunications Officers and Advisers, Media Access Project and New America Foundation, along with iBiquity and the HD Radio Alliance have also supported the condition in the record before the Commission.

documents USE has been granted access to but denied by the applications for review filed by XM, Sirius and others, as identified below, be made part of the record in the Merger Docket.

66.    The facts are that the Applicants have not provided an interoperable satellite radio receiver despite this being a condition on the grants of their respective licenses since 1997.

67.    Yet, the Applicants have never been questioned, much less held accountable for the lack of producing an interoperable satellite radio receiver.

68.    Documents shedding light on how and why this condition has not been enforced or made effective are directly relevant to ensuring that any conditions attached to the consolidation of the two SDARS licenses are not similarly nullified by the Applicants and are successfully enforced by the Commission.

69.    The Commission is obligated under Section 309 of the Communications Act to determine whether the public interest will be served or harmed by a grant of the applications in Merger Docket.

70.    An applicant's compliance with Commission rules and law directly implicates the public interest insofar as it illuminates whether it will implement a Commission authorization in compliance with its terms.

71.    For example, as disclosed in the SEC 10-Q filing made by Sirius on November 8, 2006, and the SEC 10-Q filing made by XM on November 9, 2006, in April 2006, Sirius and XM received inquiries from the Commission as to whether the FM transmitters in their products complied with the FCC's emissions and frequency rules.

72.    Two years after the Commission's inquiries began, the companies continue to report their non-compliance in their SEC filings.

73.    In Sirius' 10-Q filing on May 12, 2008, page 34, Sirius reports –

*FCC Matters.* In April 2006, we learned that XM Radio and two manufacturers of SIRIUS radios had received inquiries from the FCC as to whether the FM transmitters in their products complied with the FCC's emissions and frequency rules. We promptly began an internal review of the compliance of the FM transmitters in a number of our radios. In June 2006, we learned that a third manufacturer of SIRIUS radios had received an inquiry from the FCC as to whether the FM transmitters in its products complied with the FCC's emissions and frequency rules. In June 2006, we received a letter from the FCC making similar inquiries. In July 2006, we responded to the letter from the FCC in respect of the preliminary results of our review. In August 2006, we received a follow-up letter of inquiry from the FCC and responded to the FCC's further inquiry. We continue to cooperate with the FCC's inquiry.

During our internal review, we determined that certain of our radios with FM transmitters were not compliant with FCC rules.

In connection with our internal review, we discovered that certain SIRIUS personnel requested manufacturers to produce SIRIUS radios that were not consistent with the FCC's rules. As a result of this review, we are taking significant steps to ensure that this situation does not happen again, including the adoption of a compliance plan, approved by our board of directors, to ensure that in the future our products comply with all applicable FCC rules.

74.    In its SEC 10Q filing, May 12, 2008, page 55, XM reports,

*FCC Receiver Matter*—As we have previously disclosed, we have received inquiries from, and responded to, the FCC regarding FM modulator wireless transmitters in various XM radios not in compliance with permissible emission limits...We have been submitting documents to the FCC and are in discussions with the FCC to resolve this matter. We cannot predict at this time the extent of any further actions that we will need to undertake or any financial obligations we may incur. There can be no assurance regarding the ultimate outcome of this matter, or its significance to our business, consolidated results of operations or financial position.

75.    Sirius' violation of Commission rules regarding construction and operation of its

terrestrial repeaters also continues to be reported.

76.    In Sirius' same 10-Q filing of May 12, 2008, at page 34, Sirius reports –

In October 2006, we ceased operating 11 of our terrestrial repeaters which we discovered had been operating at variance to the specifications and applied to the FCC for new authority to resume operating these repeaters.

77.    In XM's 10 Q for May 12, 2008 at page 55, it is reported –

*FCC Repeater Network Matter*—In October 2006, we filed for both a 30-day Special Temporary Authority ("STA") and a 180-day STA with respect to our terrestrial repeater network, seeking authority to continue to operate our entire repeater network despite the fact that the technical characteristics of certain repeaters, as built, differ from the technical characteristics in the original STAs granted for our repeater network. These differences include some repeaters not being built in the exact locations, or with the same antenna heights, power levels, or antenna characteristics than set forth in the earlier STAs... We continue to communicate with the staff of the FCC regarding these matters. In February 2007, we received a letter of inquiry from the FCC relating to these matters, to which we have responded. This proceeding may result in the imposition of financial penalties against us or adverse changes to our repeater network resulting from having repeaters turned off or otherwise modified in a manner that would reduce service quality in the affected areas.

78.    While XM and Sirius have acknowledged that the Commission's inquiry may result in fines, additional license conditions or other FCC actions that could be detrimental to their business, the activities and the participation of the individual executives and senior-level employees involved in these violations have not been disclosed.

79.    It is unquestionably relevant and important for the Commission, in its consideration of the Merger Docket, to determine the roles played by the individual executives and senior-level employees in these violations and, depending on the nature and extent of their involvement, whether they may appropriately continue in their positions with these licensees.

80.    Disclosure of the documents and information sought by USE is therefore required so that they may be made part of the record in the Merger Docket and cast additional light on how to craft meaningful and enforceable conditions to protect the public interest as the Commission is required by statute to do.

81.    USE has argued consistently in its filings with the Commission that a merger without conditions will result in XM and Sirius controlling not only the network, but also the manufacturing and distribution of hardware which would in turn result in an increase in price, decrease in service, decrease in choice, lack of innovation and poor quality of service.

82.    While Sirius has claimed that it does not physically manufacture, import, or distribute radios themselves, it has been disclosed elsewhere that it has extensive control over these processes

83.    In its SEC 8K filing on April 29, 2008, p 2, Exhibit 10.33, Directed Electronics, Inc. (DEI), Sirius' exclusive retail distributor, reported it had received from Sirius amendments made by Sirius to the contract between DEI and Sirius to which DEI agreed to accept.

84.    The terms of these contract amendments show that Sirius intends to and will control who the manufacturer is, what is to be produced, decide at what price the product will be sold, decide what warranty policy the distributor will adhere to, what inventory levels will be kept and what the price of the product will be.

85.    These terms demonstrate that post-merger, Sirius, as the surviving entity, intends to control completely the public's access to the radio receivers needed to access the merged entity's network services extending its exclusive control over the satellite radio spectrum and the content of the services provided thereon to the vertical market, the satellite radio receivers.

<u>Other Applications For Review</u>

86.    On April 4, 2008, Sirius filed an Application for Review of the EB's March 21, 2008 decision to the extent it granted USE's FOIA Request.

87.    On April 15, 2008, USE filed an Opposition to Sirius' AFR.

88.    On April 4, 2008, executive and senior-level employees of Sirius, named as John Does 1 and 2 filed their Application for Review to the EB's March 21, 2008 decision to the extent it granted USE's FOIA Request.

89.    On April 15, 2008, USE filed an Opposition to Sirius' John Does' AFR.

90.    On April 4, 2008, XM and Four XM employees filed an Application for Review

of the EB's March 21, 2008 decision to the extent it granted USE's FOIA Request.

91.    On April 8, 2008, USE filed its Opposition to XM's AFR.

92.    The time limits under 5 U.S.C. §552(a)(6)(A)(ii) for Commission action on each party's filing of an AFR has expired.

93.    The time limit on USE's AFR expired April 28, 2008.

94.    The time limit on KRI's AFR expired May 1, 2008.

95.    The time limit on Sirius', XM's, Sirius John Does, and Four XM Employees AFRs expired May 2, 2008.

<u>NAB's FOIA Request</u>

96.    The National Association of Broadcasters ("NAB") in 2007 filed an FOIA request (FOIA Control No. 2007-235) that sought many of the same documents and information USE's FOIA Request seeks.

97.    On June 18, 2007, in a Letter Ruling, the Enforcement Bureau granted in part and denied in part the NAB FOIA Request.

98.    On June 29, 2007, Sirius filed an Application for Review of the EB's June 18, 2007 Letter Ruling which remains pending before the Commission without action.

99.    On July 2, 2007, XM filed an Application for Review of the EB's June 18, 2007 Letter Ruling which remains pending before the Commission without action.

100.    On July 2, 2007, Four XM Employees filed an Application for Review of the EB's June 18, 2007 Letter Ruling which remains pending before the Commission without action.

101.    On or about July 2, 2007, Three Unnamed Employees of XM filed an Application for Review of the EB's June 18, 2007 Letter Ruling which remains pending before the Commission without action.

102.    As of the filing of this Complaint, the Applications for Review of the EB's June 18, 2007 Letter Ruling have been pending before the Commission for over 10 months without action.

103.    The documents and information that was sought a year ago by NAB and the documents and information sought by USE a little over three months ago concern Sirius' and XM's compliance with the explicit condition imposed on the satellite radio licenses awarded to them in 1997, viz., the requirement that their satellite radio "systems include a receiver that will permit end users to access all licensed SDARS systems that are operational or under construction."

104.    The documents and information that was sought a year ago by NAB and the documents and information sought by USE a little over three months ago concern Sirius' and XM's compliance with the technical requirements governing emission limitations explicitly set forth in the Commission's equipment authorizations issued for XM's and Sirius' satellite radio receivers.

105.    The documents and information that was sought a year ago by NAB and the documents and information sought by USE a little over three months ago concern Sirius' and XM's compliance with the geographical parameters explicitly set forth in their licenses granted for the placement of terrestrial repeater stations.

106.    The documents and information sought by USE over three months ago seek the identity of the individual executive and senior-level employees involved in the activities described above.

107.    The activities and the participation of the individual executive and senior-level employees relate directly to XM's and Sirius' whether the operation of their respective satellite

radio services can be conducted in accordance with the terms and conditions of those licenses.

108.    An applicant's compliance with Commission rules and law directly implicates the public interest in whether it will implement a Commission authorization in compliance with its terms.

109.    Disclosure of the documents and information sought by USE is therefore required so that they may be made part of the record in the Merger Docket.

110.    Disclosure of the requested documents and information is extremely time sensitive because action in the Merger Docket is reported to be imminent.

111.    Because of its concerns over the tensions between the timing of disclosure of the documents and information and the timing of action in the Merger Docket, in a Letter from Charles H. Helein, Counsel for USE to Laurence Schecker, Office of General Counsel, FCC, May 5, 2008, attached as **Exhibit F**, it was pointed out that time for action on the Applications for Review had expired and asked whether and when action might be taken by the Commission.

112.    In an E-mail of May 9, 2008 Charles H. Helein Counsel for USE to Laurence Schecker, Office of General Counsel, attached as **Exhibit G**, a second inquiry was made about possible action on the Applications For Review.

113.    These inquiries have not been responded to at this time.

114.    The Commission, interested parties and the public in general need disclosure of the information requested in USE's FOIA Requests so it may be filed in the Merger Docket and considered in regard to the Merger Applicants' qualifications as Commission licensees and their willingness and ability to comply with Commission rules and policies.

115.    The FOIA mandate that the Commission resolve appeals of its decisions within 20 working days, 5 U.S.C. § 552(a)(6)(A)(ii), has not been met.

116.    The Commission has not notified USE that it would need more than 20 working days to resolve its Application for Review.

117.    USE's Application for Review was constructively denied on April 28, 2008.

118.    Sirius' Application For Review was constructively denied on May 2, 2008.

119.    XM's and the 4 XM Employees' Application For Review was constructively denied on May 2, 2008.

120.    Sirius John Does' Application For Review was constructively denied on May 2, 2008.

121.    The statutory 20 working day time frame for the Commission to resolve the Applications for Review has expired.

122.    Pursuant to 5 U.S.C. § 552 (a)(6)(C)(i), any person requesting records from any agency shall be deemed to have exhausted his administrative remedies if the agency fails to comply with the 20-day time limit for resolving appeals.

123.    The Commission failed to comply with the 20 working day deadline and USE is deemed to have exhausted its administrative remedies.

124.    Having exhausted all administrative remedies, USE is entitled to obtain judicial action on its FOIA Requests.

125.    No further avenues of appeal are available within the Commission.

126.    USE states that foregoing facts are true and correct to the best of its knowledge, information and belief.

## CAUSE OF ACTION
### Violation of the Freedom of Information Act for
### Wrongful Withholding of Agency Records

127.    USE repeats and re-alleges paragraphs 1-122.

128.    The Commission has wrongfully withheld agency records requested by USE by failing to comply with the statutory time limit for the processing of FOIA Requests and the Application for Review.

129.    USE has exhausted the applicable administrative remedies with respect to the Commission's wrongful withholding of the requested records.

130.    USE is entitled to injunctive relief with respect to the release and disclosure of the requested records.

## Demand for Relief

Wherefore, Plaintiff USE respectfully requests that this Court take expedited action and:

(1) order the immediate disclosure of the following documents:

Category 1, Subject to (2) and (3) following, the Petition for Declaratory Ruling and each internal document by which this Petition was referred to the EB to be processed as a formal complaint instead of a Petition for Declaratory Ruling, each document created to process this Petition as a formal complaint, and each document or citation to Commission rule, order or policy by which a Petition for Declaratory Ruling that authorizes such conversion and the identity of the office and officer(s) within the Commission that authorized the conversion;

Category 2, the Commission's copy of the January 28, 2005 letter from Mr. Tcyz to Sirius and XM, Sirius and XM's responses of March 14, 2005 and all other related documents;

Categories 5-8, all documents the EB has cleared for disclosure and all documents the EB has withheld from disclosure.

(2) order the Commission to disclose whether the determination that there are no responsive documents is based on a determination that such documents as do exist in these categories are either exempt or privileged;

(3) order the Commission to list the documents in Categories 1-4 that the Commission has labeled exempt and/or privileged in reaching its determination that there are "no responsive documents."

(4) declare that the Commission's refusal to disclose the documents requested by USE is unlawful;

(5) declare that the Commission's conduct in failing to comply with the statutory time frames for resolving appeals of FOIA requests is unlawful;

(6) award USE its costs and reasonable attorney's fees in this action as provided by 5 U.S.C. § 552(a)(4)(E);

(7) order the Commission to take such actions as are ordered herein on an expedited basis;

(8) order the Commission not to act on the Merger until the documents and information are disclosed and placed in the record of the Merger Docket and a reasonable time provided for public comment after the documents and information have been made part of the record; and

(9) grant such other relief as this Court may deem just and proper.

Respectfully submitted,

Dated: May 14, 2008

Charles H. Helein
DC Bar # 81281
Attorney for Plaintiff

Helein & Marashlian, LLC
1483 Chain Bridge Road, Suite 301
McLean, VA 22101
703-714-1300
703-714-1330 (fax)
chh@commlawgroup.com

# EXHIBIT

# A



# The *Comm*Law Group

HELEIN & MARASHLIAN, LLC
1483 Chain Bridge Road
Suite 301
McLean, Virginia 22101

Telephone: (703) 714-1300
Facsimile: (703) 714-1330
E-mail: mail@CommLawGroup.com
Website: www.CommLawGroup.com

Writer's Direct Dial Number
703-714-1301

Writer's E-mail Address
chh@commlawgroup.com

## FREEDOM OF INFORMATION ACT REQUEST

January 25, 2008

E-mail: FOIA@fcc.gov
And
Surface mail:
FOIA Public Liaison
Federal Communications Commission
445 12th Street, S.W., Room 1-A836
Washington, D.C. 20554

This FOIA request is made pursuant to 47 C.F.R. § 0.461 for the documents referenced and/or described below. Certain Offices, Bureaus/Divisions of the Commission have been specified based on the belief that these are the primary sources of the documents requested and to provide as much direction as possible so that the furnishing of the documents may be accomplished as quickly as possible. The need for these documents is extremely time sensitive because of their importance to on-going consideration of the Commission on issues in MB Docket No. 07-57.

Please take notice that this request is not limited solely to the documents that exist in the Offices, Bureaus/Divisions specified, but includes all offices, bureaus/divisions of the Commission that have or may have documents responsive to this request, whether such documents in such other Offices, Bureau/Divisions are duplicative of those in the possession of the specified Offices/Bureaus/Divisions or original to such other Offices/Bureau/Divisions.

**Office of the Chairman, Office of Commissioners, Enforcement Bureau**

1.  For the period January 1, 2005 to date, each non-privileged, non-exempt document relating to the "Petition for Declaratory Ruling to Clarify the Lack of Enforcement and Implementation of the Interoperable Mandate, FCC Rule 47 CFR sec. 25.144(a)(3)(ii)" filed July 5, 2007 in MB Docket No. 07-57 ("Petition").

**International Bureau, Satellite Division –**

2.  For the period 2005 to date, each non-privileged, non-exempt document relating to each document relating to the certifications required of the Satellite Digital Audio Radio Service (SDARS) operators "that their systems include a receiver that will permit end users to access all licensed SDARS systems that are operational or under construction." (See, Letter of Thomas S. Tcyz, Chief, Satellite Division to Patrick Donnelly, Executive Vice President and General Counsel, Sirius Satellite Radio, January 28, 2005, a web posted copy of which is attached for reference.)

**International Bureau –**

For the period January 1, 2003 to date, each non-privileged, non-exempt document relating to -

3.  Interoperable Technologies, LLC.

**Office of Engineering and Technology –**

For the period January 1, 2003 to date, each non-privileged, non-exempt document relating to -

4.  Interoperable Technologies, LLC.

**Enforcement Bureau, Spectrum Enforcement Division -**

For the period January 1, 2005 to date, each non-privileged, non-exempt document relating to -

5.  Sirius' and XM's compliance with the equipment authorization rules governing emission limitations for satellite radio receivers, including without limitation, those matters raised and considered in connection with File No. EB-06-SE-250.

**Office of Engineering and Technology –**

For the period January 1, 2005 to date, each non-privileged, non-exempt document relating to -

2

6.  Sirius' and XM's compliance with the equipment authorization rules governing emission limitations for satellite radio receivers.

**Enforcement Bureau, Spectrum Enforcement Division –**

For the period January 1, 2006 to date, each non-privileged, non-exempt document relating to –

7.  XM's and Sirius' compliance with their respective authorizations for terrestrial repeaters.

**International Bureau, Satellite Division -**

For the period January 1, 2006 to date, each non-privileged, non-exempt document relating to –

8.  XM's and Sirius' compliance with their respective authorizations for terrestrial repeaters.

**Definitions**

For purposes of this request, "document" as used herein means documents supplied by applicants, respondents, or other non-Commission employees to the Commission, its Bureaus and/or their Divisions and the staffs of same, including without limitation, electronic records of any nature, anything reduced to tangible physical form, including, but not limited to, all emails, email attachments, text messages, records, papers and books, transcriptions, pictures, drawings or diagrams of every nature, whether transcribed by hand or by some mechanical, electronic, photographic or other means, as well as sound reproductions of oral statements or conversations by whatever means made, whether in the actual or constructive possession or under control or not, relating, evidencing, constituting or pertaining in any way to the subject matters in connection with which it is used and includes originals, all file copies, all other copies, no matter how prepared, and all drafts prepared in connections with such writing, whether used or not, including by way of illustration and not by way of limitation, the following: emails, email attachments, text messages, books, records, contracts, agreements, memoranda, correspondence, bulletins, circulars, forms, pamphlets, notices, statements, journals, postcards, letters, telegrams, reports, photostats, microfilm, and maps. If a writing and/or document differ in any way from another document including, by way of illustration and not by way of limitation, any postscripts, notation, change or addendum, it shall be considered a separate document.

For purposes of this request, "relating to" means connected with, evidencing, constituting, regarding, discussing, referring to, with respect to, concerning, purporting, consisting of, embodying, establishing, comprising, commenting on, mentioning, responding to, showing, describing, analyzing, reflecting, indicating, presenting, or in any way pertaining to the specified matter.

The maximum search fee at this time is $1,000.00.

3

Expedited response is requested as the documents and information are relevant to the record being made in MB Docket No. 07-57.

Please identify the privilege and/or exemption relied on, if any, to withhold any document and identify by name or description and the office, Bureau/Division and staff person in whose possession such document resides.

Should any questions arise, kindly contact the undersigned.

Respectfully submitted,

Charles H. Helein
Counsel of Record
U.S. Electronics, Inc.
MB Docket No. 07-57

4

[PAGE 1]

Federal Communications Commission
Washington, DC

January 28, 2005

Mr. Patrick L. Donnelly
Executive Vice President and General Counsel
SIRIUS Satellite Radio
1221 Avenue off the Americas
New York, NY 10020

File Nos: IB Docket No. 95-91; SAT-MOD-20040212-00017;
. . . .

Dear Mr. Donnelly:

As an alternative to the Commission mandating standards for receivers used in providing
Satellite Digital Audio Radio Service (SDARS), SDARS operators are to certify to the
Commission that their systems include a receiver that will permit end users to access all
licensed SDARS systems that are operational or under construction.1 The Commission
authorized Sirius Satellite Radio Inc. (Sirius) in 1997 to provide SDARS in the United
States subject to such a certification.2 The authorization of the other SDARS licensee,
XM Radio Inc. (XM Radio), is subject to an identical certification requirement.3

In our recent authorization of XM Radio for the launch and operation of
replacement satellites,4 we noted that Sirius and XM Radio have on file a letter dated
October 6, 2000, in which the two SDARS licensees announced an agreement to develop
a unified standard for satellite radios, and stated their anticipation that interoperable chips
capable of receiving both services would be produced in volume in mid-2004.5 The two
licensees also stated their agreement to introduce interim interoperable radios, prior to the
introduction of fully-interoperable chipsets, that would include a common wiring harness,

[PAGE 2]

head unit, antenna, and an interchangeable trunk-mounted box containing processing
elements for both company's signals.6

In order to reflect more accurately the status of SDARS licensees' efforts in developing
interoperable receivers, we are requesting that Sirius and XM Radio file an update to the
October 6, 2000 Letter in pending proceedings where interoperable receivers are an issue.
Although the Commission is cognizant of the differences between the two SDARS
licensees' transmission technologies that initially affected the ability to develop receiver
interoperability,7 it is not clear, given the passage of time, that these differences still
exist.

For this reason, we request that Sirius submit to the Satellite Division, within 45 days from the date of this letter, the status of Sirius' efforts to develop an interoperable receiver and its time frame for making such an interoperable receiver available to the public.8

Please contact JoAnn Lucanik, (202) 418-0873, or Stephen Duall, (202) 418-1103, of my staff if you have any questions regarding this letter.

Sincerely,

Thomas S. Tcyz
Chief
Satellite Division

cc: Carl R. Frank
Counsel
Wiley Rein & Fielding LP
1776 K Street, NW
Washington, DC 20006
(202) 719-7049 (Fax)

[footnotes for page 1]

1 Establishment of Rules and Policies for the Digital Audio Radio Satellite Service in the 2310-2360 MHz Frequency Band, . . . .

2 Satellite CD Radio. Inc., Order and Authorization, 13 FCC Rcd 7971, 7995 (para. 57) (Int'l Bur. 1997) ( 1997 Sirius Authorization Order) ("IS FURTHER ORDERED that this authorization is subject to certification by [Sirius] that its final receiver design is interoperable with respect to the [XM Radio Inc.]'s Satellite Digital Audio Radio Service system final receiver design.").

3 American Mobile Radio Corporation, Order and Authorization, 13 FCC Rcd 8829, 8851 (para 54) (Int'l Bur. 1997).

4 XM Radio Inc., Order and Authorization, DA 05-180 (Int'l Bur. Sat. Div, rel. Jan. 26, 2005}

5 Letter from John R. Wormington. XM Radio Inc., and Robert D. Briskman. Sirius Satellite Radio Inc., to Magalie Roman Salas, FCC, dated Oct. 6, 2000 (October 6 Letter).

[footnotes for page 2]

6 October 6 Letter at 4.

7 1997 Sirius Authorization Order, 13 FCC Rcd at 7990 (para. 42).

8 We have also separately instructed XM Radio to file such a status report within the same time period.

[end of letter]

# EXHIBIT

# B



Federal Communications Commission
Washington, D.C. 20554

February 4, 2008

Charles H. Helein, Esq.
Helein & Marashlian, LLC
Counsel of Record
U.S. Electronics, Inc.
1483 Chain Bridge Road
Suite 301
McLean, Virginia 22101

In Re: FOIA Control No. 2008-190

Dear Mr. Helein:

This is in reference to your Freedom of Information Act (FOIA) request dated January 25, 2008, for copies of various documents pertaining to a Commission proceeding (MB Docket No. 07-57) involving Sirius Satellite Radio Inc., and XM Satellite Radio Inc. (*See* enclosed copy.)

You have asked for expedited processing of your FOIA request. Pursuant to Section 0.461(h)(2) of the Commission's rules, 47 C.F.R. § 0.461(h)(2), expedited processing shall be granted to a requester "demonstrating a compelling need that is certified by the requester to be true and correct to the best of his or her knowledge and belief." A compelling need means either (1) that failure to obtain the requested records on an expedited basis could reasonably be expected to pose an imminent threat to the life or physical safety of an individual; or (2) when a requester is primarily engaged in disseminating information, there is an urgency to inform the public concerning actual or alleged Federal Government activity.

After reviewing your request, we have determined that you have not fulfilled either requirement for expedited processing of your FOIA request. Accordingly, your request for expedited treatment is denied. You may file an application for review of this decision with the Commission's Office of General Counsel within five working days of the date of this letter. (*See* 47 C.F.R. § 0.461(h)(4)(ii).)

Charles H. Helein, Esq.                                                      2

    This action is taken under delegated authority pursuant to Sections 0.111 and 0.311 of the Commission's rules, 47 C.F.R. §§ 0.111 and 0.311.

              Sincerely,

              Susan McNeil
              Deputy Chief, Enforcement Bureau
              Federal Communications Commission

cc:  Scott Blake Harris, Esq.
      Robert L. Pettit, Esq.



# The *Comm*Law Group

HELEIN & MARASHLIAN, LLC
1483 Chain Bridge Road
Suite 301
McLean, Virginia 22101

Telephone: (703) 714-1300
Facsimile: (703) 714-1330
E-mail: mail@CommLawGroup.com
Website: www.CommLawGroup.com

Writer's Direct Dial Number
703-714-1301

Writer's E-mail Address
chh@commlawgroup.com

## FREEDOM OF INFORMATION ACT REQUEST

January 25, 2008

E-mail:  FOIA@fcc.gov
And
Surface mail:
FOIA Public Liaison
Federal Communications Commission
445 12th Street, S.W., Room 1-A836
Washington, D.C. 20554

CONTROL 2008-190

2008 JAN 25  P 1: 44

FOIA CONTROL STAFF

This FOIA request is made pursuant to 47 C.F.R. § 0.461 for the documents referenced and/or described below.  Certain Offices, Bureaus/Divisions of the Commission have been specified based on the belief that these are the primary sources of the documents requested and to provide as much direction as possible so that the furnishing of the documents may be accomplished as quickly as possible.  The need for these documents is extremely time sensitive because of their importance to on-going consideration of the Commission on issues in MB Docket No. 07-57.

Please take notice that this request is not limited solely to the documents that exist in the Offices, Bureaus/Divisions specified, but includes all offices, bureaus/divisions of the Commission that have or may have documents responsive to this request, whether such documents in such other Offices, Bureau/Divisions are duplicative of those in the possession of the specified Offices/Bureaus/Divisions or original to such other Offices/Bureau/Divisions.

**Office of the Chairman, Office of Commissioners, Enforcement Bureau**

1. For the period January 1, 2005 to date, each non-privileged, non-exempt document relating to the "Petition for Declaratory Ruling to Clarify the Lack of Enforcement and Implementation of the Interoperable Mandate, FCC Rule 47 CFR sec. 25.144(a)(3)(ii)" filed July 5, 2007 in MB Docket No. 07-57 ("Petition").

**International Bureau, Satellite Division –**

2. For the period 2005 to date, each non-privileged, non-exempt document relating to each document relating to the certifications required of the Satellite Digital Audio Radio Service (SDARS) operators "that their systems include a receiver that will permit end users to access all licensed SDARS systems that are operational or under construction." (See, Letter of Thomas S. Tcyz, Chief, Satellite Division to Patrick Donnelly, Executive Vice President and General Counsel, Sirius Satellite Radio, January 28, 2005, a web posted copy of which is attached for reference.)

**International Bureau –**

For the period January 1, 2003 to date, each non-privileged, non-exempt document relating to -

3. Interoperable Technologies, LLC.

**Office of Engineering and Technology –**

For the period January 1, 2003 to date, each non-privileged, non-exempt document relating to -

4. Interoperable Technologies, LLC.

**Enforcement Bureau, Spectrum Enforcement Division -**

For the period January 1, 2005 to date, each non-privileged, non-exempt document relating to -

5. Sirius' and XM's compliance with the equipment authorization rules governing emission limitations for satellite radio receivers, including without limitation, those matters raised and considered in connection with File No. EB-06-SE-250.

**Office of Engineering and Technology –**

For the period January 1, 2005 to date, each non-privileged, non-exempt document relating to -

2

6. Sirius' and XM's compliance with the equipment authorization rules governing emission limitations for satellite radio receivers.

**Enforcement Bureau, Spectrum Enforcement Division –**

For the period January 1, 2006 to date, each non-privileged, non-exempt document relating to –

7. XM's and Sirius' compliance with their respective authorizations for terrestrial repeaters.

**International Bureau, Satellite Division -**

For the period January 1, 2006 to date, each non-privileged, non-exempt document relating to –

8. XM's and Sirius' compliance with their respective authorizations for terrestrial repeaters.

**Definitions**

For purposes of this request, "document" as used herein means documents supplied by applicants, respondents, or other non-Commission employees to the Commission, its Bureaus and/or their Divisions and the staffs of same, including without limitation, electronic records of any nature, anything reduced to tangible physical form, including, but not limited to, all emails, email attachments, text messages, records, papers and books, transcriptions, pictures, drawings or diagrams of every nature, whether transcribed by hand or by some mechanical, electronic, photographic or other means, as well as sound reproductions of oral statements or conversations by whatever means made, whether in the actual or constructive possession or under control or not, relating, evidencing, constituting or pertaining in any way to the subject matters in connection with which it is used and includes originals, all file copies, all other copies, no matter how prepared, and all drafts prepared in connections with such writing, whether used or not, including by way of illustration and not by way of limitation, the following: emails, email attachments, text messages, books, records, contracts, agreements, memoranda, correspondence, bulletins, circulars, forms, pamphlets, notices, statements, journals, postcards, letters, telegrams, reports, photostats, microfilm, and maps. If a writing and/or document differ in any way from another document including, by way of illustration and not by way of limitation, any postscripts, notation, change or addendum, it shall be considered a separate document.

For purposes of this request, "relating to" means connected with, evidencing, constituting, regarding, discussing, referring to, with respect to, concerning, purporting, consisting of, embodying, establishing, comprising, commenting on, mentioning, responding to, showing, describing, analyzing, reflecting, indicating, presenting, or in any way pertaining to the specified matter.

The maximum search fee at this time is $1,000.00.

3

Expedited response is requested as the documents and information are relevant to the record being made in MB Docket No. 07-57.

Please identify the privilege and/or exemption relied on, if any, to withhold any document and identify by name or description and the office, Bureau/Division and staff person in whose possession such document resides.

Should any questions arise, kindly contact the undersigned.

Respectfully submitted,

Charles H. Helein
Counsel of Record
U.S. Electronics, Inc.
MB Docket No. 07-57

4

[PAGE 1]

Federal Communications Commission
Washington, DC

January 28, 2005

Mr. Patrick L. Donnelly
Executive Vice President and General Counsel
SIRIUS Satellite Radio
1221 Avenue off the Americas
New York, NY 10020

File Nos: IB Docket No. 95-91; SAT-MOD-20040212-00017;
. . . .

Dear Mr. Donnelly:

As an alternative to the Commission mandating standards for receivers used in providing
Satellite Digital Audio Radio Service (SDARS), SDARS operators are to certify to the
Commission that their systems include a receiver that will permit end users to access all
licensed SDARS systems that are operational or under construction.1 The Commission
authorized Sirius Satellite Radio Inc. (Sirius) in 1997 to provide SDARS in the United
States subject to such a certification.2 The authorization of the other SDARS licensee,
XM Radio Inc. (XM Radio), is subject to an identical certification requirement.3

In our recent authorization of XM Radio for the launch and operation of
replacement satellites,4 we noted that Sirius and XM Radio have on file a letter dated
October 6, 2000, in which the two SDARS licensees announced an agreement to develop
a unified standard for satellite radios, and stated their anticipation that interoperable chips
capable of receiving both services would be produced in volume in mid-2004.5 The two
licensees also stated their agreement to introduce interim interoperable radios, prior to the
introduction of fully-interoperable chipsets, that would include a common wiring harness,

[PAGE 2]

head unit, antenna, and an interchangeable trunk-mounted box containing processing
elements for both company's signals.6

In order to reflect more accurately the status of SDARS licensees' efforts in developing
interoperable receivers, we are requesting that Sirius and XM Radio file an update to the
October 6, 2000 Letter in pending proceedings where interoperable receivers are an issue.
Although the Commission is cognizant of the differences between the two SDARS
licensees' transmission technologies that initially affected the ability to develop receiver
interoperability,7 it is not clear, given the passage of time, that these differences still
exist.

For this reason, we request that Sirius submit to the Satellite Division, within 45 days from the date of this letter, the status of Sirius' efforts to develop an interoperable receiver and its time frame for making such an interoperable receiver available to the public.8

Please contact JoAnn Lucanik, (202) 418-0873, or Stephen Duall, (202) 418-1103, of my staff if you have any questions regarding this letter.

Sincerely,

Thomas S. Tcyz
Chief
Satellite Division

cc: Carl R. Frank
Counsel
Wiley Rein & Fielding LP
1776 K Street, NW
Washington, DC 20006
(202) 719-7049 (Fax)

[footnotes for page 1]

1 Establishment of Rules and Policies for the Digital Audio Radio Satellite Service in the 2310-2360 MHz Frequency Band, . . . .

2 Satellite CD Radio. Inc., Order and Authorization, 13 FCC Rcd 7971, 7995 (para. 57) (Int'l Bur. 1997) ( 1997 Sirius Authorization Order) ("IS FURTHER ORDERED that this authorization is subject to certification by [Sirius] that its final receiver design is interoperable with respect to the [XM Radio Inc.]'s Satellite Digital Audio Radio Service system final receiver design.").

3 American Mobile Radio Corporation, Order and Authorization, 13 FCC Rcd 8829, 8851 (para 54) (Int'l Bur. 1997).

4 XM Radio Inc., Order and Authorization, DA 05-180 (Int'l Bur. Sat. Div, rel. Jan. 26, 2005}

5 Letter from John R. Wormington. XM Radio Inc., and Robert D. Briskman. Sirius Satellite Radio Inc., to Magalie Roman Salas, FCC, dated Oct. 6, 2000 (October 6 Letter).

[footnotes for page 2]

6 October 6 Letter at 4.

7 1997 Sirius Authorization Order, 13 FCC Rcd at 7990 (para. 42).

8 We have also separately instructed XM Radio to file such a status report within the same time period.

[end of letter]

# EXHIBIT

# C



# The *Comm*Law Group

HELEIN & MARASHLIAN, LLC
1483 Chain Bridge Road
Suite 301
McLean, Virginia 22101

Telephone: (703) 714-1300
Facsimile: (703) 714-1330
E-mail: mail@CommLawGroup.com
Website: www.CommLawGroup.com

Writer's Direct Dial Number
703-714-1301

Writer's E-mail Address
chh@commlawgroup.com

March 5, 2008

**VIA U.S. MAIL AND FACSIMILE**
Fax:  202-418-7290

Ms. Karen Mercer
FCC Enforcement Bureau
Spectrum Enforcement Division
Room 3-A325
445 12th Street, S.W.
Washington, D.C. 20554

           **Re:  FOIA Control No. 2008-190**

Dear Ms. Mercer:

        U.S. Electronics, Inc. ("USE") hereby submits its comments and opposition to the responses submitted on February 29, 2008 by Sirius Satellite Radio, Inc. ("Sirius"), XM Radio Inc. ("XM") and "Three Unnamed Employees of XM Radio Inc." ("XM Employees") (Collectively, the "Respondents") to the letters of Kathryn S. Berthot dated February 14, 2008 seeking the positions of the Respondents on the Freedom of Information Request submitted by USE on January 25, 2008 ("USE's FOIA Request").

        Respondents raise a number of objections to the granting of USE's FOIA Request.  As shown herein, the Respondents' objections are without merit.

        Although Respondents provide citations to decisions justifying denials of other FOIA requests, those decisions are inapposite to USE's FOIA Request.  The decisions are a collection of legal truisms without any relevance to the facts underlying and justifying USE's FOIA Request.  In general, those decisions involve risks that disclosure would result in competitive harms, would discourage voluntary disclosures to the Commission, and would violate the expectation to and rights of privacy of individuals.  None of these risks is applicable USE's FOIA Request.

The information sought by USE vitally affects the qualifications of the Applicants to be licensees of public spectrum; and in particular, is directly relevant to the justification or lack thereof for the extraordinary relief the Applicants seek for the consolidation of their licenses – a step that has been expressly prohibited by the Commission for over the past decade. The information being sought also inherently affects the public interest in the enforcement of the Commission's statutory responsibilities as well as its rules and policies.

The Respondents' claim to confidentiality based on competitive concerns is disingenuous because the facts regarding interoperability, violations of emission standards and violations of authorized locations for stting terrestrial repeaters are in no way competitively meaningful to what they characterize as their "other audio entertainment competitors." It is equally disingenuous for the Respondents to assert confidentiality for the manufacturing entities (Wistron and KRI) in regard to which they have no standing to interpose any objections. Nor are any of the individuals (the XM Employees) entitled to an expectation of privacy for revealing what they know and to what extent they participated in violations of Commission rules. For the same reasons, it is disingenuous to argue that disclosure of information and activities that relate to and may be proof of violations of Commission rules would retard the voluntary submission of information to the Commission. The Commission has ample compulsory means to obtain such information that would not be submitted voluntarily.

As for the defense that Commission investigations are allegedly involved, the Commission began its investigation into violations of the emission standards and the mis-siting of repeaters almost two years ago. An on-going enforcement action, if any, during which the Applicants requested their extraordinary relief from the bar against consolidation of their licenses, should not perpetually bar disclosure of information important to the public interest. In addition, the Commission apparently has never investigated the Applicants' non-compliance with the interoperability mandate.

Ignoring all of these critical facts, the Applicants cite the action taken in regard to a similar FOIA request made months ago by the NAB. The Enforcement Bureau granted NAB's request in part only to have disclosure blocked by the Applicants' Applications for Review of the Bureau's decision. Inexplicably, no action on those Applications for Review has been taken despite their pendency for over 9 months. Nor has any explanation been provided as to how such a delay complies with the timetable imposed by the FOIA on the agency's duty to respond to FOIA requests. In this connection, the Commission should take official notice that Congress has passed and the President has recently signed into law "The OPEN Government Act of 2007" (Pub. L. No. 110-75) that, among other things, tightens the time limits for agencies to act on FOIA requests.

In conclusion, the generalized concerns offered by Respondents cannot and do not outweigh the reality that by asking the Commission for permission to merge, they have squarely put these compliance issues in contention, and have made the materials they submitted indispensable to the public comment process. The Commission should grant USE's FOIA

2

Request and allow the requested information into the record for consideration of its impact on the public interests affected by the proposed merger.

Respectfully submitted,
U.S. Electronics, Inc.

By *Charles H. Helein* (SW)

Charles H. Helein
Counsel of Record

Cc:
Office of the Chairman
Offices of the Commissioners

Robert L. Pettit
Joshua S. Turner
Wiley Rein LLP
Counsel for Sirius Satellite Radio Inc.

Scott Blake Harris
Harris, Wiltshire & Grannis LLP
Counsel for XM Radio Inc.

Dimple Gupa
Covington & Burling LLP
Counsel for Three Unnamed Employees of XM Radio, Inc.

Office of General Counsel
Matthew Barry
General Counsel

3

# EXHIBIT

# D



# Federal Communications Commission
## Washington, D.C. 20554

March 21, 2008

<u>VIA CERTIFIED MAIL</u>
<u>RETURN RECEIPT REQUESTED</u>
<u>AND FACSIMILE AT (703) 714-1330</u>

Charles H. Helein, Esq.
Helein & Marashlian, LLC
Counsel of Record
U.S. Electronics, Inc.
1483 Chain Bridge Road
Suite 301
McLean, Virginia 22101

Re: FOIA Control No. 2008-190 – Sirius Records

Dear Mr. Helein:

This is in response to your January 25, 2008, Freedom of Information Act ("FOIA") request filed on behalf of the U.S. Electronics, Inc. ("USE"). You seek copies of "non-privileged, non-exempt" documents supplied to the Commission by "applicants, respondents, or other non-Commission employees" and relating to any of the following: the petition filed July 5, 2007, in MB Docket No. 07-57; the certifications required of Satellite Digital Audio Radio Service ("SDARS") operators "that their systems include a receiver that will permit end users to access al licensed SDARS systems that are operational or under construction"; Interoperable Technologies, LLC; the compliance of Sirius Satellite Radio, Inc. ("Sirius") and XM Radio, Inc. ("XM"), with the equipment authorization rules governing emission limitations for satellite receivers, "including without limitation those matters and considered in connection with File No. EB-06-SE-250"; and Sirius' and XM's compliance with their respective authorizations for terrestrial repeaters.

For administrative convenience, we are addressing your FOIA request separately with respect to Sirius and XM. This letter deals with the portion of your FOIA request relating to Sirius. Your FOIA request seeks documents which are the subject of pending requests for confidentiality from Sirius pursuant to FOIA Exemptions 4 and 7(A). We accordingly served your FOIA request on Sirius and gave it an opportunity to provide additional support for its requests for confidentiality.[1] Sirius submitted a supplemental confidentiality request on February 29, 2008.[2] On March 5, 2008, USE submitted a

---

[1] See 47 C.F.R. § 0.461(d)(3). See also Letter from Kathryn S. Berthot, Chief, Spectrum Enforcement Division, Enforcement Bureau, to Robert L. Pettit, Esq., Wiley Rein LLP (February 14, 2008).

[2] See Letter from Robert L. Pettit, Esq., Wiley Rein LLP, to Kathryn S. Berthot, Chief, Spectrum Enforcement Division, Enforcement Bureau (February 29, 2008) ("February 29, 2008, letter").

Charles H. Helein, Esq.

2

response to the February 29, 2008, supplemental confidentiality request filed by Sirius.[3] On March 12, 2008, Sirius submitted a response to USE's February 29, 2008, response.[4]

Most of the requested documents that we have located were also the subject of a prior FOIA request, FOIA Control No. 2007-235. We ruled upon that FOIA request and the associated confidentiality requests on June 18, 2007.[5] Sirius argues that we should withhold some of the materials we decided to release in the June 18, 2007 ruling pending resolution of its application for review of that ruling.[6] We disagree. We will not withhold any materials found to be non-exempt in our June 18, 2007, ruling. Of course, we will not furnish any materials whose release is being contested until after a final ruling. Similarly, to the extent that USE is seeking any materials found to be exempt from disclosure in our June 18, 2007, ruling, we will not release such materials in the absence of a final ruling requiring their release. Accordingly, the determinations and analysis below closely follow the determinations and analysis in our June 18, 2007 ruling.

**Category 1.** Category 1 of your FOIA request seeks documents provided by sources outside the Commission relating to the petition filed July 5, 2007, in MB Docket No. 07-57. There are no documents responsive to this part of your request.[7]

**Category 2.** Category 2 of your FOIA request seeks documents provided by sources outside the Commission relating to the certifications required of SDARS operators "that their systems include a receiver that will permit end users to access all licensed SDARS systems that are operational or under construction." There are no documents responsive to this part of your request.[8]

**Categories 3 and 4.** Categories 3 and 4 of your FOIA request seek documents provided by sources outside the Commission relating to Interoperable Technologies, LLC. There are no documents responsive to this part of your request.[9]

---

[3] *See* Letter from , Charles H. Helein, Esq., Helein & Marshalian, LLC, to Kathryn S. Berthot, Chief, Spectrum Enforcement Division, Enforcement Bureau (March 5, 2008).

[4] *See* Letter from Robert L. Pettit, Esq., Wiley Rein LLP, to Kathryn S. Berthot, Chief, Spectrum Enforcement Division, Enforcement Bureau (March 12, 2008)

[5] Letter from Kathryn S. Berthot, Chief, Spectrum Enforcement Division, Enforcement Bureau, to Robert L. Pettit, Esq., Wiley Rein LLP (June 18, 2001) ("June 18, 2007 ruling"), *application for review pending.*

[6] February 29, 2008, letter at 6.

[7] Sirius has submitted certain documents that may be responsive to USE's FOIA request in MB Docket No. 07-57 pursuant to protective orders. We note that USE has access to these documents pursuant to the protective orders and therefore are construing USE's FOIA request not to request these documents.

[8] *See* n. 7.

[9] *See* n. 7.

Charles H. Helein, Esq.

Categories 5, 6, 7, and 8.  Categories 5, 6, 7 and 8 of your FOIA request seek documents provided by sources outside the Commission relating to Sirius's compliance with the equipment authorization rules governing emission limitations for satellite receivers, "including without limitation those matters and considered in connection with File No. EB-06-SE-250"; and Sirius' compliance with its authorizations for terrestrial repeaters.  We have located the following documents that are responsive to these parts of your request:  responses to Letters of Inquiry submitted by Sirius totaling 3,784 pages ("LOI Responses"); approximately 83 pages of documents pertaining to settlement negotiations between the Enforcement Bureau and Sirius; approximately 210 pages of documents pertaining to Sirius' proposed technical solutions and comprehensive compliance plan; approximately 157 pages of test reports submitted by Sirius in conjunction with equipment authorization applications for satellite radio receivers and the accompanying transmittal e-mails; and approximately 52 pages of interference complaints.  As explained below, we are releasing approximately 97 pages of LOI Responses, some with redactions, and are withholding approximately 3,687 pages of the LOI Responses.  We are withholding the settlement documents and the documents pertaining to Sirius' proposed technical solutions and comprehensive compliance plan. We are releasing the test reports and the accompanying transmittal e-mails.  We are also releasing the interference complaints, some with redactions.

Sirius asked us to withhold its LOI Responses in their entirety under FOIA Exemption 7(A).  FOIA Exemption 7(A), 5 U.S.C. § 552(b)(7)(A), applies to "records or information compiled for law enforcement purposes … to the extent that the production of such law enforcement records or information … could reasonably be expected to interfere with enforcement proceedings."  Sirius asserted that all of the materials it has produced qualify for protection under Exemption 7(A) because they were indisputably compiled for law enforcement purposes and their release would interfere with pending and future related enforcement proceedings.

We conclude, as we did in the June 18, 2007 ruling, that Sirius' LOI Responses should not be withheld from disclosure under Exemption 7(A).  All of the materials in question are in Sirius' possession and known to it.  In *Wireless Consumers Alliance*, the Commission concluded that the release of information already known to the target of an investigation would not be expected to result in interference to the investigation.[10] Furthermore, in this instance, we do not believe that release of these materials will result in interference to any other pending investigations or similar future investigations.  In this connection, we note that it has been publicly known for over a year that the Commission is investigating the compliance of various entities with the Commission's rules regarding FM modulators.[11]

---

[10] 20 FCC Rcd 3874, 3881-82 (2005).

[11] We note that Sirius and various other companies have disclosed pending investigations into their compliance with the Commission's rules regarding FM modulators in their filings with the Securities and Exchange Commission ("SEC").

4

Charles H. Helein, Esq.

Sirius also requested confidential treatment of its LOI Responses in their entirety under FOIA Exemption 4. FOIA Exemption 4, 5 U.S.C. § 552(b)(4), applies to "trade secrets and commercial or financial information obtained from a person and privileged or confidential." Under *National Parks and Conservation Ass'n v. Morton,*[12] commercial or financial materials are considered confidential if disclosure of the information is likely: (1) to cause substantial hardship to the competitive position of the submitter, or (2) to impair the government's ability to obtain necessary information in the future.[13]

Sirius argued that its LOI Responses contain trade secrets and privileged commercial or financial information and that the disclosure of this information would result in irreparable harm to its competitive position. In particular, Sirius argued that disclosure of such information would allow competitors to gain insight into Sirius' business processes and commercial strategies as well as its relationships with customers, harm Sirius' relationships with its suppliers and its ability to work with distributors, and assist competitors in developing, producing, marketing and selling future products and services that compete with those offered by Sirius. Sirius further argued that the release of such information would impair the Commission's ability to obtain necessary information in the future.

We find, as we did in the June 18, 2007, ruling, that Sirius has demonstrated that substantial competitive harm is likely to result from the release of some of the requested information and therefore will withhold that information from disclosure. Specifically, we will withhold from disclosure the following: contracts and agreements between Sirius and other entities regarding the design, manufacture and distribution of satellite DARS radios (approximately 992 pages), and internal documents relating to Sirius' product development and business strategies, including e-mail messages, test data and product descriptions (approximately 2,479 pages). We agree with Sirius that disclosure of these commercial materials would allow competitors to gain insight into Sirius' business processes, commercial strategies and product development and harm its relationships with its vendors. In addition, we will redact portions of Sirius' LOI Responses dated July 12 and August 14, 2006. The information redacted from the LOI Responses includes data concerning the number of units of satellite DARS radios manufactured, imported, sold, activated by consumers, at factories and at distributors and retailers; proposed technical solutions to FM modulator interference; and Sirius' proposed comprehensive compliance plan. The various data concerning the number of units of radios would be invaluable to Sirius' competitors in understanding the relationship between Sirius' manufacturing, sales and activation volumes. Further, the proposed technical solutions and comprehensive compliance plan would allow competitors to gain insight into its business processes and commercial strategies. *See, e.g., National Parks & Cons. Ass'n v. Kleppe,* 547 F.2d 673, 684 (D.C. Cir. 1976); *Timken Co. v. U.S. Customs Serv.,* 491 F. Supp. 557, 559-60 (D.D.C. 1980) (both holding that business strategies and marketing plans are exempt from disclosure under Exemption 4); *Fisher v. Renegotiation Bd.,* 355

---

[12] 498 F.2d 765, 770 (D.C. Cir. 1974) ("*National Parks*").

[13] See also *Critical Mass Energy Project v. NRC,* 975 F.2d 871 (D.C. Cir. 1992).

5

Charles H. Helein, Esq.

F. Supp. 1171, 1174 (D.D.C. 1973) (sales information, including pricing data, net sales, costs and expenses, exempt from disclosure under Exemption 4); *International Satellite, Inc.*, 57 RR 2d 460, 462-63 (1984) (withholding of business marketing plans under Exemption 4). Moreover, Sirius' proposed technical solutions and comprehensive compliance plan are the subject of ongoing settlement discussions and therefore may also be withheld under the settlement privilege of FOIA Exemption 5, 5 U.S.C. § 552(b)(5). *See The Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc. d/b/a Heatway Systems*, 332 F. 3d 976 (6th Cir. 2003) ("*Goodyear Tire*").

We find, however, as we did in the June 18, 2007 ruling, that Sirius has not demonstrated that substantial competitive harm is likely to result from the release of other materials. Accordingly, we will release these materials. Specifically, we are releasing the unredacted portions of Sirius' LOI Responses dated July 12 and August 14, 2006 (approximately 29 pages), which include information identified by Sirius as publicly available, the identities of Sirius' distributors and equipment manufacturers, and the actions taken by Sirius to correct its potential noncompliance with the technical requirements of Part 15. Sirius states in its April 20, 2007 letter that the identity of its distributors "is not, in all cases, publicly available information." We note, however, that all of the Sirius distributors identified in its LOI Responses are identified as Sirius distributors in news releases, annual reports, and other documents that are publicly available on Sirius' website. Similarly, all of the manufacturers identified in Sirius' LOI Responses are identified as Sirius manufacturers in news releases, annual reports and other documents that are publicly available on its website or in test reports submitted as part of equipment authorization applications that are publicly available in the Commission's Equipment Authorization Database. The corrective actions taken by Sirius have been reported in a publicly available filing it made with the SEC.[14] In addition, we are releasing the confidentiality requests submitted by Sirius with the LOI Responses (approximately 18 pages), a publicly available user manual (approximately 5 pages), and documents relating to a complaint made by National Public Radio to Sirius about FM modulator interference (37 pages). We are further releasing in their entirety supplemental LOI Responses (without the attached documents) from Sirius dated July 26, August 2, August 23, August 30, September 11, 2006 (approximately 10 pages). These letters are simply cover letters transmitting additional documents responsive to the LOIs and do not themselves include any commercial information.

Sirius also requested confidential treatment of information regarding when it became aware of potential non-compliance of its satellite DARS radios, what modifications were made to the radios, and the names and titles of Sirius employees who were involved in the decision to make such modifications or were aware of potential non-compliance. Sirius argued that this information is proprietary commercial information whose disclosure "would allow competitors to gain insight into Sirius's highly confidential business processes and commercial strategies as well as its corporate organization and decision-making structure." Sirius also argued that the information furnished in its response to those questions would be "of inestimable value to Sirius' competitors in understanding Sirius' internal organization …" and that its disclosure

---

[14] *See Sirius Satellite Radio, Inc.*, Form 8-K (filed July 12, 2006).

Charles H. Helein, Esq.

"could give other entities a competitive advantage over Sirius by allowing them to review Sirius's decision-making processes and benchmark Sirius' internal organization."

We find, as we did in the June 18, 2007 ruling, that these arguments are unpersuasive and therefore will not redact this information from Sirius' LOI Responses. We note that the Sirius employees in question are executive and senior-level employees whose names and titles are publicly known. Indeed, Sirius conceded that "individual job titles are a matter of public knowledge." Regarding the information as to when Sirius became aware of potential non-compliance, we note that Sirius stated in its April 20, 2007, letter that the fourth paragraph of its July 12, 2006, LOI Response "consists of information that has been disclosed in Sirius' filings to the SEC, and thus is publicly available information." Since the fourth paragraph specifies when Sirius became aware of potential non-compliance, we find that this information is not confidential. Further, we find that information as to what modifications Sirius made to its radios after they were authorized by the Commission is not commercial information entitled to confidential treatment. In this connection, Section 0.457(d)(1)(ii) of the Rules, 47 C.F.R. § 0.457(d)(1)(ii), states that applications for equipment authorizations and materials relating to such applications are not routinely available for public inspection prior to the effective date of the authorization, but will be made available for inspection following the effective date. The fact that Sirius apparently made modifications to its radios without seeking Commission authorization should not afford protection for information that would not otherwise be entitled to confidential treatment under Section 0.457(d)(1)(ii).

Moreover, we find that the release of this information would not impair the Commission's ability to obtain necessary information in the future. The impairment prong of Exemption 4 "traditionally has been found to be satisfied when an agency demonstrates that the information at issue was provided voluntarily and that submitting entities would not provide such information in the future if it were subject to public disclosure."[15] Sirius was required to provide this information in response to Commission LOIs, and as a Commission licensee, Sirius can be compelled to provide such information in response to Commission inquiries in the future.[16]

We are withholding in their entirety consent decree proposals and associated e-mails submitted by Sirius (approximately 78 pages) and tolling agreements and tolling agreement extensions (approximately 5 pages) executed by Sirius in conjunction with ongoing settlement discussions. These materials may be withheld under the settlement privilege of Exemption 5. *See Goodyear Tire*, 332 F. 3d 976.

---

[15] *See, FlightSafety Services Corporation. v. Department of Labor*, 326 F.3d 607, 612 (5th Cir. 2003).

[16] *See* 47 U.S.C. §§ 154(i), 154(j), 308(b) and 403; *see also People for the Ethical Treatment of Animals v. United States Department of Agriculture*, No. 03-195, 2005 WL 1241141, at *5-6 (D.D.C. May 24, 2005) (Not reported in F.Supp.2d) (finding that USDA's ability to obtain information in the future would not be impaired by disclosure of the withheld documents because federal regulations *require* borrowers and lenders to submit the information).

Charles H. Helein, Esq.

We have also located approximately 210 pages of responsive documents that include presentations made to Commission staff and an associated confidentiality request. We are releasing the confidentiality request (3 pages) but are withholding the presentations in their entirety (approximately 207 pages). The presentations address proposed modifications to Sirius radios with FM modulators and include technical design information and equipment compliance techniques. We find that this information is proprietary commercial information, the disclosure of which will result in substantial competitive harm to Sirius, and therefore will withhold it pursuant to Exemption 4. Additionally, these presentations are the subject of ongoing settlement discussions and therefore may also be withheld under the settlement privilege of Exemption 5. *See Goodyear Tire*, 332 F. 3d 976.

We are releasing approximately 156 pages of test reports submitted by Sirius in conjunction with equipment authorization applications for satellite radio receivers and the accompanying transmittal e-mails, which are publicly available in the Commission's Equipment Authorization Database.

Finally, we are releasing approximately 52 pages of interference complaints against Sirius.[17] Some of these documents are e-mails from listeners of the complaining stations. We have redacted the senders' e-mail addresses and other identifying information from those e-mails pursuant to FOIA Exemption 7(C), 5 U.S.C. § 552(b)(7)(C), and Section 0.457(g)(3) of the Commission's rules. FOIA Exemption (7)(C) and Section 0.457(g)(3) of our rules permit nondisclosure of information in investigatory records compiled for law enforcement purposes, to the extent that production of such information "could reasonably be expected to constitute an unwarranted invasion of personal privacy.". In addition, we redacted the fax number of a Commission field facility from two pages of documents on the basis of FOIA Exemption 2 and Section 0.457(b) of the Commission's Rules, 47 C.F.R. § 0.457(b). FOIA Exemption 2 and Section 0.457(b) of our rules permit nondisclosure of materials that are related solely to the internal personnel rules and practices of the Commission. The fax numbers of Commission field facilities are not routinely available to the public.

To the extent that we are denying in part your FOIA request in this letter, we disagree that there is a compelling public interest in disclosing information regarding Sirius' compliance with FCC requirements, even if we determine that Sirius has met its burden of demonstrating that specific records fall within an Exemption, because such information has a direct bearing on the public interest considerations raised in the pending XM/Sirius merger application.

We are releasing the confidentiality requests, complaints and publicly available information. The remaining information we have decided to release will not be made available until after the disposition of any applications for review and any judicial appeals. If no application for review is filed, the material will made available after the expiration of the filing deadline.

---

[17] Approximately 29 of the approximately 52 pages are also against XM Radio, Inc., and are included in the 30 pages released by our XM records letter of March 21, 2008.

Charles H. Helein, Esq.

You are classified under Section 0.470(a)(2) of the Commission's Rules, 47 C.F.R. § 0.470(a)(2), as a commercial requester and, therefore, we will assess charges that recover the full, reasonable direct cost of searching for, reviewing and duplicating the records sought under the FOIA. The charges for search and review are as follows: $1220.62 for 17 hours and 15 minutes by GS-15 and Senior Level employees ($71.92 per hour); $122.28 for 2 hours by a GS-14 employee ($61.14 per hour); $43.51 for one hour by a GS-12 employee ($43.51 per hour); and duplication costs of $107.10 for 630 pages of records ($.17 per page).[18] The Financial Operations Division of the Office of the Managing Director of the FCC will bill you for the total amount of $1,493.51 under separate cover. Payment is due 30 days after receipt of the bill with checks made payable to the FCC.

The undersigned official is responsible for the partial denial of your FOIA request. If you believe the partial denial of your FOIA request is in error, you may file an application for review of this decision with the Commission's Office of General Counsel within 10 working days pursuant to Section 0.461(i)(2) of the Commission's Rules, 47 C.F.R. § 0.461(i)(2).

Besides ruling on the FOIA request, this letter also constitutes a ruling on Sirius' confidentiality requests. We are providing to Sirius copies of its LOI responses showing which portions of those responses we have determined to be confidential. If Sirius believes our treatment of its request for confidential treatment of documents is in error, it may file an application for review of this action with the Office of General Counsel pursuant to Section 0.461(i)(2) of the Commission's Rules within 10 working days of the date we furnish the above-mentioned copies.

Sincerely,

Kathryn S. Berthot
Chief, Spectrum Enforcement Division
Enforcement Bureau

cc:     Robert L. Pettit, Esq.

---

[18] These charges are the total charges for reviewing and duplicating the records sought in your FOIA request with respect to both Sirius and XM. We note that the duplication cost only applies to the documents that are released with this response. You may incur additional duplication charges for any documents that we may release after the disposition of any appeals filed by Sirius and/or XM.



Federal Communications Commission
Washington, D.C. 20554

March 21, 2008

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**AND FACSIMILE AT (703) 714-1330**

Charles H. Helein, Esq.
Helein & Marashlian, LLC
Counsel of Record
U.S. Electronics, Inc.
1483 Chain Bridge Road
Suite 301
McLean, Virginia 22101

Re: FOIA Control No. 2008-190 - XM Records

Dear Mr. Helein:

This is in response to your January 25, 2008, Freedom of Information Act ("FOIA") request filed on behalf of the U.S. Electronics, Inc. ("USE"). You seek copies of "non-privileged, non-exempt" documents supplied to the Commission by "applicants, respondents, or other non-Commission employees" and relating to any of the following: the petition filed July 5, 2007, in MB Docket No. 07-57; the certifications required of Satellite Digital Audio Radio Service ("SDARS") operators "that their systems include a receiver that will permit end users to access al licensed SDARS systems that are operational or under construction"; Interoperable Technologies, LLC; the compliance of Sirius Satellite Radio, Inc. ("Sirius") and XM Radio, Inc. ("XM"), with the equipment authorization rules governing emission limitations for satellite receivers, "including without limitation those matters and considered in connection with File No. EB-06-SE-250"; and Sirius' and XM's compliance with their respective authorizations for terrestrial repeaters.

For administrative convenience, we are addressing your FOIA request separately with respect to Sirius and XM. This letter deals with the portion of your FOIA request relating to XM. Your FOIA request seeks documents which are the subject of pending requests for confidentiality from XM and two groups of XM employees. XM submitted earlier requests for confidentiality pursuant to FOIA Exemptions 4 and 6. We accordingly served your FOIA request on XM and gave it an opportunity to provide additional support for its requests for confidentiality.[1] XM submitted a supplemental

---

[1] *See* 47 C.F.R. § 0.461(d)(3). *See also* Letter from Kathryn S. Berthot, Chief, Spectrum Enforcement Division, Enforcement Bureau, to James S. Blitz, Esq., Vice President and Regulatory Counsel, XM Radio, Inc. (April 9, 2007).

Charles H. Helein, Esq.

confidentiality request on February 29, 2008.[2] On February 29, 2008 we received additional confidentiality requests from "Three unnamed employees of XM Radio, Inc.,"[3] and "Four XM employees"[4] pursuant to FOIA Exemptions 6 and 7(C). On March 5, 2008, USE submitted a response to the February 29, 2008, supplemental confidentiality request filed by XM and to the February 29, 2008, confidentiality request filed by "Three Unnamed employees of XM Radio, Inc.[5] On March 7, 2008, USE submitted a response to the February 29, 2008, confidentiality request filed by "Four employees."[6]

Most of the requested documents that we have located were also the subject of a prior FOIA request, FOIA Control No. 2007-235. We ruled upon that FOIA request and the associated confidentiality requests on June 18, 2007.[7] XM argues that we should withhold some of the materials we decided to release in the June 18, 2007 ruling pending resolution of its application for review of that ruling.[8] The "Three unnamed employees of XM Radio, Inc.," also argue that we should withhold some of the materials we decided to release in the June 18, 2007, pending resolution of its application for review.[9] Likewise, the "Four XM employees" argue that we should defer or deny USE's FOIA request for some of materials we decided to release in the June 18, 2007 ruling pending resolution of the application for review.[10] We disagree with XM and both groups of XM employees. We will not withhold any materials found to be non-exempt in our June 18, 2007 ruling. Of course, we will not furnish any materials whose release is being contested until after a final ruling. Similarly, to the extent that USE is seeking any materials found to be exempt from disclosure in our June 18, 2007, ruling, we will not release such materials in the absence of a final ruling requiring their release. Accordingly, the determinations and

[2] See Letter from Scott Blake Harris, Esq., Harris, Wiltshire & Grannis, LLP, to Karen Mercer, Spectrum Enforcement Division, Enforcement Bureau (February 29, 2008) ("February 29, 2008, XM Letter").

[3] See Letter from Lanny L. Breuer, Esq., Covington & Burling, LLP, to Karen Mercer, Spectrum Enforcement Division, Enforcement Bureau (February 29, 2008) ("February 29, 2008, Three Employees Letter").

[4] See Letter from Lori J. Searcy, Esq., Searcy Law Offices, to Karen Mercer, Spectrum Enforcement Division, Enforcement Bureau (February 29, 2008) ("February 29, 2008, Four Employees Letter").

[5] See Letter from Charles H. Helein, Esq., Helein & Marashlian, LLC, to Karen Mercer, Spectrum Enforcement Division, Enforcement Bureau (March 5, 2008).

[6] See Letter from Charles H. Helein, Esq., Helein & Marashlian, LLC, to Karen Mercer, Spectrum Enforcement Division, Enforcement Bureau (March 7, 2008).

[7] Letter from Kathryn S. Berthot, Chief, Spectrum Enforcement Division, Enforcement Bureau, to Robert L. Pettit, Esq., Wiley Rein LLP (June 18, 2001) ("June 18, 2007 ruling"), application for review pending.

[8] February 29, 2008, XM Letter at 2.

[9] February 29, 2008, Three Employees Letter at 2. The "Three unnamed employees of XM Radio, Inc.," request that we "maintain" our "confidential treatment" of those materials. In fact, in our June 18, 2007, ruling, we denied the request for confidential treatment of those materials.

[10] February 29, 2008, Four Employees Letter at 1.

Charles H. Helein, Esq.

3

analysis below closely follow the determinations and analysis in our June 18, 2007 ruling.

**Category 1.** Category 1 of your FOIA request seeks documents provided by sources outside the Commission relating to the petition filed July 5, 2007, in MB Docket No. 07-57. There are no documents responsive to this part of your request.[11]

**Category 2.** Category 2 of your FOIA request seeks documents provided by sources outside the Commission relating to the certifications required of SDARS operators "that their systems include a receiver that will permit end users to access all licensed SDARS systems that are operational or under construction." There are no documents responsive to this part of your request.[12]

**Categories 3 and 4.** Categories 3 and 4 of your FOIA request seek documents provided by sources outside the Commission relating to Interoperable Technologies, LLC. There are no documents responsive to this part of your request.[13]

**Categories 5, 6, 7, and 8.** Categories 5, 6, 7 and 8 of your FOIA request seek documents provided by sources outside the Commission relating to XM's compliance with the equipment authorization rules governing emission limitations for satellite receivers, "including without limitation those matters and considered in connection with File No. EB-06-SE-250"; and XM' compliance with its authorizations for terrestrial repeaters. We have located the following documents that are responsive to these parts of your request: responses submitted by XM to Letters of Inquiry (LOIs) regarding the compliance with Commission rules of FM modulators/transmitters used by XM in connection with its satellite DARS radios (collectively, "FM Modulator Responses") totaling approximately 2,725 pages; the responses submitted by XM to LOIs regarding XM's compliance with the Commission's rules and authorizations relating to its terrestrial repeaters (collectively, "Repeater Responses") totaling approximately 25 pages; approximately 81 pages of documents pertaining to settlement negotiations between the Enforcement Bureau and XM; approximately 17 pages of documents pertaining to XM's proposed technical solutions and comprehensive compliance plan; and approximately 30 pages of interference complaints. As explained below, we are releasing approximately 409 pages of FM Modulator Responses, some with redactions, and withholding approximately 2,316 pages of documents. We are releasing the Repeater Responses. We are withholding the settlement documents and the documents pertaining to XM's proposed technical solutions and comprehensive compliance plan. We are releasing the interference complaints.

---

[11] XM has submitted certain documents that may be responsive to USE's FOIA request in MB Docket No. 07-57 pursuant to protective orders. We note that USE has access to these documents pursuant to the protective orders and therefore are construing USE's FOIA request not to request these documents.

[12] See n. 11.

[12] See n. 11.

4

Charles H. Helein, Esq.

We are releasing XM's confidentiality requests (approximately 17 pages), the portions of XM's FM Modulator Responses dated May 26, June 26, June 27, July 21, August 11, October 17, and October 27, 2006 for which it has not requested confidential treatment (approximately 47 pages), and a privilege log submitted with XM's October 17, 2006, LOI Response (approximately 2 pages). In addition, we are releasing documents provided by XM with its August 21, 2006, LOI Response for which it has not requested confidential treatment, including copies of equipment certifications, user guides, confidentiality requests submitted with equipment authorization applications, Telecommunications Certification Body ("TCB") letters, and pictures of devices (approximately 326 pages).[14]

XM sought confidential treatment of certain portions of its FM Modulator Responses and the documents submitted therewith pursuant to FOIA Exemption 4. FOIA Exemption 4, 5 U.S.C. § 552(b)(4), applies to "trade secrets and commercial or financial information obtained from a person and privileged or confidential." Under *National Parks and Conservation Ass'n v. Morton*,[15] commercial or financial materials are considered confidential if disclosure of the information is likely: (1) to cause substantial hardship to the competitive position of the submitter, or (2) to impair the government's ability to obtain necessary information in the future.[16]

XM requested that the following materials be accorded confidential treatment under Exemption 4: data concerning the number of units of satellite DARS radios manufactured, imported, sold, activated by consumers, at factories and at distributors and retailers; a contract with a manufacturer; block diagrams, schematics and other information regarding the design of XM's radios; bills of materials relating to its radios; and correspondence (including e-mail) among XM employees and between XM and third parties, such as equipment manufacturers, testing bodies, and TCBs. XM asserts that these materials constitute trade secrets and confidential commercial information and that disclosure of this information would cause substantial hardship to XM's competitive position. Specifically, XM asserted that these materials provide commercial information regarding the terms of its contractual agreements with manufacturers and vendors and satellite radio sales and manufacturing statistics. XM also asserted that these materials contain trade secrets regarding the satellite radios' design. XM maintained that release of this information would compromise its position in negotiation with manufacturers and provide competitors with an in-depth review of its core business processes and key relationships.

We find, as we did in the June 18, 2007, ruling, that XM has demonstrated that substantial competitive harm is likely to result from the release of these materials and therefore will withhold them from disclosure. Specifically, we will withhold from

---

[14] Although XM did not request confidentiality of any portion of these documents, we are redacting a name of a private citizen and telephone numbers from one of these documents pursuant to FOIA Exemptions 6 and 7(C), 5 U.S.C. §§ 552(b)(6) and 552(b)(7)(C).

[15] 498 F.2d 765, 770 (D.C. Cir. 1974) ("*National Parks*").

[16] See also *Critical Mass Energy Project v. NRC*, 975 F.2d 871 (D.C. Cir. 1992).

Charles H. Helein, Esq.

disclosure under Exemption 4 the following documents submitted by XM with its May 26, August 11 and October 17, 2006 LOI Responses: diagrams, schematics and other information regarding the design of XM's receivers (approximately 451 pages); a contract between XM and a manufacturer (approximately 74 pages); bills of materials relating to receiver equipment (approximately 667 pages), which include information regarding the parts used in XM's radios and the cost of those parts; and correspondence (including e-mail) among XM employees and between XM and third parties (approximately 1,096 pages), which include information regarding XM's product design and development, corporate strategies and business processes. The diagrams, schematics and related information contain trade secrets regarding the design of XM's radios. Release of the contract, bills of materials and correspondence would result in competitive harm by revealing proprietary information regarding the design of XM's receivers, compromising XM's position in negotiation with manufacturers and providing competitors with insight into its core business processes and key relationships. In addition, we have redacted from XM's LOI Responses dated May 26, June 26, June 27, July 21, August 11, August 21 and October 17, 2006 data concerning the number of units of satellite DARS radios manufactured, imported, sold, activated by consumers, at factories and at distributors and retailers. These data would be invaluable to XM's competitors in understanding the relationship between XM's manufacturing, sales and activation volumes. *See, e.g., National Parks & Cons. Ass'n v. Kleppe*, 547 F.2d 673, 684 (D.C. Cir. 1976); *Timken Co. v. U.S. Customs Serv.*, 491 F. Supp. 557, 559-60 (D.D.C. 1980) (both holding that business strategies and marketing plans are exempt from disclosure under Exemption 4); *Fisher v. Renegotiation Bd.*, 355 F. Supp. 1171, 1174 (D.D.C. 1973) (sales information, including pricing data, net sales, costs and expenses, exempt from disclosure under Exemption 4); *International Satellite, Inc.*, 57 RR 2d 460, 462-63 (1984) (withholding of business marketing plans under Exemption 4).

XM also sought confidential treatment under Exemption 4 of information in its August 21 and September 6, 2006 LOI Responses regarding when it became aware of potential non-compliance of its satellite DARS radios, what modifications were made to the radios, and the names and titles of XM employees who were involved in the decision to make such modifications or were aware of potential non-compliance.[17] XM asserted that disclosure of this information would reveal commercially sensitive information which would be of substantial value to XM's competitors and thus cause XM competitive harm. In particular, XM asserted that disclosure of the names and titles of XM employees and executives involved in the design and production of XM's radios would be of value to companies seeking access to employees in a highly competitive high-tech industry. XM further asserted that disclosure of this information would impair the Commission's ability to obtain necessary information in the future. In this regard, XM

---

[17] We note that in the confidentiality requests submitted with its August 21, 2006 and September 6, 2006 LOI responses, XM did *not* request confidentiality of the information as to when XM became aware of potential non-compliance and what modifications XM made to its radios. Further, this information was *not* redacted in the confidential, redacted versions of the August 21, 2006 and September 6, 2006 LOI responses that XM submitted to the Enforcement Bureau. In its April 20, 2007 letter, XM states that it did request confidentiality of this information, but does not explain how disclosure of this information would cause it competitive harm.

Charles H. Helein, Esq.

6

stated that the willingness of potential witnesses to participate in XM's investigation or in a potential enforcement proceeding would suffer if they feared their responses would be disclosed to the public.

We find, as did in the June 18, 2007, ruling, that XM has not demonstrated that it would likely suffer substantial competitive injury from disclosure of this information. While XM claimed that disclosure of the names and titles of XM employees and executives involved in the design and production of its radios would be of value to companies seeking access to employees in a highly competitive high-tech industry, we note that the XM employees in question are executive and senior-level employees whose names and titles are publicly known. In addition, two of the named individuals are no longer employed by XM. Accordingly, we do not consider this adequate justification for confidentiality under Exemption 4. Further, we find that information as to when XM became aware of potential non-compliance and what modifications XM made to its radios after they were authorized by the Commission is not commercial information entitled to confidential treatment. In this connection, Section 0.457(d)(1)(ii) of the Rules, 47 C.F.R. § 0.457(d)(1)(ii), states that applications for equipment authorizations and materials relating to such applications are not routinely available for public inspection prior to the effective date of the authorization, but will be made available for inspection following the effective date. The fact that XM apparently made modifications to its radios without seeking Commission authorization should not afford protection for information that would not otherwise be entitled to confidential treatment under Section 0.457(d)(1)(ii).

Moreover, we do not believe that disclosure of this information will impair the Commission's ability to obtain similar information in the future. The impairment prong of Exemption 4 "traditionally has been found to be satisfied when an agency demonstrates that the information at issue was provided voluntarily and that submitting entities would not provide such information in the future if it were subject to public disclosure."[18] XM was required to provide this information in response to Commission LOIs, and as a Commission licensee, XM can be compelled to provide such information in response to Commission inquiries in the future.[19]

XM also requested confidential treatment of the names and titles of XM employees who were involved in the decision to make modifications to its satellite DARS radios or were aware of potential non-compliance pursuant to FOIA Exemption 6. XM argued that disclosure of the names and titles of the XM employees and executives would constitute an "unwarranted invasion of personal privacy." XM further argued that

---

[18] See *FlightSafety Services Corporation. v. Department of Labor*, 326 F.3d 607, 612 (5th Cir. 2003).

[19] See 47 U.S.C. §§ 154(i), 154(j), 308(b) and 403; *see also People for the Ethical Treatment of Animals v. United States Department of Agriculture*, No. 03-195, 2005 WL 1241141, at *5-6 (D.D.C. May 24, 2005) (Not reported in F.Supp.2d) (finding that USDA's ability to obtain information in the future would not be impaired by disclosure of the withheld documents because federal regulations *require* borrowers and lenders to submit the information).

7

Charles H. Helein, Esq.

revealing this information could subject the named individuals to "public speculation, industry prejudice, and potential harassment."

We are unpersuaded that the names and titles of XM employees who were involved in, or aware of, the company's potential non-compliance can be protected from disclosure under FOIA Exemption 6. FOIA Exemption 6, 5 U.S.C. § 552(b)(6), protects from disclosure information about individuals in "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." Assuming that the names and titles of these XM employees could be characterized as personnel or similar files, we find that XM has not demonstrated that their release would result in "a clearly unwarranted invasion of personal privacy." XM is a publicly-traded corporation and the employees at issue are executives and other high-level employees. As such, these employees have no reasonable expectation of privacy as to their business decisions concerning potential violations of the FCC's rules.[20] Further, in balancing any minimal privacy interests of XM employees and the public's interest in knowing their identities and conduct, we find that the mere possibility that high-level XM employees may be the subject of public scrutiny or speculation does not outweigh the public's interest in understanding the agency's enforcement proceedings. Accordingly, we will not redact the names and titles of the XM executives and employees who were involved in the decision to make modifications to its satellite DARS radios or were aware of potential non-compliance of those radios. We will, however, redact these employees' direct business telephone numbers. Thus, we are releasing XM's LOI Responses dated August 21 and September 6, 2006 (approximately 16 pages) with the redactions indicated above.

XM sought confidential treatment of the entirety of its Repeater Responses,[21] with the exception of that part of an Exhibit that has been put into the record in another proceeding,[22] under FOIA Exemption 4. XM asserted that the text of the Repeater Responses contain explicit descriptions of its internal business processes, including analysis of and information about XM's network architecture and its strategic approach to repeater deployment. In addition, XM asserted that the Repeater Responses provide names and job-related information about current and former XM employees who were involved in the decisions to deploy or modify its terrestrial repeaters at variance or who were aware of such deployment or modification. XM requested confidential treatment of the entire text of its Repeater Responses because portions of the text cannot effectively be redacted or omitted from that letter. XM argued that disclosure of this information will cause substantial hardship to its competitive position. XM also argued that disclosure would impair the Commission's ability to obtain necessary information in the future.

---

[20] *McConnell*, 18 FCC Rcd at 26372-73 (redacting names of lower-level employees but releasing publicly known names).

[21] XM requests confidential treatment of the entire text of its Repeater Responses, asserting that "portions of the text cannot effectively be redacted or omitted."

[22] A portion of XM's Exhibit to its March 12, 2007 letter is included in a request for Special Temporary Authority filed by XM with the International Bureau. *See* File No. SAT-STA-20061002-00114 (filed October 2, 2006).

Charles H. Helein, Esq.

      We find that XM has failed to demonstrate that substantial competitive harm will result from disclosure of the text of its Repeater Responses. While XM asserted that the Repeater Responses contain explicit descriptions of its internal business processes, including analysis of and information about XM's network architecture and its strategic approach to repeater deployment, we note that this information is substantially the same information that has already been publicly disclosed in the STA request that XM filed with the International Bureau.[23] Further, XM has not shown how substantial competitive injury will result from disclosure of the names and job-related information about current and former XM employees who were involved in the decisions to deploy or modify its terrestrial repeaters at variance or who were aware of such deployment or modification. For the reasons stated above, we also do not believe that disclosure of this information will impair the Commission's ability to obtain similar information in the future.

      Regarding the Exhibits to its Repeater Responses, XM sought confidential treatment under Exemption 4 of the portion of the Exhibits that have not been placed into the public record in the pending STA proceeding. XM stated that this "new" information provides previously undisclosed details about its repeater network, the disclosure of which would reveal sensitive business information that could harm XM's competitive position. This information includes data as to whether the listed repeaters are currently operating, whether each listed repeater was initially deployed at variance or subsequently modified, the date of the variance, and the date variant operation ceased. We do not believe that XM has demonstrated that it will suffer substantial competitive injury if this information is released. We note that XM's STA request specifically identifies which of the listed repeaters it has turned off. Thus, it is already a matter of public record whether the listed repeaters are currently operating. The STA request also indicates what actions XM took to bring certain repeaters into compliance and the date on which it began such actions. Further, we do not see how disclosure of the date of the variances will harm XM's competitive position.

      XM also asserted that Exemption 6 protects from disclosure the text of the Repeater Responses to the extent that the Responses provide names and job-related information about current and former XM employees who were involved in the decisions to deploy or modify its terrestrial repeaters at variance or who were aware of such deployment or modification. For the reasons explained above with respect to XM's FM Modulator Responses, we find that the Repeater Responses cannot be protected from disclosure under Exemption 6.

      Moreover, XM sought confidential treatment under Exemption 4 of the Declaration accompanying its March 12, 2007, LOI response, noting that the Declaration details the internal processes through which XM obtained the facts needed to respond to the Commission's LOI. This Declaration, however, states only in very general terms that the Declarant interviewed various unnamed current and former XM employees in order to respond to the Commission's LOI. We therefore find that it is not protected from

---

[23] *See* File No. SAT-STA-20061002-00114, Declaration of Jeffrey Snyder.

9

Charles H. Helein, Esq.

disclosure under either Exemption 4. XM also asked that we withhold this Declaration under Exemption 6. We note, however, that the Declaration does not identify any of the employees interviewed by the Declarant by name or provide any personal information about these employees. Thus, we do not believe that XM has demonstrated that disclosure of the Declaration "would constitute a clearly unwarranted invasion of personal privacy." Accordingly, we will release the Repeater Responses, including the confidentiality request, Exhibits and Declaration, in their entirety (approximately 25 pages).

We are withholding in their entirety consent decree proposals and associated e-mails submitted by XM (approximately 76 pages) and tolling agreements and tolling agreement extensions (approximately 5 pages) executed by XM in conjunction with ongoing settlement discussions. These materials may be withheld under the settlement privilege of Exemption 5. *See Goodyear Tire*, 332 F. 3d 976. Finally, we are redacting from XM's October 27, 2006, LOI Response a paragraph discussing a proposed consent decree and are withholding in its entirety a consent decree proposal submitted by XM (approximately 10 pages). These materials may be withheld under the settlement privilege of FOIA Exemption 5, 5 U.S.C. § 552(b)(5). *See The Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc. d/b/a Heatway Systems*, 332 F. 3d 976 (6th Cir. 2003).

We have also located approximately 17 pages of responsive documents that include presentations made to Commission staff. The presentations address proposed modifications to XM radios with FM modulators and include equipment compliance techniques. We find that this information is proprietary commercial information, the disclosure of which will result in substantial competitive harm to XM, and therefore will withhold it pursuant to Exemption 4. Additionally, these presentations are the subject of ongoing settlement discussions and therefore may also be withheld under the settlement privilege of Exemption 5. *See Goodyear Tire*, 332 F. 3d 976.

Finally, we are releasing approximately 30 pages of interference complaints against XM.[24] Some of these documents are e-mails from listeners of the complaining stations. We have redacted the senders' e-mail addresses and other identifying information from those e-mails pursuant to FOIA Exemption 7(C), 5 U.S.C. § 552(b)(7)(C), and Section 0.457(g)(3) of the Commission's Rules. FOIA Exemption (7)(C) and Section 0.457(g)(3) of our rules permit nondisclosure of information in investigatory records compiled for law enforcement purposes, to the extent that production of such information "could reasonably be expected to constitute an unwarranted invasion of personal privacy.". In addition, we redacted the fax number of a Commission field facility from two pages of documents on the basis of FOIA Exemption 2 and Section 0.457(b) of the Commission's Rules, 47 C.F.R. § 0.457(b). FOIA Exemption 2 and Section 0.457(b) of our rules permit nondisclosure of materials that are related solely to the internal personnel rules and practices of the Commission. The fax numbers of Commission field facilities are not routinely available to the public.

---

[24] All but one of the approximately 30 pages are also against Sirius Satellite Radio, Inc., and are included in the 52 pages released by our Sirius records letter of March 21, 2008.

Charles H. Helein, Esq.

To the extent that we are denying in part your FOIA request in this letter, we disagree that there is a compelling public interest in disclosing information regarding XM's potential rule violations, even if we determine that XM has met its burden of demonstrating that specific records fall within an Exemption, because such information has a direct bearing on the public interest considerations raised in the pending XM/Sirius merger application.

We are releasing the confidentiality requests, complaints and the portions of the LOI Responses and documents for which XM does not request confidentiality concurrently with this letter ruling. The remaining information that we have decided to release will not be made available until after the disposition of any applications for review and any judicial appeals. If no application for review is filed, the material will made available after the expiration of the filing deadline.

You are classified under Section 0.470(a)(2) of the Commission's Rules, 47 C.F.R. § 0.470(a)(2), as a commercial requester and, therefore, we will assess charges that recover the full, reasonable direct cost of searching for, reviewing and duplicating the records sought under the FOIA. The charges for search and review are as follows: $1220.62 for 17 hours and 15 minutes by GS-15 and Senior Level employees ($71.92 per hour); $122.28 for 2 hours by a GS-14 employee ($61.14 per hour); $43.51 for one hour by a GS-12 employee ($43.51 per hour); and duplication costs of $107.10 for 630 pages of records ($.17 per page).[25] The Financial Operations Division of the Office of the Managing Director of the FCC will bill you for the total amount of $1,493.51 under separate cover. Payment is due 30 days after receipt of the bill with checks made payable to the FCC.

The undersigned official is responsible for the partial denial of your FOIA request. If you believe the partial denial of your FOIA request is in error, you may file an application for review of this decision with the Commission's Office of General Counsel within 10 working days pursuant to Section 0.461(i)(2) of the Commission's Rules, 47 C.F.R. § 0.461(i)(2). Besides ruling on the FOIA request, this letter also constitutes a ruling on XM's confidentiality requests. We are providing to XM copies of its LOI responses showing which portions of those responses we have determined to be confidential. If XM believes our treatment of its request for confidential treatment of

---

[25] These charges are the total charges for reviewing and duplicating the records sought in your FOIA request with respect to both Sirius and XM. We note that the duplication cost only applies to the documents that are released with this response. You may incur additional duplication charges for any documents that we may release after the disposition of any appeals filed by Sirius and/or XM.

Charles H. Helein, Esq.                                                                                    11

documents is in error, it may file an application for review of this action with the Office
of General Counsel pursuant to Section 0.461(i)(2) of the Commission's Rules within 10
working days of the date we furnish the above-mentioned copies.

Sincerely,

Kathryn S. Berthot
Chief, Spectrum Enforcement Division
Enforcement Bureau

cc:     James S. Blitz, Esq.
        Scott Blake Harris, Esq.
        Lori J Searcy, Esq.
        Lanny A. Breuer, Esq.

# EXHIBIT

# E



# The CommLaw Group

HELEIN & MARASHLIAN, LLC
1483 Chain Bridge Road
Suite 301
McLean, Virginia 22101

Telephone: (703) 714-1300
Facsimile: (703) 714-1330
E-mail: mail@CommLawGroup.com
Website: www.CommLawGroup.com

Writer's Direct Dial Number
703-714-1301

Writer's E-mail Address
chh@commlawgroup.com

March 31, 2008

**VIA EMAIL**
Laurence.schecker@fcc.gov

Laurence Schecker
Office of General Counsel
Federal Communications Commission
445 12th Street, S.W.
Washington, DC 20554

> Re:  *Freedom of Information Act Request (Control No. 2008-190)*
>      *U.S. Electronics, Inc.'s Application for Review*

U.S. Electronics, Inc. ("USE"), by its attorneys and pursuant to Section 0.461(i)(2) of the Commission's Rules, hereby files its Application for Review of the Enforcement Bureau's ("EB") March 21, 2008 partial denial of USE's Freedom of Information Act ("FOIA") request of January 25, 2008, Control No. 2008-190 ("Request").

Please direct any questions or comments to the undersigned.

Respectfully Submitted,

Charles H. Helein
Counsel to U.S. Electronics, Inc.

Enclosure

Cc:    Kathryn S. Berthot
       Scott Blake Harris, Esq.
       Lori J. Searcy, Esq.
       Robert L. Pettit, Esq.
       Dimple Gupta

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Review or Freedom of Information | ) |
| Action | ) |
| | ) |

FOIA Control no. 2008-190

### APPLICATION FOR REVIEW

U.S. Electronics, Inc. ("USE"), by its attorneys and pursuant to Section 0.461(i)(2) of the Commission's Rules, hereby files its Application for Review of the Enforcement Bureau's ("EB") March 21, 2008 decision to the extent it denied USE's Freedom of Information Act ("FOIA") request of January 25, 2008, Control No. 2008-190 ("Request").

USE's FOIA Request sought the disclosure of records relating to the Commission's consideration of issues in MB Docket No. 07-57, XM Satellite Radio Holdings, Inc.'s ("XM") and Sirius Satellite Radio, Inc.'s ("Sirius") consolidated application for authority to transfer control of FCC radio licenses held by XM and Sirius to a new combined company (the "XM-Sirius Merger"). *See* FOIA Request (Control No. 2008-190) attached as Exhibit A and incorporated herein by reference.

The Commission notified XM and Sirius of USE's FOIA Request and provided them the opportunity to respond because XM and Sirius had, in the first instance, requested confidential treatment of their submissions. *See* 47 C.F.R. § 0.461(d)(3); *see* Letter from Kathryn S. Berthot, Chief, Spectrum Enforcement Division, Enforcement Bureau to James S. Blitz, Esq. Vice President and Regulatory Counsel, XM Radio, Inc.,

and to Robert L. Pettit, Esq., Wile rein LLP, attached as Exhibit B and incorporated herein by reference.

In response, on February 29, 2008, XM and Sirius submitted supplemental confidentiality requests. *See* XM's Letter from Scott Blake Harris, Esq., Harris, Wiltshire & grannies, LLP, to Karen Mercer, Spectrum Enforcement Division, Enforcement Bureau, attached as Exhibit C and incorporated herein by reference; *see* Sirius' Letter from Robert L. Pettit, Esq., to Kathryn S. Berthot, Chief Spectrum Enforcement Division, Enforcement Bureau, attached as Exhibit D and incorporated herein by reference.

On March 5, 2008, USE responded to XM's and Sirius' supplemental confidentiality requests.[1] *See* Letter from Charles H. Helein, Esq. Helein and Marashlian, LLC, to Kathryn S. Berthot, Chief Spectrum Enforcement Division, Enforcement Bureau, attached as Exhibit E and incorporated herein by reference.

On March 12, 2008, Sirius submitted a response to USE's March 5th response. *See* Sirius' Letter from Robert L. Pettit, Esq., to Karen Mercer, Enforcement Bureau, attached as Exhibit F and incorporated herein by reference.

On March 21, 2008, the EB responded to USE's FOIA Request by partially denying disclosure of the requested documents. *See* Letters from Karthryn S. Berthot Chief Spectrum Enforcement Division, Enforcement Bureau to Charles H. Helein, Esq., Helein and Marashlian, LLC, attached as Exhibit G and incorporated herein by reference.

---

[1] USE also filed a response to the confidentiality request file by the Unnamed employees of XM and KRI. *See* Letter from Charles H. Helein, Esq., Helein and Marashlian, LLC, to Karen Mercer, Spectrum Enforcement Division, Enforcement Bureau (March 7, 2008).

In its partial denial, the EB found that XM and Sirius demonstrated that substantial competitive harm is likely to result from the release of some of the requested information and therefore will be withheld from disclosure. *See* Exhibit G.

As evidenced from the attached exhibits, the issues governing disclosure of the requested information have been thoroughly briefed by the parties and therefore need not be repeated here. *See* Exhibits A-E. Suffice it to say, USE has a compelling interest in having access to the information XM and Sirius have provided to the Commission. Such information bears directly on the public interest considerations raised by the merger application and because the requested information is so closely intertwined with the facts of the merger proceeding, the compelling public interest in obtaining access to the information clearly outweighs any confidentiality interests XM and Sirius may have with regard to such information.

There is no legitimate basis to withhold the requested information. Rather, disclosure of the requested information is consistent with Commission and court precedent, which holds that federal agencies have discretion to release information on public interest grounds, *even if* the information falls within the scope of a FOIA exemption.[2] Because there is a compelling interest to disclose the denied information,

---

[2]    *See Liberty Cable Company, Inc.*, 11 FCC Rcd 2475, 24767 (1996), *aff'd sub nom. Barthold Cable Company Co. v. FCC*, 114 F.3d 274 (D.C. Cir. 1997); *see also National Exchange Carrier Ass'n, Inc.*, 5 FCC Rcd 7184 (7990) (finding that mere "public embarrassment, unfavorable publicity, or customer disgruntlement are not generally considered" to be sufficient reasons to keep information confidential); *see also CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1133 n. 1 (D.C. Cir. 1987) ("The agency's decision to release the data normally will be grounded either in its view that none of the FOIA exemptions applies . . ., or in its belief that release is justified in the exercise of its discretion, even though the data fall within one or more of the statutory exemptions."); *Larry D. Henderson and Robert S. Benz d/b/a Quad Communications*, 15 FCC Rcd 17073, 17076 (2000) (denying a request for confidential treatment where the materials

3

the Commission should overturn the EB's decision to the extent it denies USE's FOIA request.

Any finding that there is not a compelling interest should be rejected out of hand and the Commission should be wary of any conclusion on the EB's part that rests on the finding that it "disagree[s] that there is a compelling public interest in disclosing information regarding the applicants' potential rule violations because such information has a direct bearing on the public interest considerations raised in the merger application." *See* Exhibit G. Such a conclusion is not only gratuitous, it appears to exceed the bounds of the EB's delegated authority and the FCC's Rules.

Equally disconcerting is the EB's conclusion that there "are no responsive documents" to Category 1, Category 2, or Categories 3 and 4 of the FOIA Request. *See* Exhibit G. This flatly contradicts the fact that documents are known to exist, documents that bear directly on the critical issues before the Commission in the XM-Sirius Merger. The significance of these withheld documents cannot be understated and is further underscored by a commentator's recent reflection on the Department of Justice's ("DOJ") approval of the XM-Sirius merger.

> The [DOJ] found that there is no competition between the companies for existing subscribers because 'satellite radio equipment sold by each company is customized to each network and will not function with the other service. XM and

---

implicated important rights of both parties concerning the use of a 900 MHz Specialized Mobile Radio service license); *Confidentiality Policy Statement*, 13 FCC Rcd at 24818 ¶ 2 ("Even when particular information falls within the scope of a FOIA exemption, federal agencies generally are afforded the discretion to release the information on public interest grounds."); *Gulfcoast Services, Inc.*, 14 FCC Rcd 8163, 8165 ¶ 5 (WTB 1999) (denying a request for confidentiality for financial data submitted as part of a license application because "the public interest considerations favoring openness in our licensing proceedings outweigh any potential difficulty that Gulf Coast might experience by disclosure of this information").

4

Sirius made some efforts to develop an interoperable radio capable of receiving both sets of satellite signals. Depending on how such a radio could be configured, it could enable consumers to switch between providers without incurring the costs of new equipment. The [DoJ's] investigation revealed, however, that no such interoperable radio is on the market and that such a radio likely would not be introduced in the near term.' Recall that one of the arguments made *against* this merger was that the companies had promised to develop and market an interoperable radio, but to this day have not done so. So in essence, the Justice Department has *rewarded* the companies for failing to keep their promise. This is perverse. *See Gigi Sohn Public Knowledge,* March 20, 2008, attached at Exhibit H.

Just as it is perverse for the DOJ to reward XM and Sirius for failing to keep their promise, it would be perverse for the Commission to continue to withhold responsive documents.

USE wishes to reiterate what it has said throughout these proceedings that it does not oppose approval of the merger. However, USE has urged that if the Commission approves the merger, it should condition its approval on requiring open access to the satellite radio network. In that connection, USE has previously proposed an open device condition as have several public interest advocates and business interests. In order to sculpt the conditions that will ensure open access, it is essential that the documents in question be made part of the record on the merger applications.

USE also reiterates the necessity of appointing an independent monitor to ensure that any conditions adopted, if the merger is approved, are carried out as mandated by the Commission. The licensees are apparently under investigation by the Commission for noncompliance with past mandates of the Commission. The documents relating to that investigation are the subject of these FOIA requests. Full disclosure of these documents is therefore essential so that proper ground rules for the monitoring and enforcement of conditions can be framed.

5

For these reasons and those stated in its earlier submissions, USE requests that the
Commission reverse the EB's findings and disclose the information requested by USE in
its entirety.

Respectfully Submitted,

Charles H. Helein
Counsel to U.S. Electronics, Inc.

Cc:     Kathryn S. Berthot
        Scott Blake Harris, Esq.
        Lori J. Searcy, Esq.
        Lanny A. Breuer, Esq.
        Robert L. Pettit, Esq.
        Dimple Gupta

## CERTIFICATE OF SERVICE

I, Sherry A. Reese, administrative assistant in the law firm Helein & Marashlian, LLC, do hereby certify that on March 31, 2008, I served a copy U.S. Electronics, Inc.'s Application for Review upon the following parties by email:

    Kathryn S. Berthot (Kathryn.berthot@fcc.gov)
    Lori J. Searcy, Esq. (lori@searcy-law.com)
    Robert L. Pettit, Esq. (rpettit@wileyrein.com)
    Dimple Gupta (dgupta@cov.com)

and the following party via first class mail, postage pre-paid:

    Scott Blake Harris, Esq.
    Harris, Wiltshire & Grannis LLP
    1200 18th Street, NW
    Washington, DC 20036-2560

Sherry A. Reese

7

# ATTACHMENT
# A



# The *Comm*Law Group

HELEIN & MARASHLIAN, LLC
1483 Chain Bridge Road
Suite 301
McLean, Virginia 22101

Telephone: (703) 714-1300
Facsimile: (703) 714-1330
E-mail: mail@CommLawGroup.com
Website: www.CommLawGroup.com

Writer's Direct Dial Number
703-714-1301

Writer's E-mail Address
chh@commlawgroup.com

## FREEDOM OF INFORMATION ACT REQUEST

January 25, 2008

E-mail: FOIA@fcc.gov
And
Surface mail:
FOIA Public Liaison
Federal Communications Commission
445 12th Street, S.W., Room 1-A836
Washington, D.C. 20554

CONTROL 2008-190    2008 JAN 25 P 1: 44    FOIA CONTROL STAFF

This FOIA request is made pursuant to 47 C.F.R. § 0.461 for the documents referenced and/or described below. Certain Offices, Bureaus/Divisions of the Commission have been specified based on the belief that these are the primary sources of the documents requested and to provide as much direction as possible so that the furnishing of the documents may be accomplished as quickly as possible. The need for these documents is extremely time sensitive because of their importance to on-going consideration of the Commission on issues in MB Docket No. 07-57.

Please take notice that this request is not limited solely to the documents that exist in the Offices, Bureaus/Divisions specified, but includes all offices, bureaus/divisions of the Commission that have or may have documents responsive to this request, whether such documents in such other Offices, Bureau/Divisions are duplicative of those in the possession of the specified Offices/Bureaus/Divisions or original to such other Offices/Bureau/Divisions.

**Office of the Chairman, Office of Commissioners, Enforcement Bureau**

    1. <u>For the period January 1, 2005 to date</u>, each non-privileged, non-exempt document relating to the "Petition for Declaratory Ruling to Clarify the Lack of Enforcement and Implementation of the Interoperable Mandate, FCC Rule 47 CFR sec. 25.144(a)(3)(ii)" filed July 5, 2007 in MB Docket No. 07-57 ("Petition").

**International Bureau, Satellite Division –**

    2. <u>For the period 2005 to date</u>, each non-privileged, non-exempt document relating to each document relating to the certifications required of the Satellite Digital Audio Radio Service (SDARS) operators "that their systems include a receiver that will permit end users to access all licensed SDARS systems that are operational or under construction." (See, Letter of Thomas S. Tcyz, Chief, Satellite Division to Patrick Donnelly, Executive Vice President and General Counsel, Sirius Satellite Radio, January 28, 2005, a web posted copy of which is attached for reference.)

**International Bureau –**

    <u>For the period January 1, 2003 to date</u>, each non-privileged, non-exempt document relating to -

    3. Interoperable Technologies, LLC.

**Office of Engineering and Technology –**

    <u>For the period January 1, 2003 to date</u>, each non-privileged, non-exempt document relating to -

    4. Interoperable Technologies, LLC.

**Enforcement Bureau, Spectrum Enforcement Division -**

    <u>For the period January 1, 2005 to date</u>, each non-privileged, non-exempt document relating to -

    5. Sirius' and XM's compliance with the equipment authorization rules governing emission limitations for satellite radio receivers, including without limitation, those matters raised and considered in connection with File No. EB-06-SE-250.

**Office of Engineering and Technology –**

    <u>For the period January 1, 2005 to date</u>, each non-privileged, non-exempt document relating to -

6. Sirius' and XM's compliance with the equipment authorization rules governing emission limitations for satellite radio receivers.

**Enforcement Bureau, Spectrum Enforcement Division –**

For the period January 1, 2006 to date, each non-privileged, non-exempt document relating to –

7. XM's and Sirius' compliance with their respective authorizations for terrestrial repeaters.

**International Bureau, Satellite Division -**

For the period January 1, 2006 to date, each non-privileged, non-exempt document relating to –

8. XM's and Sirius' compliance with their respective authorizations for terrestrial repeaters.

**Definitions**

For purposes of this request, "document" as used herein means documents supplied by applicants, respondents, or other non-Commission employees to the Commission, its Bureaus and/or their Divisions and the staffs of same, including without limitation, electronic records of any nature, anything reduced to tangible physical form, including, but not limited to, all emails, email attachments, text messages, records, papers and books, transcriptions, pictures, drawings or diagrams of every nature, whether transcribed by hand or by some mechanical, electronic, photographic or other means, as well as sound reproductions of oral statements or conversations by whatever means made, whether in the actual or constructive possession or under control or not, relating, evidencing, constituting or pertaining in any way to the subject matters in connection with which it is used and includes originals, all file copies, all other copies, no matter how prepared, and all drafts prepared in connections with such writing, whether used or not, including by way of illustration and not by way of limitation, the following: emails, email attachments, text messages, books, records, contracts, agreements, memoranda, correspondence, bulletins, circulars, forms, pamphlets, notices, statements, journals, postcards, letters, telegrams, reports, photostats, microfilm, and maps. If a writing and/or document differ in any way from another document including, by way of illustration and not by way of limitation, any postscripts, notation, change or addendum, it shall be considered a separate document.

For purposes of this request, "relating to" means connected with, evidencing, constituting, regarding, discussing, referring to, with respect to, concerning, purporting, consisting of, embodying, establishing, comprising, commenting on, mentioning, responding to, showing, describing, analyzing, reflecting, indicating, presenting, or in any way pertaining to the specified matter.

The maximum search fee at this time is $1,000.00.

3

Expedited response is requested as the documents and information are relevant to the record being made in MB Docket No. 07-57.

Please identify the privilege and/or exemption relied on, if any, to withhold any document and identify by name or description and the office, Bureau/Division and staff person in whose possession such document resides.

Should any questions arise, kindly contact the undersigned.

Respectfully submitted,

Charles H. Helein
Counsel of Record
U.S. Electronics, Inc.
MB Docket No. 07-57

4

[PAGE 1]

Federal Communications Commission
Washington, DC

January 28, 2005

Mr. Patrick L. Donnelly
Executive Vice President and General Counsel
SIRIUS Satellite Radio
1221 Avenue off the Americas
New York, NY 10020

File Nos: IB Docket No. 95-91; SAT-MOD-20040212-00017;
. . . .

Dear Mr. Donnelly:

As an alternative to the Commission mandating standards for receivers used in providing
Satellite Digital Audio Radio Service (SDARS), SDARS operators are to certify to the
Commission that their systems include a receiver that will permit end users to access all
licensed SDARS systems that are operational or under construction.1 The Commission
authorized Sirius Satellite Radio Inc. (Sirius) in 1997 to provide SDARS in the United
States subject to such a certification.2 The authorization of the other SDARS licensee,
XM Radio Inc. (XM Radio), is subject to an identical certification requirement.3

In our recent authorization of XM Radio for the launch and operation of
replacement satellites,4 we noted that Sirius and XM Radio have on file a letter dated
October 6, 2000, in which the two SDARS licensees announced an agreement to develop
a unified standard for satellite radios, and stated their anticipation that interoperable chips
capable of receiving both services would be produced in volume in mid-2004.5 The two
licensees also stated their agreement to introduce interim interoperable radios, prior to the
introduction of fully-interoperable chipsets, that would include a common wiring harness,

[PAGE 2]

head unit, antenna, and an interchangeable trunk-mounted box containing processing
elements for both company's signals.6

In order to reflect more accurately the status of SDARS licensees' efforts in developing
interoperable receivers, we are requesting that Sirius and XM Radio file an update to the
October 6, 2000 Letter in pending proceedings where interoperable receivers are an issue.
Although the Commission is cognizant of the differences between the two SDARS
licensees' transmission technologies that initially affected the ability to develop receiver
interoperability,7 it is not clear, given the passage of time, that these differences still
exist.

For this reason, we request that Sirius submit to the Satellite Division, within 45 days from the date of this letter, the status of Sirius' efforts to develop an interoperable receiver and its time frame for making such an interoperable receiver available to the public.8

Please contact JoAnn Lucanik, (202) 418-0873, or Stephen Duall, (202) 418-1103, of my staff if you have any questions regarding this letter.

Sincerely,

Thomas S. Tcyz
Chief
Satellite Division

cc: Carl R. Frank
Counsel
Wiley Rein & Fielding LP
1776 K Street, NW
Washington, DC 20006
(202) 719-7049 (Fax)

[footnotes for page 1]

1 Establishment of Rules and Policies for the Digital Audio Radio Satellite Service in the 2310-2360 MHz Frequency Band, . . . .

2 Satellite CD Radio. Inc., Order and Authorization, 13 FCC Rcd 7971, 7995 (para. 57) (Int'l Bur. 1997) ( 1997 Sirius Authorization Order) ("IS FURTHER ORDERED that this authorization is subject to certification by [Sirius] that its final receiver design is interoperable with respect to the [XM Radio Inc.]'s Satellite Digital Audio Radio Service system final receiver design.").

3 American Mobile Radio Corporation, Order and Authorization, 13 FCC Rcd 8829, 8851 (para 54) (Int'l Bur. 1997).

4 XM Radio Inc., Order and Authorization, DA 05-180 (Int'l Bur. Sat. Div, rel. Jan. 26, 2005)

5 Letter from John R. Wormington. XM Radio Inc., and Robert D. Briskman. Sirius Satellite Radio Inc., to Magalie Roman Salas, FCC, dated Oct. 6, 2000 (October 6 Letter).

[footnotes for page 2]

6 October 6 Letter at 4.

7 1997 Sirius Authorization Order, 13 FCC Rcd at 7990 (para. 42).

8 We have also separately instructed XM Radio to file such a status report within the same time period.

[end of letter]

# ATTACHMENT
# B



Federal Communications Commission
Washington, D.C. 20554

February 14, 2008

**VIA CERTIFIED MAIL-RETURN RECEIPT REQUESTED**
**AND FACSIMILE AT (202) 719-7049**

Robert L. Pettit, Esq.
Counsel for Sirius Satellite Radio Inc.
Wiley Rein LLP
1776 K Street, N.W.
Washington, D.C. 20006

In Re: FOIA Control No. 2008-190

Dear Mr. Pettit:

We have received a Freedom of Information Act (FOIA) request from Charles H. Helein, Esq., representing U.S. Electronics, Inc. Mr. Helein requests copies of various documents pertaining to Sirius Satellite Radio Inc ("Sirius"). (*See* enclosed copy of FOIA request.)

We have determined that certain documents Sirius submitted to the Commission are the subject of pending confidentiality requests pursuant to Section 0.459 of the Commission's Rules ("Rules"), 47 C.F.R. § 0.459. Section 0.461(d)(3) of the rules provides that when requests are made for documents that are the subject of a pending request for confidentiality, the custodian of records will mail the request to the party that originally submitted the documents.

Before we make a final decision on the FOIA request, we are giving you the opportunity to respond and, if necessary, supplement your pending confidentiality request. Your response is due no later than February 29, 2008, and must be submitted by U.S. Mail and facsimile to:

> Federal Communications Commission
> Enforcement Bureau
> Spectrum Enforcement Division
> Attention: Karen Mercer, Room 3-A325
> 445 12th St., SW
> Washington, D.C. 20554
> Fax Number: (202) 418-7290

Robert L. Pettit, Esq.                                              2

     We note that pursuant to Section 1.1206(a)(7) of the Rules, 47 C.F.R. § 1.1206(a)(7), proceedings involving FOIA requests are permit-but-disclose proceedings under the ex parte rules. *See* 47 C.F.R. § 1.1206(b).

     If you have any questions regarding this matter, please contact me at (202) 418-1160.

                 Sincerely,

                 Kathryn S. Berthot
                 Chief, Spectrum Enforcement Division
                 Enforcement Bureau

Enclosure

cc:  Charles H. Helein



Federal Communications Commission
Washington, D.C. 20554

February 14, 2008

**VIA CERTIFIED MAIL-RETURN RECEIPT REQUESTED**
**AND FACSIMILE AT (202) 730-1301**

Scott Blake Harris
Counsel for XM Satellite Radio Inc.
Harris, Wiltshire & Grannis LLP
1200 Eighteenth Street, N.W.
12ᵗʰ Floor
Washington, D.C. 20036

In Re: FOIA Control No. 2008-190

Dear Mr. Harris:

We have received a Freedom of Information Act (FOIA) request from Charles H. Helein, Esq., representing U.S. Electronics, Inc. Mr. Helein requests copies of various documents pertaining to XM Satellite Radio Inc. ("XM"). (*See* enclosed copy of FOIA request.)

We have determined that certain documents XM submitted to the Commission are the subject of pending confidentiality requests pursuant to Section 0.459 of the Commission's Rules ("Rules"), 47 C.F.R. § 0.459. Section 0.461(d)(3) of the rules provides that when requests are made for documents that are the subject of a pending request for confidentiality, the custodian of records will mail the request to the party that originally submitted the documents.

Before we make a final decision on the FOIA request, we are giving you the opportunity to respond and, if necessary, supplement your pending confidentiality request. Your response is due no later than February 29, 2008, and must be submitted by U.S. Mail and facsimile to:

Federal Communications Commission
Enforcement Bureau
Spectrum Enforcement Division
Attention: Karen Mercer, Room 3-A325
445 12ᵗʰ St., SW
Washington, D.C. 20554
Fax Number: (202) 418-7290

Scott Blake Harris, Esq.                                            2

    We note that pursuant to Section 1.1206(a)(7) of the Rules, 47 C.F.R.
§ 1.1206(a)(7), proceedings involving FOIA requests are permit-but-disclose proceedings
under the ex parte rules.  *See* 47 C.F.R. § 1.1206(b).

    If you have any questions regarding this matter, please contact me at
(202) 418-1160.

                Sincerely,

                Kathryn S. Berthot
                Chief, Spectrum Enforcement Division
                Enforcement Bureau

Enclosure

cc: Charles H. Helein

# ATTACHMENT
# C

**HARRIS, WILTSHIRE & GRANNIS** LLP

1200 EIGHTEENTH STREET, NW
WASHINGTON, DC 20036

TEL 202.730.1300   FAX 202.730.1301
WWW.HARRISWILTSHIRE.COM

ATTORNEYS AT LAW

February 29, 2008

<u>Via Fax and U.S. Mail</u>

Karen Mercer
Spectrum Enforcement Division
Enforcement Bureau
Federal Communications Commission
445 12th Street, S.W., Room 3-A325
Washington, DC 20554

> RE:   FOIA Control No. 2008-190

Dear Ms. Mercer:

Thank you for the letter of February 14, 2008, giving XM Radio Inc. ("XM") the opportunity to respond to the Freedom of Information Act ("FOIA") request filed by U.S. Electronics, Inc. (the "USE FOIA Request"). In accordance with 47 C.F.R. § 0.459, XM hereby responds and requests that the Commission honor XM's previous requests for confidential treatment in this and related proceedings. XM incorporates hereby all of its previous requests for confidentiality and explicitly reiterates those requests.

While we cannot determine all of the underlying information the Commission might consider responsive to the USE FOIA Request, it appears that four distinct categories of information could be involved and we will briefly review the reasons we have requested confidentiality for that information. This summary does not intentionally exclude any protected information or supersede any previous requests for confidentiality. Instead, we provide this analysis to assist with your final decision on the FOIA request.

**1.    Materials Associated with File No. EB-06-SE-148 and EB-06-SE-356**

The USE FOIA Request seeks documents submitted by XM in the EB-06-SE-250 proceeding. These documents were also the subject of a prior FOIA request filed by the National Association of Broadcasters ("NAB").[1] On June 18, 2007, the Enforcement Bureau (the "Bureau") responded to NAB's FOIA request granting it in part, and denying

---

[1]   FOIA Control No. 2007-235.

Ms. Karen Mercer
February 29, 2008
Page 2 of 9

it in part.[2]  In particular, the Bureau denied NAB's FOIA request for the majority of the materials XM sought to protect from disclosure, finding "XM has demonstrated that substantial competitive harm is likely to result from the release of these materials."[3]

The Bureau should deny the USE FOIA Request for the materials that the Bureau has already determined are exempt from disclosure.  The USE FOIA Request is limited solely to "non-privileged" and "non-exempt" documents.[4]  The USE Request does not ask the Bureau to reconsider its prior findings nor does it provide sufficient justification for disclosure of these exempt materials.  U.S. Electronics argues only that its FOIA Request is necessary because the "documents and information are relevant to the record being made in MB Docket No. 07-57."[5]  NAB advanced a similar argument in its FOIA request, which the Bureau rejected.  In fact, the Bureau stated that it "disagree[d]" that there was any "compelling public interest" in disclosing the information.[6]

While the Bureau determined that the majority of the materials covered by NAB's request were exempt from FOIA disclosure, the Bureau held that a limited number of documents (45 pages of material) was not covered by a FOIA Exemption.  On July 2, 2007, XM filed an Application for Review of the Bureau's decision with respect to that small amount of material.[7]  To the extent the USE FOIA Request seeks documents that are the subject of the pending Application for Review, the Bureau should deny that request pending resolution of the Application for Review.

XM initially requested confidential treatment pursuant to FOIA Exemptions 4, 6, and 7[8] for the materials XM submitted in File Nos. EB-06-SE-148 and EB-06-SE-356.[9]  In particular, XM requested confidential treatment of materials submitted in response to your letters of April 20, 2006, August 7, 2006 (jointly, the "FM Modulator Letters"), and February 15, 2007 (the "Repeater Letter").  XM has fully explained and supplemented its requests for confidential treatment of these materials.[10]

---

[2]  Letter from Kathryn S. Berthot to David H. Solomon, Counsel for NAB, FOIA Control No. 2007-235 (June 18, 2007) ("June 18 Ruling").

[3]  Id. at 2-3.

[4]  USE FOIA Request at 2-3.

[5]  Id. at 4.

[6]  June 18 Ruling at 8-9 (distinguishing the reasoning and case law NAB presented in support of this point).

[7]  Application for Review, FOIA Control No. 2007-235 (July 2, 2007) (See attached).

[8]  5 U.S.C. § 552(b)(4), (6) & (7).

[9]  The FOIA request explicitly seeks information regarding File No. EB-06-SE-148, but information produced in EB-06-SE-356 is implicitly sought as well.

[10]  See April 20, 2007 Letter to Kathryn S. Berthot re File No. EB-06-SE-148 and EB-06-SE-356.

Ms. Karen Mercer
February 29, 2008
Page 3 of 9

As XM also explained in its response to NAB's FOIA request, the information XM provided in its responses to the Repeater Letter ("XM Repeater Response") and the FM Modulator Letters ("FM Modulator Responses") constitutes "commercial or financial information" for purposes of FOIA Exemption 4, which protects from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). Those responses provide confidential information including XM's network architecture, deployment strategy, and the terms of XM's contractual agreements with manufacturers and vendors. Courts have given a broad reading to the phrase "commercial or financial" and, as a result, virtually all of the information provided in XM's responses falls into this category. *See, e.g., Critical Mass Energy Project v. NRC*, 975 F.2d 871, 877-9 (D.C. Cir. 1992) (*en banc*) (safety reports by a non-profit corporation are treated as "commercial" for FOIA purposes). The XM Repeater Response and FM Modulator Responses also qualify as "information obtained from a person," under FOIA Exemption 4, because the content of those letters was not generated by the Commission itself.

When financial or commercial information is provided at the government's explicit request, the information is considered confidential as defined by FOIA Exemption 4 if the information's disclosure is likely either to: (1) impair the government's ability to obtain necessary information in the future; or (2) cause substantial hardship to the competitive position of the person from whom the information was obtained. *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974); *Critical Mass Energy Project*, 975 F.2d at 877-9.[11] The XM Repeater Response and FM Modulator Responses satisfy both prongs of this confidentiality test. First, disclosure of the responses would impair the Commission's ability to obtain necessary information in the future. The responses provide names and job-related information about current and former XM employees, as well as specific information about their conduct – which was gathered in large part through the cooperation of those current and former employees. The willingness of those individuals and other potential witnesses to participate in future investigations or in enforcement proceedings would suffer if these responses were publicly disclosed. Indeed, the disclosure of this information would have a chilling affect on individuals across the communications industry who might otherwise be willing to assist the Commission in future investigations.

Second, disclosure of the XM Repeater Response and the FM Modulator Responses would also cause substantial hardship to XM's competitive position. XM faces intense competition from a variety of sources, including traditional AM/FM radio, HD Radio, Internet radio and downloading devices, direct broadcast satellite or cable audio systems, and digital music services, among other services.

---

[11]    The XM Repeater Response and FM Modulator Responses were provided in response to Commission Letters of Inquiry.

Ms. Karen Mercer
February 29, 2008
Page 4 of 9

The information provided in the XM Repeater Response was gathered through internal research by XM. Because of the sensitive nature of this information, XM treated the fruits of this investigation as highly confidential and has not disclosed the information to anyone outside of the company and its counsel. The XM Repeater Response also contains nonpublic information regarding XM's network architecture, business plan, and deployment strategy that is crucial to XM's ability to provide its service to consumers. Any disclosure of this information would provide a significant advantage to XM's competitors.

The FM Modulator Responses also provide commercial information regarding the terms of XM's contractual agreements with manufacturers and vendors and satellite receiver sales and manufacturing statistics. The FM Modulator Responses contain trade secrets regarding the satellite receivers' design and redesign. Thus, XM would suffer substantial hardship if its competitors were allowed to view this sensitive information about its core strategic functions.

The Commission has routinely held that information comparable to the XM Repeater Response and the FM Modulator Responses should not be disclosed because it would cause substantial competitive injury. *See, e.g.*, June 18 Ruling at 3; *Allnet Communication Services, Inc. v. FCC*, 800 F. Supp. 984, 985 (D.D.C. 1992) (affirming the Commission's decision not to disclose computer models submitted as part of a mandatory tariff review); *International Satellite, Inc.*, FOIA Control Nos. 84-93, 57 R.R. 2d 460 (1984) (technical and commercial information about a company's possible changes in operation and the company's strengths and weaknesses should not be disclosed under FOIA Exemption 4).

FOIA Exemption 6 protects against disclosure of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "Congress' primary purpose in enacting Exemption 6 was to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." *United States Dep't of State v. Washington Post Co.*, 456 U.S. 595, 599 (1982). Neither the Commission nor the public would benefit if this information were revealed. As discussed above, revealing the information in either response could subject the named individuals to public speculation, industry prejudice, and potential harassment.

Exemption 7 of FOIA protects from mandatory disclosure any records or information "compiled for law enforcement purposes," if disclosure "could reasonably be expected to interfere with enforcement proceedings," 5 U.S.C. § 552(b)(7)(A), or "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C); *FBI v. Abramson*, 456 U.S. 615, 633 (1982). Records compiled by agencies having both law enforcement and administrative functions, like the

Ms. Karen Mercer
February 29, 2008
Page 5 of 9

Commission, qualify as investigative files compiled for law enforcement purposes under
Exemption 7. *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1540 (D.C. Cir. 1993).

Exemption 7(A) focuses not on individual privacy, but on the integrity of the
investigation itself. The Commission has routinely denied FOIA requests for information
submitted to the Commission during an ongoing investigation. *See Kay v. FCC*, 867 F.
Supp. 11, 15 (D.D.C. 1994) (holding that the Commission properly withheld the
requested documents because the documents were protected under FOIA Exemption 7
because of an ongoing investigation).

Exemption 7(C) is similar to FOIA Exemption 6 but broader; thus, courts require a lesser
degree of intrusion on personal privacy in order to invoke Exemption 7(C). *United States
Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 756
(1989). This reflects the common-sense view that disclosure of information about an
individual is inherently more troubling when it connects a person with possible non-
compliance. Indeed, the D.C. Circuit has recognized that "a primary purpose of
Exemption 7(C)" is ensuring that individuals are not "associated unwarrantedly with
alleged criminal activity." *Stern v. FBI*, 737 F.2d 84, 92 (D.C. Cir. 1984). Publishing the
names of people who were merely involved in an investigation -- but were never actually
accused of any wrongdoing -- could "make those persons the subjects of rumor and
innuendo, possibly resulting in serious damage to their reputations." *Id.* That kind of
disclosure should be permitted "only if the public interest in the information outweighs
the significant privacy interests implicated." *Id.*

2.      **Core XM Business Plans and Strategies**

XM also previously requested confidential treatment of certain XM business plans,
network architecture designs including terrestrial repeaters, internal strategies, and sales
and planning data submitted to the Commission. An example of this type of information
is XM's submissions to the Commission regarding the relative importance to XM's
business of various geographic areas and the relative importance of the repeaters in those
areas. This information contains highly sensitive and proprietary information about XM
that would be exempt from disclosure by Exemption 4 to FOIA.

As discussed above, Exemption 4 to FOIA protects from disclosure "trade secrets and
commercial or financial information obtained from a person and privileged or
confidential." 5 U.S.C. § 552(b)(4). The information listed was generated by XM, not by
the Commission, and therefore is "information obtained from a person." Some of the
submitted information includes XM's trade secrets, such as the coverage of its repeaters
in certain areas and the importance of individual repeaters to its service. The submitted
information also contains protected commercial or financial information. *See, e.g.,
Critical Mass Energy Project*, 975 F.2d at 874; *Public Citizen Health Research Group*,

Ms. Karen Mercer
February 29, 2008
Page 6 of 9

704 F.2d at 1290. For example, sales and planning data is clearly financial and the relative importance of various markets to XM is clearly commercial.

The business plans, network designs, and other information also satisfy both prongs of the *National Parks* confidentiality test. *See* 498 F.2d at 770. First, disclosure of the information would impair the Commission's ability to obtain necessary information in the future. XM has responded to Commission inquires with complete frankness and openness. Disclosing sensitive and proprietary information of this nature would impede XM's and other companies' abilities to respond effectively to Commission inquiries in the future. Confidentiality provides an opportunity for companies to share highly sensitive yet relevant information with the Commission without exposing themselves to attack from competitors. Both the Commission and companies benefit from a legal regime that allows confidential disclosure to the government. The public interest would be harmed if that legal regime were undermined.

Second, disclosure of this information would also cause substantial hardship to XM's competitive position. As noted above, XM faces intense competition from a variety of sources. Disclosing XM's trade secrets, network architecture, business strategies and other similar information would reveal information to its competitors that is crucial to XM's ability to provide its service to consumers. XM has consistently guarded the disclosure of this information and treated it as highly confidential. XM would suffer substantial hardship if its competitors were allowed to view this sensitive information about its core strategic functions.

3.    **MB Docket No. 07-57**

Some of the information possibly within the scope of the USE FOIA Request is information XM submitted in response to Commission requests in the ongoing consideration of the proposed merger between Sirius Satellite Radio, Inc. ("Sirius") and XM, MB Docket No. 07-57. XM requested confidential treatment for the information it provided to the Commission including information regarding its interoperable receivers and its terrestrial repeaters. In particular, XM requested confidential treatment pursuant to the protective orders in the merger docket of information it submitted to the Commission on November 16, 2007 in response to the Commission's data requests.[12] XM redacted confidential and highly confidential information that could be covered by the USE FOIA Request.[13] This information is properly withheld from disclosure pursuant to FOIA Exemption 4.

---

[12]    *See Public Response of XM Radio Inc. to the Information and Document by the Federal Communications Commission*, MB Docket No. 07-57 (November 16, 2007).

[13]    In the merger docket, the Commission has adopted two protective orders, one covering confidential information and a second, covering highly confidential information. *See Applications of Sirius Satellite Radio Inc. & XM Radio, Inc. For Approval to Transfer Control*, MB Docket No. 07-57, Protective Order, DA 07-3135 (July 11, 2007) ("First Protective Order"); *Applications of Sirius*

Ms. Karen Mercer
February 29, 2008
Page 7 of 9

There is no doubt that the information regarding XM's receivers and terrestrial repeaters constitutes "commercial information" for purposes of this FOIA exemption. The term "commercial" in Exemption 4 should be given its ordinary meaning. *See Public Citizen*, 704 F.2d at 1290; *International Satellite, supra*. The data contain descriptions and information about XM's strategic and design approach to interoperability. As such, the data provide a confidential review of XM's previous and current approaches to a key component of its business.

The information is protected by Exemption 4 because disclosure would impair the Commission's ability to obtain necessary information in the future. As discussed above, XM has responded to all Commission inquires with complete frankness and openness. Disclosing sensitive and proprietary information of this nature would penalize candor, creating an incentive for the subjects of future enforcement inquiries to tell the Commission the bare minimum instead of providing more comprehensive responses to its questions.

The information is also protected by Exemption 4 because disclosure will cause substantial hardship to XM's competitive position. As noted above, XM faces intense competition from a variety of sources. The requested information provides details about XM's network architecture, business plan, and deployment strategy that is crucial to XM's ability to provide its service to consumers. XM would suffer substantial hardship if its competitors were allowed to obtain this sensitive information about its core strategic functions.

Again, USE's only argument for disclosure is that the "documents and information are relevant to the record being made in MB Docket No. 07-57."[14] Much of the information USE seeks is already part of the record in the merger docket and the remainder is covered by protective orders, which create an explicit process that allows access to protected information while still protecting this highly confidential and proprietary information.[15]

4.    **Consent Decree Discussions**

XM requested confidential treatment, pursuant to FOIA Exemptions 4 and 5, of any consent decree or related settlement discussions, documents and emails between XM and the Commission, including any of its Bureaus.

---

*Satellite Radio Inc. & XM Radio, Inc. For Approval to Transfer Control*, MB Docket No. 07-57, Protective Order, DA 07-4666 (Nov. 16, 2007) ("Second Protective Order").

[14]    USE FOIA Request at 4.

[15]    *See* First Protective Order at ¶¶ 7-10; Second Protective Order at ¶¶ 6-12.

Ms. Karen Mercer
February 29, 2008
Page 8 of 9

FOIA Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The Commission has said that drafts that arise from negotiations of a consent decree between a party and the Commission are protected from disclosure by the settlement privilege of Exemption 5. *Wireless Consumer Alliances*, 20 FCC Rcd. 3874, *30 (Feb. 15, 2005) (drafts that arose from the settlement negotiations between a wireless provider and the Enforcement Bureau are protected from disclosure under Exemption 5 despite the public release of the final consent decree); June 18 Ruling at 6.

Consent decree drafts and discussions could also include information protected from disclosure by FOIA Exemption 4. For example, the consent decree drafts could include privileged confidential commercial information that was removed from the final public consent decree. For the reasons discussed above, this type of sensitive information is clearly protected from disclosure under Exemption 4.

In conclusion, when the Supreme Court rejected another meritless FOIA request almost twenty years ago, it explained that FOIA addresses the public's right to be informed about what their *government* is up to, which is clearly not the issue here. Using language equally applicable to the USE FOIA Request, the Court found the purpose of FOIA:

> is not fostered by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct. In this case – and presumably in the typical case in which one private citizen is seeking information about another – the requester does not intend to discover anything about the conduct of the agency that has possession of the requested records. Indeed, response to this request would not shed any light on the conduct of any Government agency or official.

*Reporters Committee for Freedom of the Press*, 489 U.S. at 773.

The purpose of the USE FOIA Request is to fish for information that it might use in its ongoing private contractual dispute with Sirius – not to find out anything about *government* activity. U.S. Electronics has inundated the Commission with petitions, motions, letters, and other filings in the merger docket that in essence invite the Commission to insert itself into a private contractual dispute;[16] the instant FOIA request

---

[16] *See, e.g.,* Letter from Kathleen Wallman to Chairman Kevin J. Martin, FCC, MB Docket No. 07-57 (filed Feb. 11, 2008); Letter from Charles Heilein to Marlene H. Dortch, Secretary, FCC, MB Docket No. 07-57 (filed Dec. 19, 2007); Petition of U.S. Electronics, Inc. To Designate Application for Hearing, MB Docket No. 07-57 (filed Nov. 9, 2007); Comments on Notice of Proposed Rulemakings Submitted by U.S. Electronics, Inc., MB Docket No. 07-57 (filed Aug. 10, 2007); Letter from Charles

Ms. Karen Mercer
February 29, 2008
Page 9 of 9

is only another step in U.S. Electronics' efforts to use the Commission's processes to
benefit its interests, rather than the public.  The Commission should honor XM's requests
for confidentiality and deny U.S. Electronics' requests for such information in their
entirety.

Please contact the undersigned if you require any additional information.  Thank you for
your consideration of this matter.

Sincerely,

Scott Blake Harris
HARRIS, WILTSHIRE & GRANNIS LLP
1200 18th Street NW
Washington, DC 20036
(202)730-1330

Helein to Marlene H. Dortch, Secretary, FCC, MB Docket No. 07-57 (filed Sept. 4, 2007); Letter from
Charles Helein to Chairman Martin, FCC, MB Docket No. 07-57 (filed Oct. 9, 2007).

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington, D.C. 20554

|  | ) |  |
|---|---|---|
| *In the Matter of* | ) | |
| | ) | |
| REVIEW OF FREEDOM OF INFORMATION ACTION | ) | FOIA Control No. 2007-235 |
| | ) | |
| | ) | |
| | ) | |

**To: Office of General Counsel**

APPLICATION FOR REVIEW

# TABLE OF CONTENTS

Summary ........................................................................................................ 2

Argument ..................................................................................................... 4

    I.    XM's LOI Responses Are Exempt from Disclosure Under FOIA Exemption 4 .................................................................... 4

    II.    XM's LOI Responses Are Exempt from Disclosure Under FOIA Exemption 6 .................................................................... 9

    III.    XM's LOI Responses Are Exempt from Disclosure Under FOIA Exemption 7 .................................................................. 12

        A.   Exemption 7(A) ........................................................... 12

        B.   Exemption 7(C) ........................................................... 14

Conclusion ................................................................................................. 15

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington, D.C. 20554

| | | |
|---|---|---|
| | ) | |
| *In the Matter of* | ) | |
| | ) | |
| REVIEW OF FREEDOM OF INFORMATION ACTION | ) | FOIA Control No. 2007-235 |
| | ) | |
| | ) | |
| | ) | |

To: **Office of General Counsel**

## APPLICATION FOR REVIEW

Pursuant to sections 0.461 and 1.115 of the Commission's rules, XM Radio Inc. hereby seeks Commission review of a June 18, 2007 ruling by the Enforcement Bureau regarding disclosure of information for which XM sought confidential treatment.[1] The Bureau's Ruling addressed a Freedom of Information Act ("FOIA") request by the National Association of Broadcasters ("NAB") for copies of substantially all correspondence between XM and the Commission in connection with pending enforcement proceedings that involve XM. The Bureau granted NAB's request in part and denied it in part.

## SUMMARY

The Bureau correctly determined that certain XM confidential information was exempt from disclosure under FOIA and appropriately protected sensitive commercial and proprietary information. But the Bureau erred in failing to provide confidential treatment for, and agreeing to disclose, four documents (totaling approximately 45 pages). These four documents contain XM's responses to Commission Letters of Inquiry ("LOIs") regarding when XM became aware

---

[1]  Letter from Kathryn S. Berthot, Chief, Spectrum Enforcement Division, to David H. Solomon, Wilkinson, Barker, Knauer, LLP, Counsel for NAB, FOIA Control No. 2007-235 – XM Records ("Bureau Ruling").

2

of compliance problems with its FM modulators and terrestrial repeaters, the reasons for those compliance problems, and the names of XM employees identified as being responsible for or aware of the compliance problems.[2] In order to answer the LOIs as candidly and completely as possible, XM did not merely supply the Enforcement Bureau with information from XM's files. Rather, XM conducted its own internal investigation and included the fruits of that investigation in its response. Consequently, the responses disclose information about XM's internal decision-making processes, as well as about the events in question and the company's knowledge of and response to those events. Moreover, because witnesses' recollections sometimes conflict, the responses include those conflicting recollections and the names of both current and former employees at various levels of the company who may have known about the subjects of the inquiries. XM's responses identify persons whose actual involvement with, or knowledge of, the matters under investigation may have been only tangential depending on the accuracy of individual recollections.

The Bureau did not appropriately consider the adverse consequences that disclosure of the information provided by XM would have on future internal inquiries intended to collect the composite "knowledge" of an organization. Complete candor in such situations requires encouraging full cooperation in interviews and collecting factual material that may not all fit neatly together. Disclosing this information may unfairly tarnish the reputations of individuals,

---

[2]    The four documents are:  the August 21, 2006 letter from 2006 letter from Joseph M. Titlebaum to Neal McNeil regarding File No. EB-06-SE-148 (five-page letter plus five one-page declarations); the September 6, 2006 letter from Terry G. Mahn to Neal McNeil regarding File No. EB-06-SE-148 (four-page letter plus one page of names and titles and a one-page declaration); the March 12, 2007 letter from James S. Blitz to Kathryn S. Berthot regarding File No. EB-06-SE-356 (seven-page letter plus a one-page declaration, an exhibit divider, and two eight-page spreadsheets); and the March 27, 2007 letter from Scott Blake Harris to Kathryn S. Berthot regarding File No. EB-06-SE-356 (two-page letter plus a two-page spreadsheet).

3

unfairly subject companies like XM and individual employees to opportunistic attacks by competitors like NAB, and undermine the public interest in facilitating internal investigations in response to government inquiries. For these reasons, the four documents should be protected from disclosure under FOIA Exemptions 4 and 6.

Finally, the Commission should also withhold disclosure based on Exemptions 7(A) and 7(C). The Commission should take this opportunity to limit the scope of one of its own prior ruling involving FOIA Exemption 7(A), so as to make clear that this exemption also covers the information at issue here, consistent with Supreme Court precedent. While the Bureau may have felt bound by the broad language in this prior Commission ruling, the Commission can and should bring its prior ruling in line with court rulings.

<u>ARGUMENT</u>

I.    **XM's LOI Responses Are Exempt from Disclosure Under FOIA Exemption 4.**

Exemption 4 to FOIA, 5 U.S.C. § 552(b)(4), exempts from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." XM's LOI responses were obviously "information obtained from a person," that is, not generated by the Commission itself. In addition, the broad reading the courts have given to the phrase "commercial or financial" makes clear that virtually all of the information in XM's LOI responses falls into this category.[3] *See, e.g., Critical Mass Energy Project v. Nuclear Regulatory*

---

[3]    The Bureau's Ruling states at one point that "information about when XM became aware of potential non-compliance and what modifications XM made to its radios after they were authorized by the Commission is *not commercial information entitled to confidential treatment.*" Bureau Ruling at 4 (emphasis added). To the extent the italicized phrase was intended as a finding that the LOI responses failed the "commercial" prong of the applicable test (and not just the "confidential" prong), the Bureau clearly erred. *See Public Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983) (reports about product safety are "commercial" because they will be instrumental in the manufacturer's attempts to market the products). Facts developed in the Commission's FM modulator and terrestrial

4

*Comm'n,* 975 F.2d 871, 874 (D.C. Cir. 1992) (*en banc*) (treating safety reports by a non-profit corporation as "commercial"); *Am. Airlines, Inc. v. Nat'l Mediation Bd.*, 588 F.2d 863, 870 (2d Cir. 1978) (treating the number of authorization cards submitted in support of union's certification petition as "commercial"). Thus, the only real question is whether the information in XM's LOI responses qualifies as "confidential."

Under FOIA, "confidential" has a specialized meaning derived from the purposes of the statute. Because XM was required to respond to the Commission's LOIs, the information is considered "confidential" if disclosure is likely *either* to: (1) impair the government's ability to obtain necessary information in the future; or (2) cause substantial harm to XM's competitive position. *Nat'l Parks and Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974). In this case, both prongs are satisfied.

As an initial matter, the *purpose* of the NAB's FOIA request is to fish for information that it might use in its ongoing campaign to curtail XM's competition with its members – not to find out anything about *government* activity. Since the earliest days of the satellite radio industry, the NAB (on behalf of XM's competitors, terrestrial radio broadcasters) has endeavored to limit or cripple satellite radio's growth and impact; the instant FOIA request is only another step in NAB's efforts to use the Commission's processes to benefit the interest of NAB's members, rather than the public. In other words, this request is designed to cause substantial harm to XM's competitive position and will do so – thus the documents are "confidential" under settled law. As importantly, the documents are "confidential" because disclosing them will

---

Continued . . .

    repeater inquiries have already significantly affected XM's commercial operations, and XM is well aware that additional commercial consequences are likely to follow. Under *Public Citizen,* this gives XM an intensely commercial interest in all factual information requested by the Commission.

plainly impair the Commission's ability to obtain necessary information in future investigations. As the D.C. Circuit has stated, "when dealing with a FOIA request for information the provider is required to supply, the governmental impact inquiry will focus on the possible effect of disclosure on its *quality.*" *Critical Mass,* 975 F.2d at 878 (emphasis added); *Washington Post Co. v. Dep't of Health and Human Servs.,* 690 F.2d 252, 268-69 (D.C. Cir. 1982) (quality of information submitted to government may be impaired where the nature of the inquiry leaves substantial room for interpretation by the submitting party).

There are at least two reasons why disclosure of XM's LOI responses would adversely affect the quality of future responses in Commission enforcement proceedings. *First,* even though a business organization may be obligated to respond to Commission LOIs, as XM was required to reply to the LOIs here, Bureau Ruling at 5, 7, individual employees – as well as *former* employees – may not be obligated to cooperate with efforts to provide that response. In this case, many of the events about which the Commission inquired happened more than five years ago, and there has been significant employee turnover at XM during that time. XM was able to respond as completely as it did only because both former and current employees at all levels of the company were willing to be interviewed at length by counsel so that their recollections, some of which were of events more than five years past, could be taken into account. Disclosing the identities and recollections of these individuals may subject them improperly to reputational harm and adverse consequences in their chosen professions.

As a result, disclosing the identities of the individuals who provided information to XM, along with the information they provided, will surely deter cooperation by individuals in connection with future FCC investigations. It would be terribly short-sighted for the Commission to adopt a disclosure policy in this case that would make it less likely that potential

witnesses in comparable situations will voluntarily and fully cooperate in future investigations. Indeed, similar considerations recently prompted the Department of Justice (DOJ) to change its policy regarding companies' refusal to waive the attorney-client privilege. Under the so-called "Thompson Memorandum," DOJ policy held that a corporation's refusal to waive attorney-client privilege during a criminal investigation could be considered a relevant indicator of non-cooperation in determining whether to indict the corporation. *See, e.g., United States v. Stein*, 440 F. Supp. 2d 315, 319 (S.D.N.Y. 2006). But last December DOJ changed its position in response to concerns that its policy would deter cooperation with internal corporate investigations. The "McNulty Memorandum" concluded that a corporation's refusal to waive privilege over attorney-client communications could not be held "against the corporation in making a charging decision."[4] DOJ reversed course because it recognized that the privilege "'encourage[s] full and frank communication between attorneys and their client and thereby promote[s] broader public interests in the observance of law and administration of justice'" (quoting *Upjohn v. United States*, 449 U.S. 383, 389 (1976)).[5] In other words, the promise of confidentiality – whether between attorney and client or regulator and corporation – actually promotes, rather than restricts, openness and honesty in a given proceeding. Without that promise, as DOJ rightly recognized, an individual's instinct to protect himself or herself inevitably replaces "full and frank communication."

In addition, the "knowledge" of any business organization is necessarily a composite of what its employees know. If the employees claim to "know" different things that are to some extent irreconcilable, there may be no simple answer to the question of what the organization as

---

[4]   Memorandum of Deputy Attorney General Paul McNulty, *available at* http://news.findlaw.com/hdocs/docs/doj/121206mcnultymemo.html.

[5]   *Id.*

7

a whole knew or when it knew it. Under these circumstances, a Commission policy of protecting detailed elements of LOI responses from disclosure will encourage respondents to bring all relevant, even if sometimes conflicting, information to the Commission's attention. Or to put the matter negatively, compelling disclosure here may cause future respondents to feel the need to answer in generalities or harmonize differing recollections. As noted above, XM conducted its investigation by not only reviewing materials in its files, but also by conducting interviews of current employees, former employees, and even outside advisors. XM gave the Commission the recollections of those XM believed might have been involved in these matters – even where those recollections were not identical and where it was not clear whether or to what extent the individual was actually involved. This is precisely the kind of disclosure the Commission should encourage. However, by making public the details of who had what recollections, the Commission necessarily deters candid communications in response to internal corporate inquiries. This result will hamper future internal inquiries and ultimately, FCC enforcement efforts.

Disclosing XM's LOI responses will also cause substantial harm to XM's competitive position. *Nat'l Parks*, 498 F.2d at 770. XM candidly responded to the LOIs in detail. Its responses provide insights into XM's organizational processes, how it became aware of the potential non-compliance, how it reacted, and how the potential non-compliance affected its business processes and strategy. Accordingly, disclosing these responses would reveal not just the "name[s] and titles" of XM's employees as the Bureau suggested, but also details about XM's internal workings that go far beyond any public disclosure XM has made to date on these subjects. As XM explained in its April 20, 2007 letter, "[a]ny disclosure of this information would provide a peek into XM's 'play book,' giving a significant advantage to XM's

8

competitors, which includes the party filing the FOIA request . . . . Thus, XM would suffer substantial hardship if its competitors were allowed to view this sensitive information about its core strategic functions."

## II.    XM's LOI Responses Are Exempt from Disclosure Under FOIA Exemption 6.

FOIA Exemption 6 protects against disclosure of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). According to the Supreme Court, "Congress' primary purpose in enacting Exemption 6 was to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." *United States Dep't of State v. Washington Post Co.*, 456 U.S. 595, 599 (1982).

The statutory reference to "personnel files and medical files and similar files" has misled some agencies and courts into taking a narrow view of Exemption 6. But the Supreme Court has forcefully rejected a narrow view of this exemption, finding the protection of individual privacy "was not intended to turn upon the label of the file which contains the damaging information." *Id.* at 601-02. Rather, "[w]hen disclosure of information which applies to a particular individual is sought from Government records, courts must determine whether release of the information would constitute a clearly unwarranted invasion of that person's privacy."

The Bureau's focused its analysis of Exemption 6 solely and erroneously on names and titles. *See* Bureau Ruling at 5. Framing XM's Exemption 6 argument solely as a request for "confidential treatment of the names and titles of XM employees," the Bureau said it was willing to "assum[e] that the names and titles of these XM employees could be characterized as personnel or similar files," *id.*, but it was "not willing to redact the names and titles." *Id.* (The Bureau had already observed that the "names and titles" of XM's executive and senior-level

9

employees "are publicly known." Bureau Ruling at 4.)` This treatment of Exemption 6 cannot be reconciled with the applicable law.

First, the Bureau's finding that the considerable harm such disclosure might cause to individuals does not outweigh "the public's interest in understanding the agency's enforcement proceedings" (Bureau Ruling at 5) is directly contrary to the facts: NAB is seeking this information in order to damage XM on behalf of NAB's terrestrial radio constituents and not to better understand any FCC proceedings. In fact, any suggestion of a positive public interest in disclosure is contradicted by the Bureau Ruling itself, which elsewhere concluded -- correctly -- that "NAB seeks disclosure of information obtained in an enforcement proceeding *for use in an entirely separate licensing proceeding.*" Bureau Ruling at 8 (emphasis added). It was on this basis that the Bureau explained -- again, correctly -- "we disagree that there is a compelling public interest in disclosing information regarding XM's potential rule violations." *Id.*

Having concluded that there was no public interest in disclosing information about potential rule violations by XM, and that NAB's interest in the documents from the enforcement proceeding was to make collateral use of them, the Bureau's conclusion that the privacy interests of the individuals mentioned in XM's LOI responses were outweighed is inexplicable. The Supreme Court said it quite succinctly: "disclosure of records regarding private citizens, identifiable by name, is not what the framers of the FOIA had in mind." *United States Dep't of Justice v. Reporters Committee for Freedom of the Press,* 489 U.S. 749, 765 (1989).

Second, to the extent that there is any skepticism about whether "personnel files or medical files or similar files" were involved here, that question is decisively settled in XM's favor. As the D.C. Circuit has held, "All information which 'applies to a particular individual' is covered by Exemption 6, regardless of the type of file in which it is contained." *Washington*

*Post Co.,* 690 F.2d at 260 (quoting *United States Dep't of State,* 456 U.S. at 599). Under this ruling, information about an individual's involvement – or *possible* involvement – in matters that are the subject of regulatory enforcement activity clearly qualifies, and not just to the extent of "names and titles." Such information is precisely what the Bureau Ruling would release to XM's competitors.

Third, it is irrelevant – as a matter of law – whether certain information in XM's LOI responses (such as names and titles) is also available from other public sources. In *Reporters Committee for Freedom of the Press, supra,*, the Supreme Court held that a computerized FBI "rap sheet" was protected from disclosure under Exemption 7(C) even though *everything* on the rap sheet was a matter of public record. 489 U.S. at 749. And in *New York Times Co. v. NASA,* 920 F.2d 1002, 1008-10 (D.C. Cir. 1990), the D.C. Circuit held that an audio recording of the voices of the *Challenger* astronauts in the moments before the fatal explosion was protected under Exemption 6 even though NASA had already made a transcript of the recording public. Thus, the fact that "names and titles" of XM's employees may be publicly available, or that XM has disclosed its *receipt* of the LOIs in securities filings, is utterly irrelevant to the analysis under Exemption 6.

Finally, the Bureau's application of the legally required balancing test seriously understated the potential harm to the individuals disclosed in XM's response, by repeatedly discussing "names and titles" as if that were the only issue here. The real and serious invasion of personal privacy here is not the disclosure that a particular person held a particular position at XM, but the linkage of individuals, by name, to recollections about – and perhaps even each individual's alleged role in – the underlying activities and alleged non-compliance that are the

subject of the Enforcement Bureau's investigations. That linkage is as patent an invasion of privacy as disclosing a medical condition or reprimand in a personnel file.

## III.     XM's LOI Responses Are Exempt from Disclosure Under FOIA Exemption 7.

Exemption 7 of FOIA protects from mandatory disclosure any records or information "compiled for law enforcement purposes," if disclosure "could reasonably be expected to interfere with enforcement proceedings," 5 U.S.C. § 552(b)(7)(A), or "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7) (C); *FBI v. Abramson*, 456 U.S. 615, 633 (1982). Records compiled by agencies having both law enforcement and administrative functions, like the Commission, qualify as investigatory files compiled for law enforcement purposes under Exemption 7. *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1540 (D.C. Cir. 1993).

### A.     Exemption 7(A).

Although the Commission's investigation has progressed significantly, the matters that are the subject of the LOIs are not yet closed. Disclosure of the documents at issue could compromise the current investigation and establish a precedent that would compromise unrelated Commission enforcement proceedings. As explained above in the discussion of Exemption 4, publicizing the names of voluntary witnesses at this time would make both those witnesses and other potential witnesses less likely to voluntarily and fully cooperate in the future. Such reticence would inevitably lead to more limited and less useful responses. That is exactly the kind of harm that Exemption 7(A) was intended to avert.

Exemption 7(A) focuses not on individual privacy but on the integrity of the investigation itself. The Commission has routinely denied FOIA requests for information submitted to the Commission during an ongoing investigation. In *Kay v. FCC*, the Commission received a FOIA

request for "all complaints, letters, reports, and memoranda, or notes submitted to the FCC by any person" with respect to an ongoing investigation. 867 F. Supp. 11, 15 (D.D.C. 1994). The District Court held that the Commission properly withheld the requested documents because the documents were protected under FOIA exemption 7. *Id.* at 16-20; *see also In the Matter of Rocky Mountain Record*, 21 FCC Rcd 12362 (October 27, 2006) (denying access to documents in an enforcement proceeding because protection would interfere with an ongoing investigation including deterring potential witnesses, and exposing witnesses to potential harassment.) Indeed, just a few months ago, the Commission relied on Exemption 7 to reject a FOIA request submitted by a reporter for many of the same records sought by the NAB.[6]

By contrast, the Commission said in *Wireless Consumer Alliance*, 20 FCC Rcd. 3876, 3881 (2005), that LOI responses such as those at issue here do not qualify for Exemption 7(A) because "[a]s a general proposition, release of information already known to the target of the investigation would not be expected to result in interference." The Commission should take this opportunity to limit the scope of this ruling, which sweeps much too broadly. In this case, for example, XM has provided the Commission with summaries of witness recollections that do not agree on all points. Each witness knows what he or she has told XM's counsel, but not necessarily what other witnesses have said. Public disclosure of the LOI responses, therefore, could actually taint further testimony at the Commission or elsewhere by compromising the independence of the witnesses' recollections. Moreover, the Commission should approach the matter "categorically," as the Supreme Court has instructed, *Reporters Committee for Freedom of the Press,* 489 U.S. at 773-75, and consider the long-term effect of permitting disclosure of unevaluated investigatory materials.

---

[6]   Letter to Christopher Stern, Bloomberg News, from the Enforcement Bureau dated 26 September 2006, FOIA Control Number 2006-486.

13

B.    Exemption 7(C).

Exemption 7(C) is similar to Exemption 6 (as discussed above), but broader; thus, courts require a lesser degree of intrusion on personal privacy in order to invoke Exemption 7(C). *See Reporters Committee*, 489 U.S. at 756. This reflects the common-sense view that disclosure of information about an individual is inherently more troubling when it connects a person with possible non-compliance. Indeed, the D.C. Circuit has recognized that "a primary purpose of Exemption 7(C)" is ensuring that individuals are not "associated unwarrantedly with alleged criminal activity." *Stern v. FBI*, 737 F.2d 84, 92 (D.C. Cir. 1984). Publishing the names of people who were merely involved in an investigation – but were never actually accused of any wrongdoing – could "make those persons the subjects of rumor and innuendo, possibly resulting in serious damage to their reputations." *Id.* That kind of disclosure should be permitted "only if the public interest in the information outweighs the significant privacy interests implicated." *Id.*

In *Stern*, the court held that the privacy interests of two FBI agents outweighed the public interest in knowing the names of everyone who was involved in potentially wrongful activity. The primary public interest was in knowing that a government investigation of wrongdoing was thorough and that any wrongdoers were held accountable. *Id.* That interest "would not be satiated in any way by the release" of the agents' names. *Id.* The same considerations apply here. The XM employees who would be harmed by the release of their names never had the chance to even review – much less respond to – any allegations that might have been leveled against them during the investigation. Subjecting the XM employees involved in the investigation to the "embarrassment or stigma wrought by negative disclosures," *id.* at 91, would contravene a core purpose of Exemption 7.

14

For these reasons, the Commission should make clear that Exemptions 7(A) and 7(C) are fully applicable to ongoing investigations and apply those exemptions to the NAB's FOIA request.

## CONCLUSION

It is perhaps telling that the NAB's FOIA request can be summed up so aptly using the Supreme Court's own characterization of an equally meritless request almost twenty years ago. As the Supreme Court said in *Reporters Committee,* the purpose of FOIA

> is not fostered by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct. In this case – and presumably in the typical case in which one private citizen is seeking information about another – the requester does not intend to discover anything about the conduct of the agency that has possession of the requested records. Indeed, response to this request would not shed any light on the conduct of any Government agency or official.

*Reporters Committee,* 489 U.S. at 773. The same is true here. The Commission should exempt from disclosure XM's four documents and deny the NAB's request in its entirety.

Respectfully Submitted,

Scott Blake Harris
Mark Grannis
Amy Richardson

**HARRIS, WILTSHIRE & GRANNIS LLP**
1200 18th Street, NW
Washington, DC 20036-2560
(202) 730-1300
*Counsel to XM Radio Inc.*

July 2, 2007

15

# ATTACHMENT D



1776 K STREET NW
WASHINGTON, DC 20006
PHONE  202.719.7000
FAX  202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE  703.905.2800
FAX  703.905.2820

www.wileyrein.com

February 29, 2008

Robert L. Pettit
202.719.7019
rpettit@wileyrein.com

**VIA FIRST CLASS MAIL AND FACSIMILE**

Karen Mercer
Federal Communications Commission
Enforcement Bureau
Spectrum Enforcement Division
Room 3-A325
445 12th Street, S.W.
Washington, DC  20554

Re:    *FOIA Control No. 2008-190*

Dear Ms. Mercer:

This letter is Sirius Satellite Radio Inc.'s ("Sirius" or "we") response to the letter of Kathryn S. Berthot dated February 14, 2008, in the Freedom of Information Act ("FOIA") request submitted by U.S. Electronics, Inc. ("USE") noted above.

Some of the material arguably within the scope of the FOIA request was submitted under protective order in response to information requests tendered by the Commission to Sirius as part of the Commission's ongoing consideration of the proposed merger between Sirius and XM Satellite Radio Holdings Inc. ("XM"), MB Docket No. 07-57. In addition, as the February 14, 2008 letter noted, many of the documents that USE requested are subject to pending confidentiality requests. Specifically, Sirius has requested confidentiality for documents it submitted to the Commission as part of File No. EB-06-SE-250.[1]

---

[1]     In addition to the documents covered by these specific confidentiality requests, any documents subject to the USE FOIA request that discuss proposed consent decrees or other similar settlement agreements between the Commission and Sirius are exempt from public disclosure pursuant to FOIA Exemption 5. *See, e.g., Wireless Consumer Alliance*, 20 FCC Rcd. 3874 (2005) (withholding drafts of consent decrees); Letter from Kathryn S. Berthot, Chief, Spectrum Enforcement Division, FCC, to David H. Solomon, Wilkinson Barker Knauer, LLP, Counsel for NAB, File No. EB-06-SE-250 – Sirius Records (June 18, 2007) at 5 ("June 18 Letter Ruling") (attached as Exhibit 1) (withholding from disclosure Sirius presentations that were "the subject of ongoing settlement discussions").



Karen Mercer
February 29, 2008
Page 2

**MB Docket No. 07-57**

        USE's FOIA request extends to certain information submitted by Sirius to the Commission regarding interoperability and terrestrial repeaters.[2]  Because this information was submitted in the merger docket under the terms of the protective order, and meets the requirements for FOIA Exemption 4,[3] there is no reason to release these documents publicly and the agency should decline to do so.

        In the Merger Docket, the Commission has adopted two protective orders, one covering confidential information[4] and a second, more restrictive order covering highly confidential information.[5]  The Second Protective Order grants "more limited access to those materials [submitted by parties] which, if released to competitors, would allow those competitors to gain a significant advantage in the marketplace."[6]  On November 16, 2007, Sirius filed its response to the Media Bureau's Initial Information and Document Request dated November 2, 2007 (the "Merger Information Request").  Pursuant to the Commission's Order adopting the Protective Order, the Order Adopting the Second Protective Order, and instructions from Media Bureau staff, Sirius filed two copies of its response, a redacted public copy, and an unredacted public copy available for inspection pursuant to the terms of the Protective Orders.

        In the public copy, Sirius redacted confidential and highly confidential information that may be covered by USE's FOIA request, including information related to Sirius' terrestrial repeaters and development of interoperable satellite

---

[2]        USE FOIA Request at 2-3.

[3]        47 C.F.R. § 0.457(d) (implementing 5 U.S.C. § 552(b)(4)).

[4]        *Applications of Sirius Satellite Radio Inc. & XM Radio, Inc. For Approval to Transfer Control*, Protective Order, MB Docket No. 07-57, DA 07-3135 (rel. July 11, 2007) (the "First Protective Order").

[5]        *Applications of Sirius Satellite Radio Inc. & XM Radio, Inc. For Approval to Transfer Control*, Protective Order, MB Docket No. 07-57, DA 07-4666 (rel. Nov. 16, 2007) ("Second Protective Order" and together with *the First Protective Order*, the "Protective Orders").

[6]        Second Protective Order at ¶ 3.



Karen Mercer
February 29, 2008
Page 3

radio receivers.[7] Such information is properly withheld from public inspection pursuant to FOIA's Exemption 4.

Exemption 4 protects commercial and/or financial information that, if disclosed, will: (1) impair the government's ability to obtain necessary information in the future; or (2) cause substantial harm to the competitive position of the person from whom the information was obtained.[8] The information redacted in Sirius' response to the Merger Information Request clearly falls within this Exemption. Sirius redacted information related to technical data concerning its terrestrial repeaters, potential manufacturers of interoperable radios, as well as pricing and cost information for such radios. Such proprietary and confidential information is at the core of Sirius' operations and its disclosure to competitors would provide them with a distinct advantage. Moreover, release of such information would tend to deter fulsome cooperation by parties subject to Commission inquiries in the future for fear of public disclosure of sensitive and confidential information. The agency should thus find that these materials are exempt from FOIA disclosure.

USE provides no compelling justification that would allow the agency to disclose these exempt materials.[9] USE states that its request is necessary because the "documents and information [it seeks] are relevant to the record being made in MB Docket No. 07-57."[10] However, these documents are already part of the record in MB Docket No. 07-57. The Commission has already designed a process to ensure that these documents can be properly reviewed and considered in the merger context. The Protective Orders provide access by persons such as USE to documents and information withheld from public disclosure under conditions intended to permit timely consideration of these documents as part of the merger

---

[7]   See REDACTED COPY, *Response of Sirius Radio Inc. to the Information and Document Request Issued on November 2, 2007 by the Federal Communications Commission*, Narrative Responses III.E, IV.D.4, IV.D.5, IV.D.6, IV.D.7 & IV.D.8; Exhibit III.A.

[8]   *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974) (footnote omitted).

[9]   Indeed, USE limits its request to those documents that are "non-privileged" and "non-exempt." USE FOIA Request at 2-3. USE thus does not appear to be requesting disclosure of exempt documents on public interest grounds. *See Examination of Current Policy Concerning the Treatment of Confidential Information Submitted to the Commission*, 13 FCC Rcd. 24816, 24818 (¶ 2) (1998) ("Even when particular information falls within the scope of a FOIA exemption, federal agencies generally are afforded the discretion to release the information on public interest grounds.").

[10]   USE FOIA Request at 4.



Karen Mercer
February 29, 2008
Page 4

proceeding while assuring the protection of Sirius' proprietary information.[11] There is thus no public interest reason to disclose publicly these exempt documents pursuant to FOIA.

## EB-06-SE-250

USE also seeks documents submitted by Sirius as part of the EB-06-SE-250 proceeding. These documents were the subject of a prior FOIA request filed by the National Association of Broadcasters ("NAB").[12] As Sirius showed in response to that earlier request, these materials are covered by FOIA Exemptions 4 and 7.[13] The documents that Sirius submitted in the EB-06-SE-250 proceeding included privileged information, trade secrets, and sensitive commercial and financial information that meet both prongs of the test under Exemption 4 (discussed above). Exemption 7(A) shields from disclosure documents "compiled for law enforcement purposes" and if released can "reasonably be expected to interfere with enforcement proceedings."[14] The EB-06-SE-250 documents qualify for this exemption because the Commission's investigation remains ongoing and because disclosure of these documents would interfere with these proceedings. Exemption 7(C) shields documents from disclosure "compiled . . . for law enforcement purposes" where disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy."[15] Many of the documents submitted in the EB-06-SE-250 proceeding identify specific Sirius employees without drawing a distinction between those who may only have had limited knowledge of the issues in the proceeding and those who were more actively involved. There is no public interest in disclosure of the identity of these individuals, and any arguable interest in

---

[11]    *See* First Protective Order at ¶¶ 7-10; Second Protective Order at ¶¶ 6-12.

[12]    FOIA Control No. 2007-235.

[13]    5 U.S.C. §§ 552(b)(4) & (7). In its response Sirius also explained that although the Commission's rules, 47 C.F.R. § 0.459(b), bar "blanket" requests for confidential treatment, it is appropriate in cases such as these where there are a large number of documents at issue for the Commission to rule on requests for confidentiality on a categorical or "generic" basis. *See, e.g., NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 236 (1978) (explaining that Congress intended to prohibit "blanket exemptions" but not "generic determinations").

[14]    5 U.S.C. § 552(b)(7)(A).

[15]    5 U.S.C. § 552(b)(7)(C).



Karen Mercer
February 29, 2008
Page 5

disclosure is significantly outweighed by the privacy interests of those individuals in not being unfairly associated with the issues covered by that proceeding.[16]

     On June 18, 2007, the Enforcement Bureau granted in part, and denied in part, NAB's request.[17]  In doing so, the Enforcement Bureau issued a determination on Sirius' request for confidential treatment of these documents.  The Enforcement Bureau found that "Sirius has demonstrated that substantial competitive harm is likely to result from the release of some of the requested information," because "disclosure of these commercial materials would allow competitors to gain insight into Sirius' business processes, commercial strategies and product development and harm its relationships with its vendors."[18]  As a result, the Enforcement Bureau ruled that this information should be withheld from disclosure under FOIA Exemption 4 and FOIA Exemption 5.[19]

     For those documents that the Bureau has already determined are exempt from FOIA disclosure, the Bureau should simply deny USE's request.  USE's FOIA request provides no basis for revisiting the Bureau's prior decision on these issues, and does not even attempt to argue that there is a public interest justification for releasing these documents despite their exempt status.  In fact, USE's FOIA request appears to be limited solely to "non-privileged" and "non-exempt" documents.[20]

     Indeed, while USE fails to offer any compelling reason for releasing these documents despite their confidential nature, the sole justification that USE does arguably provide is the unsupported assertion that these "documents and information are relevant to the record being made in MB Docket No. 07-57."[21]  This is a passing reference to the same argument that was made (in a much more detailed presentation) by NAB in its FOIA request.  Thus, the Enforcement Bureau has already had the opportunity to consider and reject the supposed relevance of these documents to the XM/Sirius merger proceeding as a basis for releasing exempt

---

[16]    *Deglace v. DEA*, No. 05-2276, 2007 WL 521896, at *2  (D.D.C. Feb. 15, 2007) (citing *United States Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 776 (1989)).

[17]    June 18 Letter Ruling.

[18]    *Id.* at 3.

[19]    5 U.S.C. § 552(b)(5).

[20]    *See supra* note 9.

[21]    USE FOIA Request at 4.



Karen Mercer
February 29, 2008
Page 6

documents. The Bureau "disagree[d]" that there was any "compelling public interest" in disclosing this information,[22] and found that all of the case law cited by NAB was distinguishable. USE cannot offer any basis for revisiting this conclusion, and certainly has failed to do so with its unadorned assertion of relevance.

While the Enforcement Bureau determined that the vast majority of the materials at issue in the NAB request were exempt from FOIA disclosure, the Bureau also held that a limited amount of material was not covered by a FOIA exemption and therefore could be released. On June 29, 2007, Sirius filed an Application for Review of the Bureau's decision with respect to the limited number of the documents the Bureau determined should be released.[23] In its Application for Review, Sirius explained that some of the information that the Bureau decided to release was just as commercially sensitive as the information that the Bureau determined was exempt, and should therefore be subject to the same FOIA exemptions.[24] In addition, Sirius and third-party intervenors showed that the identities of the various Sirius employees that Sirius identified as having knowledge of the issues in the proceeding were covered by FOIA Exemption 7.[25] Release of this information serves no purpose, and could unfairly associate these individuals with non-compliant conduct where no determination of individual involvement has been made.[26] For this reason, as Sirius explained, the case law clearly shows that the names and identifying information of third parties who are mentioned in law enforcement records are routinely withheld.[27] The Application for Review remains pending. To the extent that USE seeks documents that are the subject of the still-pending Application for Review, the Bureau should deny USE's request as to these documents pending resolution of the Application for Review.

---

[22]     June 18 Letter Ruling at 6.

[23]     Application for Review of Freedom of Information Action of Sirius Satellite Radio, FOIA Control No. 2007-235 (June 29, 2007) ("Application for Review") (attached as Exhibit 2). Sirius did not challenge the release of all of the information contained in these documents, but rather sought additional redactions of relevant information contained in the documents before they were released.

[24]     *Id.* at 3-5; 11-13.

[25]     *Id.* at 5-11.

[26]     *Id.* at 5, 7.

[27]     *Id.* at 7.



Karen Mercer
February 29, 2008
Page 7

Additionally, Sirius understands that USE has filed a FOIA request with the Commission for documents submitted by Kiryung Electronics Company, Ltd. ("KRI") and Wistron NeWeb Corp. ("WNC") concerning the matters "raised and considered" in proceeding EB-06-SE-250.[28] To the extent such documents cover topics similar or identical to those covered by the documents discussed above but are not subject to a pending confidentiality request, we ask that the Bureau exercise its discretion and deny this USE's FOIA request for the reasons stated above.[29]

Please contact me at the telephone number above should you have any further questions or require additional information.

Sincerely,

Robert L. Pettit
Joshua S. Turner

Attachments

---

[28]   FOIA Control No. 197

[29]   47 C.F.R § 0.459(f) (permitting the Commission to *sua sponte* withhold public disclosure of documents even where no request for confidentiality was filed).

# EXHIBIT 1



Federal Communications Commission
Washington, D.C. 20554

June 18, 2007

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**AND FACSIMILE AT (202) 783-5851**

David H. Solomon, Esq.
Wilkinson Barker Knauer, LLP
2300 N Street, Northwest
Suite 700
Washington, D.C. 20037

Re: FOIA Control No. 2007-235 – Sirius Records

Dear Mr. Solomon,

This is in response to your March 22, 2007, Freedom of Information Act ("FOIA") request filed on behalf of the National Association of Broadcasters ("NAB"). You seek copies of Letters of Inquiry ("LOIs") or similar correspondence from the Commission to Sirius Satellite Radio, Inc. ("Sirius") and XM Radio, Inc. ("XM"), as well as responses from both companies, concerning the compliance with the Commission's rules of FM modulators/transmitters used in connection with their satellite Digital Audio Radio Service ("DARS") radios and of their terrestrial repeaters.

For administrative convenience, we are addressing your FOIA request separately with respect to Sirius and XM. This letter deals with the portion of your FOIA request relating to Sirius. Your FOIA request seeks documents which are the subject of pending requests for confidentiality from Sirius pursuant to FOIA Exemptions 4 and 7(A). We accordingly served your FOIA request on Sirius and gave it an opportunity to provide additional support for its requests for confidentiality.[1] Sirius submitted a supplemental confidentiality request on April 20, 2007.[2] On May 23, 2007, NAB submitted a response to the April 20, 2007 supplemental confidentiality request filed by Sirius.[3] On May 30, 2007, Sirius responded to NAB's May 23, 2007 response.[4]

---

[1] See 47 C.F.R. § 0.461(d)(3). See also Letter from Kathryn S. Berthot, Chief, Spectrum Enforcement Division, Enforcement Bureau, to Robert L. Pettit, Esq., Wiley Rein LLP (April 9, 2007).

[2] See Letter from Robert L. Pettit, Esq., Wiley Rein LLP, to Kathryn S. Berthot, Chief, Spectrum Enforcement Division, Enforcement Bureau (April 20, 2007) ("April 20, 2007 letter").

[3] See Letter from David H. Solomon, Esq., Wilkinson Barker Knauer, LLP, to Kathryn S. Berthot, Chief, Spectrum Enforcement Division, Enforcement Bureau (May 23, 2007).

[4] See Letter from Robert L. Pettit, Esq., Wiley Rein LLP, to Kathryn S. Berthot, Chief, Spectrum Enforcement Division, Enforcement Bureau (May 30, 2007).

David H. Solomon, Esq.                                                            2

     Categories 1, 3 and 5. Categories 1, 3 and 5 of your FOIA request seek LOIs or similar letters from the Commission to Sirius regarding the compliance with Commission rules of FM modulators/transmitters used by Sirius in connection with its satellite DARS radios. We have located two LOIs from the Commission to Sirius dated June 20, 2006 and August 7, 2006 that are responsive to this request. We are releasing these documents in their entirety (approximately 13 pages).

     Categories 2, 4 and 5. Categories 2, 4 and 5 of your FOIA request seek the responses of Sirius (including any documents provided therewith) to LOIs or similar letters from the Commission regarding its compliance with Commission rules of FM modulators/transmitters used by Sirius in connection with its satellite DARS radios and any other documents submitted by Sirius relating to these matters. We have located approximately 3,784 pages of responsive documents ("LOI Responses"). As explained below, we are releasing approximately 97 pages of documents, some with redactions, and withholding approximately 3,687 pages of documents.

     Sirius asks us to withhold its LOI Responses in their entirety under FOIA Exemption 7(A). FOIA Exemption 7(A), 5 U.S.C. § 552(b)(7)(A), applies to "records or information compiled for law enforcement purposes … to the extent that the production of such law enforcement records or information … could reasonably be expected to interfere with enforcement proceedings." Sirius asserts that all of the materials it has produced qualify for protection under Exemption 7(A) because they were indisputably compiled for law enforcement purposes and their release would interfere with pending and future related enforcement proceedings.

     We conclude that Sirius' LOI Responses should not be withheld from disclosure under Exemption 7(A). All of the materials in question are in Sirius' possession and known to it. In *Wireless Consumers Alliance*, the Commission concluded that the release of information already known to the target of an investigation would not be expected to result in interference to the investigation.[5] Furthermore, in this instance, we do not believe that release of these materials will result in interference to any other pending investigations or similar future investigations. In this connection, we note that it has been publicly known for almost a year that the Commission is investigating the compliance of various entities with the Commission's rules regarding FM modulators.[6]

     Sirius also requests confidential treatment of its LOI Responses in their entirety under FOIA Exemption 4. FOIA Exemption 4, 5 U.S.C. § 552(b)(4), applies to "trade secrets and commercial or financial information obtained from a person and privileged or confidential." Under *National Parks and Conservation Ass'n v. Morton*,[7] commercial or financial materials are considered confidential if disclosure of the information is likely:

---

[5] 20 FCC Rcd 3874, 3881-82 (2005).

[6] We note that Sirius and various other companies have disclosed pending investigations into their compliance with the Commission's rules regarding FM modulators in their filings with the Securities and Exchange Commission ("SEC").

[7] 498 F.2d 765, 770 (D.C. Cir. 1974) ("*National Parks*").

David H. Solomon, Esq.                                                          3

(1) to cause substantial hardship to the competitive position of the submitter, or (2) to impair the government's ability to obtain necessary information in the future.[8]

Sirius argues that its LOI Responses contain trade secrets and privileged commercial or financial information and that the disclosure of this information would result in irreparable harm to its competitive position. In particular, Sirius argues that disclosure of such information would allow competitors to gain insight into Sirius' business processes and commercial strategies as well as its relationships with customers, harm Sirius' relationships with its suppliers and its ability to work with distributors, and assist competitors in developing, producing, marketing and selling future products and services that compete with those offered by Sirius. Sirius further argues that the release of such information would impair the Commission's ability to obtain necessary information in the future.

We find that Sirius has demonstrated that substantial competitive harm is likely to result from the release of some of the requested information and therefore will withhold that information from disclosure. Specifically, we will withhold from disclosure the following: contracts and agreements between Sirius and other entities regarding the design, manufacture and distribution of satellite DARS radios (approximately 992 pages), and internal documents relating to Sirius' product development and business strategies, including e-mail messages, test data and product descriptions (approximately 2,479 pages). We agree with Sirius that disclosure of these commercial materials would allow competitors to gain insight into Sirius' business processes, commercial strategies and product development and harm its relationships with its vendors. In addition, we will redact portions of Sirius' LOI Responses dated July 12 and August 14, 2006. The information redacted from the LOI Responses includes data concerning the number of units of satellite DARS radios manufactured, imported, sold, activated by consumers, at factories and at distributors and retailers; proposed technical solutions to FM modulator interference; and Sirius' proposed comprehensive compliance plan. The various data concerning the number of units of radios would be invaluable to Sirius' competitors in understanding the relationship between Sirius' manufacturing, sales and activation volumes. Further, the proposed technical solutions and comprehensive compliance plan would allow competitors to gain insight into its business processes and commercial strategies. *See, e.g., National Parks & Cons. Ass'n v. Kleppe*, 547 F.2d 673, 684 (D.C. Cir. 1976); *Timken Co. v. U.S. Customs Serv.*, 491 F. Supp. 557, 559-60 (D.D.C. 1980) (both holding that business strategies and marketing plans are exempt from disclosure under Exemption 4); *Fisher v. Renegotiation Bd.*, 355 F. Supp. 1171, 1174 (D.D.C. 1973) (sales information, including pricing data, net sales, costs and expenses, exempt from disclosure under Exemption 4); *International Satellite, Inc.*, 57 RR 2d 460, 462-63 (1984) (withholding of business marketing plans under Exemption 4). Moreover, Sirius' proposed technical solutions and comprehensive compliance plan are the subject of ongoing settlement discussions and therefore may also be withheld under the settlement privilege of FOIA Exemption 5, 5 U.S.C. § 552(b)(5). *See The Goodyear Tire & Rubber*

---

[8] *See also Critical Mass Energy Project v. NRC*, 975 F.2d 871 (D.C. Cir. 1992).

4

David H. Solomon, Esq.

*Co. v. Chiles Power Supply, Inc. d/b/a Heatway Systems*, 332 F. 3d 976 (6th Cir. 2003) ("*Goodyear Tire*").

We find, however, that Sirius has not demonstrated that substantial competitive harm is likely to result from the release of other materials. Accordingly, we will release these materials. Specifically, we are releasing the unredacted portions of Sirius' LOI Responses dated July 12 and August 14, 2006 (approximately 29 pages), which include information identified by Sirius as publicly available, the identities of Sirius' distributors and equipment manufacturers, and the actions taken by Sirius to correct its potential noncompliance with the technical requirements of Part 15. Sirius states in its April 20, 2007 letter that the identity of its distributors "is not, in all cases, publicly available information." We note, however, that all of the Sirius distributors identified in its LOI Responses are identified as Sirius distributors in news releases, annual reports, and other documents that are publicly available on Sirius' website. Similarly, all of the manufacturers identified in Sirius' LOI Responses are identified as Sirius manufacturers in news releases, annual reports and other documents that are publicly available on its website or in test reports submitted as part of equipment authorization applications that are publicly available in the Commission's Equipment Authorization Database. The corrective actions taken by Sirius have been reported in a publicly available filing it made with the SEC.[9] In addition, we are releasing the confidentiality requests submitted by Sirius with the LOI Responses (approximately 18 pages), a publicly available user manual (approximately 5 pages), and documents relating to a complaint made by National Public Radio to Sirius about FM modulator interference (37 pages). We are further releasing in their entirety supplemental LOI Responses (without the attached documents) from Sirius dated July 26, August 2, August 23, August 30, September 11, 2006 (approximately 10 pages). These letters are simply cover letters transmitting additional documents responsive to the LOIs and do not themselves include any commercial information.

Sirius also requests confidential treatment of information regarding when it became aware of potential non-compliance of its satellite DARS radios, what modifications were made to the radios, and the names and titles of Sirius employees who were involved in the decision to make such modifications or were aware of potential non-compliance. Sirius argues that this information is proprietary commercial information whose disclosure "would allow competitors to gain insight into Sirius's highly confidential business processes and commercial strategies as well as its corporate organization and decision-making structure." Sirius also argues that the information furnished in its response to those questions would be "of inestimable value to Sirius' competitors in understanding Sirius' internal organization ..." and that its disclosure "could give other entities a competitive advantage over Sirius by allowing them to review Sirius's decision-making processes and benchmark Sirius' internal organization."

We find that these arguments are unpersuasive and therefore will not redact this information from Sirius' LOI Responses. We note that the Sirius employees in question are executive and senior-level employees whose names and titles are publicly known.

---

[9] *See* Sirius Satellite Radio, Inc., Form 8-K (filed July 12, 2006).

David H. Solomon, Esq.

5

Indeed, Sirius concedes that "individual job titles are a matter of public knowledge." Regarding the information as to when Sirius became aware of potential non-compliance, we note that Sirius states in its April 20, 2007 letter that the fourth paragraph of its July 12, 2006 LOI response "consists of information that has been disclosed in Sirius' filings to the SEC, and thus is publicly available information." Since the fourth paragraph specifies when Sirius became aware of potential non-compliance, we find that this information is not confidential. Further, we find that information as to what modifications Sirius made to its radios after they were authorized by the Commission is not commercial information entitled to confidential treatment. In this connection, Section 0.457(d)(1)(ii) of the Rules, 47 C.F.R. § 0.457(d)(1)(ii), states that applications for equipment authorizations and materials relating to such applications are not routinely available for public inspection prior to the effective date of the authorization, but will be made available for inspection following the effective date. The fact that Sirius apparently made modifications to its radios without seeking Commission authorization should not afford protection for information that would not otherwise be entitled to confidential treatment under Section 0.457(d)(1)(ii).

Moreover, we find that the release of this information would not impair the Commission's ability to obtain necessary information in the future. The impairment prong of Exemption 4 "traditionally has been found to be satisfied when an agency demonstrates that the information at issue was provided voluntarily and that submitting entities would not provide such information in the future if it were subject to public disclosure."[10] Sirius was required to provide this information in response to Commission LOIs, and as a Commission licensee, Sirius can be compelled to provide such information in response to Commission inquiries in the future.[11]

We have also located approximately 97 pages of responsive documents that include presentations made to Commission staff and an associated confidentiality request. We are releasing the confidentiality request (approximately 3 pages) but are withholding the presentations in their entirety (approximately 94 pages). The presentations address proposed modifications to Sirius radios with FM modulators and include technical design information and equipment compliance techniques. We find that this information is proprietary commercial information, the disclosure of which will result in substantial competitive harm to Sirius, and therefore will withhold it pursuant to Exemption 4. Additionally, these presentations are the subject of ongoing settlement discussions and therefore may also be withheld under the settlement privilege of Exemption 5. *See Goodyear Tire*, 332 F. 3d 976.

---

[10] *See, FlightSafety Services Corporation. v. Department of Labor*, 326 F.3d 607, 612 (5th Cir. 2003).

[11] *See* 47 U.S.C. §§ 154(i), 154(j), 308(b) and 403; *see also People for the Ethical Treatment of Animals v. United States Department of Agriculture*, No. 03-195, 2005 WL 1241141, at *5-6 (D.D.C. May 24, 2005) (Not reported in F.Supp.2d) (finding that USDA's ability to obtain information in the future would not be impaired by disclosure of the withheld documents because federal regulations *require* borrowers and lenders to submit the information).

David H. Solomon, Esq.

6

Finally, we are withholding in their entirety consent decree proposals submitted by Sirius (approximately 126 pages). These materials may be withheld under the settlement privilege of Exemption 5. *See Goodyear Tire*, 332 F. 3d 976.

**Categories 13 and 14.** Category 13 of your FOIA request seeks any LOI or similar letter from the Commission to Sirius regarding Sirius' compliance with the Commission's rules and authorizations relating to its terrestrial repeaters. Category 14 seeks the response of Sirius (including any documents provided therewith) to the LOI or similar letter from the Commission to Sirius regarding Sirius' compliance with the Commission's rules and authorizations relating to its terrestrial repeaters. There are no documents responsive to these requests.

Finally, to the extent that we are denying in part your FOIA request in this letter, we disagree that there is a compelling public interest in disclosing information regarding Sirius' potential rule violations, even if we determine that Sirius has met its burden of demonstrating that specific records fall within an Exemption, because such information has a direct bearing on the public interest considerations raised in the pending XM/Sirius merger application. You assert that the Commission has previously ordered disclosure of this kind of material in closely analogous circumstances. We find, however, that the cases cited in support of this assertion are distinguishable. Unlike the instant case, *Liberty Cable Company, Inc.*[12] did not involve a FOIA request, but rather only a ruling on a confidentiality request. In *Liberty Cable*, the Commission upheld a decision to release information submitted in a licensing proceeding in order to advance important public policies in that same proceeding.[13] By contrast, NAB seeks disclosure of information obtained in an enforcement proceeding for use in an entirely separate licensing proceeding. Further, in *Liberty Cable*, the Commission found that the audit report in question was not subject to protection under Exemption 4,[14] whereas in the instant case, we find that much of the material at issue is protected by Exemption 4. Moreover, the information at issue in *Liberty Cable* was routinely disclosed by the company. Sirius, on the other hand, does not routinely disclose much of the material it seeks to protect. In the other cited case, *Larry D. Henderson and Robert S. Benz d/b/a Quad Communications*,[15] the Commission was faced with an unusual procedural situation. In that case, Quad had filed a "petition to purge authorization" held by Gelico for a 900 MHz Specialized Mobile Radio Service station, and the Bureau had denied the petition, based in part on allegedly confidential materials submitted by Gelico.[16] Because these materials were central to the Bureau's determination as to whether Quad or Gelico were entitled to use the frequencies, the Commission found that Quad should have access to these materials

---

[12] 11 FCC Rcd 2475 (1996), *aff'd sub nom. Bartholdi Cable Company v. FCC*, 113 F.3d 274 (D.C. Cir. 1997) ("*Liberty Cable*").

[13] *Id.* at 2477.

[14] *Id.* at 2476.

[15] 15 FCC Rcd 17073 (2000) ("*Henderson*").

[16] *Id.* at 17076.

David H. Solomon, Esq.

7

under the principles of procedural fairness.[17]  Thus, *Henderson* differs from this FOIA request.

We are releasing the LOIs, confidentiality requests and the information identified as publicly available by Sirius concurrently with this letter ruling.  The remaining information we have decided to release will not be made available until after the disposition of any applications for review and any judicial appeals.  If no application for review is filed, the material will made available after the expiration of the filing deadline.

You are classified under Section 0.470(a)(2) of the Commission's Rules, 47 C.F.R. § 0.470(a)(2), as a commercial requester and, therefore, we will assess charges that recover the full, reasonable direct cost of searching for, reviewing and duplicating the records sought under the FOIA.  The charges for search and review are as follows: $2242.24 for 32 hours by a GS-15 employee ($70.07 per hour); $1250.97 for 21 hours by a GS-14 employee ($59.57 per hour); $1008 for 20 hours by a GS-13 employee ($50.40 per hour); and duplication costs of $75.82 for 446 pages of records ($.17 per page).[18] The Financial Operations Division of the Office of the Managing Director of the FCC will bill you for the total amount of $4577.03 under separate cover.  Payment is due 30 days after receipt of the bill with checks made payable to the FCC.

The undersigned official is responsible for the partial denial of your FOIA request.  If you believe the partial denial of your FOIA request is in error, you may file an application for review of this decision with the Commission's Office of General Counsel within 10 working days pursuant to Section 0.461(i)(2) of the Commission's Rules, 47 C.F.R. § 0.461(i)(2).  Besides ruling on the FOIA request, this letter also constitutes a ruling on Sirius' confidentiality requests.  We are providing to Sirius copies of its LOI responses showing which portions of those responses we have determined to be confidential.  If Sirius believes our treatment of its request for confidential treatment of

---

[17] *Id.*

[18] These charges are the total charges for reviewing and duplicating the records sought in your FOIA request with respect to both Sirius and XM.  We note that the duplication cost only applies to the documents that are released with this response.  You may incur additional duplication charges for any documents that we may release after the disposition of any appeals filed by Sirius and/or XM.

David H. Solomon, Esq.                                              8

documents is in error, it may file an application for review of this action with the Office
of General Counsel pursuant to Section 0.461(i)(2) of the Commission's Rules within 10
working days of the date we furnish the above-mentioned copies.

Sincerely,

Kathryn S. Berthot
Chief, Spectrum Enforcement Division
Enforcement Bureau


cc:     Robert L. Pettit, Esq.
        James S. Blitz, Esq.
        Scott Blake Harris, Esq.

# EXHIBIT 2

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington, DC 20554

*In the Matter of:*

REVIEW OF FREEDOM OF INFORMATION          FOIA Control No. 2007-235
ACTION

**APPLICATION FOR**
**REVIEW OF FREEDOM OF INFORMATION ACTION**

TABLE OF CONTENTS

Introduction and Summary ................................................................ 1

Argument ........................................................................................ 2

I.    Redaction of Distributors' Identities and Details of Communications ................. 2

II.   Redaction of Identities and Titles of Individual Employees ............................. 5

III.  Redaction of the Narrative ............................................................ 11

Conclusion ...................................................................................... 13

1

## INTRODUCTION AND SUMMARY

Sirius Satellite Radio Inc. ("Sirius"), through counsel, hereby seeks review of the Enforcement Bureau's June 18, 2007 determination[1] regarding the NAB's Freedom of Information Act ("FOIA") request dated March 22, 2007 ("NAB FOIA Request").[2] Sirius commends the Bureau for the careful consideration given to the protection of Sirius' sensitive commercial and proprietary information. However, Sirius respectfully submits this petition for review pursuant to Section 0.461(i)(2) of the Commission's rules to request that additional redactions be made in three discrete areas. These redactions are necessary to ensure full and accurate application of the policy goals discussed in the June 18, 2007 Letter. The additional redactions Sirius is requesting are in the company's July 12, 2006[3] and August 14, 2006[4] letters to the Enforcement Bureau.

*First,* Sirius seeks redaction of the identities of its distributors, along with the details of the communications between Sirius and its distributors. This is precisely the same type of information that the Bureau correctly concluded would cause competitive harm if released, and while the Bureau is correct that the names of Sirius' distributors are publicly known, the fact that these particular distributors were involved in this matter is not public knowledge.

---

[1] Letter from Kathryn S. Berthot, Chief, Spectrum Enforcement Division, FCC, to David H. Solomon, Wilkinson, Barker, Knauer, LLP, Counsel for NAB, File No. EB-06-SE-250 – Sirius Records (June 18, 2007) ( "FCC June 18 Letter").

[2] Sirius is advised that two of its employees, John Does 1 and 2, by separate Application, are also seeking review of the Enforcement Bureau's June 18, 2007 decision. Sirius hereby adopts and incorporates by reference all arguments set forth in John Does 1 and 2's application insofar as those arguments pertain to names, titles and identifying information of Sirius employees.

[3] Letter from Patrick L. Donnelly, Executive Vice President, General Counsel and Secretary, Sirius Satellite Radio Inc. to Kathryn S. Berthot, Chief, Spectrum Enforcement Division, FCC, File No. EB-06-SE-250 (July 12, 2006) ( "July 12, 2006 Letter").

[4] Letter from Patrick L. Donnelly, Executive Vice President, General Counsel and Secretary, Sirius Satellite Radio Inc. to Kathryn S. Berthot, Chief, Spectrum Enforcement Division, FCC, File No. EB-06-SE-250 (August 14, 2006) ( "August 14, 2006 Letter").

*Second,* Sirius requests that the names and job titles of the employees identified in its correspondence with the Bureau be redacted. This information falls within Exemption 7, because its release would both hinder the current investigation and make it more difficult for the FCC to obtain complete, candid responses from corporate entities in the future. Corporations cannot act but through their employees. By subjecting individual employees to unwarranted invasions of privacy, and by exposing these employees' identities to targeted, high-profile publication by parties bent on seeking a competitive advantage through regulatory proceedings, release of this data would create a powerful disincentive for individual employees to fully cooperate in future enforcement proceedings. This data also falls within Exemption 4, as making this information available would give competitors insight into Sirius' processes for designing, manufacturing and distributing new and revised products.

*Third,* a substantial portion of Sirius' narrative description of the manner in which it dealt with the FM modulator issue should be redacted. The Bureau properly withheld many of the internal and external communications surrounding this issue, finding that release of that information would cause competitive harm to Sirius. The narrative constitutes in large measure of a distillation of the information contained in these documents or similar information, and thus its release would just as clearly pose competitive harm to Sirius as would release of the underlying documents. Moreover, the narrative also meets the requirements of Exemption 7, as it discusses the role played by specific individuals, and its release would thus jeopardize further investigations and constitute an unwarranted invasion of privacy.

## ARGUMENT

### I.    Redaction of Distributors' Identities and Details of Communications

Sirius requests that the Commission redact the identities of the distributors mentioned in the response to Question 1 on page 3 of the August 14, 2006 Letter to the Enforcement Bureau, along with the details of Sirius' communications with these distributors. This would result in redaction of the response after the phrase "Distributors were notified as follows." As explained in the Sirius' April 20 letter to the Enforcement Bureau,[5] the response to this question contains specific information regarding Sirius' communications with its distributors and is proprietary commercial information entitled to protection under Exemption 4.[6] Even if the Bureau is correct to say that these distributors "are identified as Sirius distributors in news releases, annual reports, and other documents that are publicly available on Sirius' website,"[7] Sirius has never publicly identified these particular distributors as having been involved in the Bureau's regulatory compliance investigation. Further, the Bureau's ruling properly notes the competitive harm that will flow from disclosing the details of Sirius' relationships with its vendors and distributors.[8] The same logic that requires keeping the contracts and agreements between Sirius and its vendors confidential should also prevent the disclosure of the precise nature of the communications that took place between Sirius and its distributors. Disclosure of the identities of these distributors, and the details regarding the way in which Sirius communicates with each of them, could harm Sirius' ability to work with these entities as well as other distributors in the future, and would provide Sirius' competitors with an understanding of the methods and procedures Sirius employs for making changes to its products in response to regulatory concerns

---

[5] Letter from Robert L. Pettit and Joshua S. Turner, Wiley Rein LLP, Counsel for Sirius Satellite Radio Inc., to Thomas D. Fitz-Gibbon, Enforcement Bureau, FCC, File No. EB-06-SE-250 (Apr. 20, 2007) ("April 20, 2007 Letter").

[6] *Id.* at 16-17.

[7] FCC June 18 Letter at 4.

[8] *Id.* at 3.

4

and for communication with its distributors.  Redaction of this information is appropriate under Exemption 4 to prevent these competitive injuries.

II.     Redaction of Identities and Titles of Individual Employees

Sirius also requests that the Commission redact the information provided in response to Question 2 on pages 4-5 of the August 14, 2006 Letter in its entirety.  The Bureau explained that its decision to release this information was based on the fact that "the Sirius employees in question are executive and senior-level employees whose names and titles are publicly known."[9]  However, the response to Question 2 in the August 14, 2006 Letter does not merely disclose "the names and titles of [particular] Sirius employees."  Rather, it identifies those particular individuals as those "who were involved in the decision to make ... modifications [to satellite DARS radios] or were aware of potential non-compliance."[10]  Sirius has never disclosed this list publicly.

Sirius compiled this list of employees based on an internal review process.  Sirius made every effort to conduct as thorough a review as possible, and to correctly identify those employees who played a role in the compliance matters.  However, a number of them were never informed that Sirius identified them in its submissions to the Enforcement Bureau and, none of these individuals had the opportunity to consult with counsel, prior to their identification in Sirius' correspondence.  It would be fundamentally unfair to publicly associate these employees with non-compliant conduct.

---

[9] *Id.* at 4.

[10] *Id.*

Public disclosure of the possibility that these individuals may have been to some degree involved with the non-compliance of Sirius products with Commission regulations is thus inappropriate under Exemption 7, which "protects from disclosure 'records or information compiled for law enforcement purposes,' ... to the extent that disclosure of such records would cause an enumerated harm."[11]

In determining whether records were compiled for a law enforcement purpose, the courts focus on "how and under what circumstances the requested files were compiled."[12]  The first prong under Exemption 7 is satisfied where "the investigatory activity that gave rise to the documents is 'related to the enforcement of federal laws,' and there is a rational nexus between the investigation at issue and the agency's law enforcement duties."[13]  The records at issue here were indisputably compiled by the Bureau as part of an investigation that is "related to the enforcement of federal laws," and the nexus between the Bureau's investigation and the Commission's authority to enforce the Communications Act and its own Rules is clear.

The second prong of Exemption 7 is also satisfied, as at least two of the harms enumerated in the statute would be caused by public disclosure of the identities of the Sirius employees in question.

First, disclosure of the list may interfere with pending or prospective law enforcement proceedings.[14]  The Enforcement Bureau's investigation is ongoing, and the listed employees are potential targets of this ongoing investigation, many of whom are currently unaware of this

---

[11] *Deglace v. DEA*, 2007 WL 521896, at *2 (D.D.C. 2007) (quoting 5 U.S.C. § 552(b)(7)).

[12] *Jefferson v. Dept. of Justice*, 284 F.3d 172, 176-77 (D.C. Cir. 2002) (citing *Weissberg v. Dep't. of Justice*, 489 F.2d 1195, 1202 (D.C. Cir. 1973)).

[13] *Id.* at 177 (quoting *Pratt v. Webster*, 673 F.2d 408, 420, 421 (D.C. Cir. 1982)).

[14] *See* April 20, 2007 Letter at 4-5.

status. Releasing this information could thus have an impact on this or future investigations. The agency should give the policies motivating Exemption 7 due consideration when deciding whether to release the names of persons who may be the subject of further investigative proceedings.

Second, public dissemination of the identities of these employees as having been involved in alleged non-compliant activities would be an unwarranted invasion into their personal privacy. Courts have recognized that "[i]ndividuals have a 'strong interest in not being associated unwarrantedly with alleged criminal activity.' For this reason, the names of and identifying information about third parties who are mentioned in law enforcement records routinely are withheld."[15] Where the individual's privacy interest outweighs the public interest in disclosure, it is appropriate for an agency to withhold the information.[16]

The Sirius employees identified in Question 2 unquestionably have a strong privacy interest at stake. Disclosure would inform the public not merely of the names and titles of Sirius employees, but would connect those employees to non-compliant activity. Moreover, in drafting the response to Question 2 Sirius sought to be as forthcoming as possible in identifying individuals who appeared to have been involved in non-compliant conduct. In order to ensure that Sirius provided the Bureau with complete and accurate information, Sirius did not attempt to draw categorical distinctions between those employees who may merely have had knowledge of the possibility of non-compliance and those who may have been more actively involved in that

---

[15] *Deglace*, 2007 WL 521896, at *3 (quoting *Stern v. FBI*, 737 F.2d 84, 91-92 (D.C. Cir. 1984)); *see also Martin v. Dep't of Justice*, 2007 WL 1574605, at *8 (D.C. Cir. 2007) ("We also note that privacy interests are particularly difficult to overcome when law enforcement information regarding third parties is implicated.").

[16] *See, e.g., Stern*, 737 F.2d at 91 (citing *Fund for Constitutional Gov't v. Nat'l Archives*, 656 F.2d 856, 862 (D.C. Cir. 1980) (decision whether to disclose on privacy grounds "necessitates a balancing between each censured employee's interest in privacy and the public's interest in disclosure").

non-compliance.[17]   Similarly, Sirius notes that the employees named in this response had varying levels of knowledge of the Commission's Rules, and the response did not attempt to identify which employees had actual knowledge that the Commission's Rules were being violated.  As a result, disclosure of the response to Question 2 would link an undifferentiated pool of individuals with unspecified levels of wrongdoing.  This could unfairly taint those employees who had no knowledge that violations were taking place with the suggestion of deliberate malfeasance.

Though to Sirius' knowledge none of these employees have to date been subject to investigation by any other law enforcement entity for their potential involvement in non-compliant activity, release of this document "may make those persons the subjects of rumor and innuendo, possibly resulting in serious damage to their reputations."[18]  The D.C. Circuit has recognized that disclosure of information such as this "should be allowed only if the public interest in the information outweighs the significant privacy interests implicated."[19]

Here, that burden cannot be met because the public interest in knowing the specific identities of the employees whom Sirius had reason to believe may, in varying degrees, have known about, or been involved in, the company's non-compliance is minimal.[20]  The public

---

[17] *See, e.g., Stern*, 737 F.3d at 92-93 (finding error where, in deciding disclosure was appropriate, "the district court failed to give sufficient consideration to the FBI's conclusion that these two employees were not in any sense directly responsible for the cover-up, but rather were culpable only for inadvertence and negligence").

[18] *Stern*, 737 F.3d at 92 (citing *Fund for Constitutional Gov't*, 656 F.2d at 864) ; *see also Deglace*, 2007 WL 521896, at *3 (quoting *Computer Prof'l for Soc. Responsibility v. United States Secret Serv.*, 72 F.3d 897, 904 (D.C. Cir. 1966)) ("The release of such information can have a potentially stigmatizing or embarrassing effect on [Mr. Ming] and cause [him] to be subjected to unnecessary public scrutiny and scorn.").

[19] *Stern*, 737 F.3d at 92.

[20] *See id.* at 93 ("While we agree with the district court that the public has a strong interest in the airing of the FBI's unlawful and improper activities, we find that the public interest in knowing the identities of employees who became entwined inadvertently in such activities is not as great.").

8

interest asserted by NAB in this case is to permit evaluation of *the company's* non-compliance and its responses thereto for the purposes of opposing the proposed merger between Sirius and XM.[21] That interest can be fully realized by disclosing, as Sirius already has done, that certain employees in the company were aware of and/or directed the manufacture and distribution of non-compliant equipment, and by admitting, as it has done, that from a corporate perspective Sirius undertook actions that it should not have taken, that it regrets taking, and that it is working to correct. The only arguable public interest at issue in this case revolves around the actions that Sirius took as a corporate licenseholder. The Commission is free to determine whether to give any weight in the merger proceeding to these actions. Public disclosure of the identities of the individual Sirius employees who may have been involved with or had knowledge of these actions adds nothing to the Commission's ability to gauge the wrongdoing of Sirius *qua* corporate entity. That is especially true where, as here, the Commission itself already has access to the information. To the extent that these names may have any relevance, the Commission is already able to make that determination without releasing the names publicly.[22] The weak public interest in disclosure cannot outweigh the strong personal interest in maintaining the privacy of

---

[21] *See* Letter from David H. Solomon, Wilkinson Barker Knauer, LLP, Counsel to NAB, to Kathryn S. Berthot, Chief, Spectrum Enforcement Division, FCC, File No. EB-06-SE-148, at 2 (May 23, 2007). This does not appear to be a cognizable public interest for FOIA purposes. The Supreme Court has explained that "FOIA's central purpose is to ensure that the *Government's activities* be opened to the sharp eye of public scrutiny, not that information about *private citizens* that happens to be in the warehouse of the Government be so disclosed." *Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 774 (1989) (emphasis added); *see also Mays v. DEA*, 234 F.3d 1324, 1327 (D.C. Cir. 2000) (citing *id.* at 771) (noting that "FOIA is concerned with the right of the general public to know what their government is up to"). Thus, the D.C. Circuit will not even engage in the public-private balancing analysis unless the FOIA requester is able to "(1) show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake, and (2) show that the information is likely to advance that interest." *Martin*, 2007 WL 1574605 at *8 (quoting *Boyd v. Dep't of Justice*, 475 F.3d 381, 387 (D.C. Cir. 2007)). NAB has not made this showing.

[22] *Brown v. EPA*, 384 F. Supp. 2d 271, 279 (D.D.C. 2005) (explaining that "[t]he lone public interest that is relevant for purposes of Exemption 7(C) is one that focuses on the citizens' right to be informed about what their government is up to," and that "the D.C. Circuit has time and again rejected the suggestion that the disclosure of names in government investigative files can somehow provide insight into the workings of the government") (internal citations and quotations omitted).

9

the individuals, particularly given that some of the individuals listed were "culpable only for inadvertence and negligence."[23] Disclosure of an undifferentiated list of names, as set out in the response to Question 2, would be especially unfair and intrusive to these individuals.

The personal nature of this information is sufficient, standing alone, to warrant refusing to release it under Exemption 7. But releasing highly prejudicial information of this type, especially given that it is likely to be widely publicized in the separate Sirius/XM merger proceeding, will also have a pernicious effect on the Commission's future ability to gain access to unfiltered, complete information from individual employees in investigations of this type. That is particularly problematic in the context of letters of inquiry, where the information necessary to respond to investigative inquiries is spread across a potentially large number of individual employees and the response must be completed within a tight timeframe. Allowing the identities of individual employees identified in the context of an internal investigation to become pawns in a completely separate, high-profile proceeding could cause corporate employees to be more circumspect in the future when responding to Commission inquiries, and (contrary to the purposes underlying Exemption 7) thereby jeopardize the ability of the Commission to gain complete, unvarnished information in response to its own letters of inquiry.

Redaction of this list is also appropriate under Exemption 4. While the Bureau correctly noted that it is public information that these individuals work at Sirius (and their titles, too, are public),[24] the fact that these individuals may have known about or been involved in these particular product modifications is not publicly known. Disclosure of the identities and/or job titles of the individuals at Sirius who participated in the engineering of a series of responses to a

---

[23] *Stern*, 737 F.3d at 92.

[24] FCC June 18 Letter at 4.

10

competitive product would give Sirius' competitors improper "insight into Sirius' business processes, commercial strategies and product development,"[25] by allowing competitors to understand who in the Sirius organization participates in designing new products and making modifications to existing products in order to meet customer needs.

III.    Redaction of the Narrative

Finally, Sirius requests that the Commission make additional redactions to the information contained in the response to Question 9 on pages 6-8 of the July 12, 2006 Letter to the Enforcement Bureau. Sirius conceded,[26] and the Commission recognized,[27] that the information contained in paragraph 4 of page 2 of the July 12, 2006 Letter has previously been disclosed in Sirius' SEC filings. However, the response to Question 9 elaborates on paragraph 4, providing significantly greater detail about when Sirius became aware of potential non-compliance and, crucially, how the company responded to the situation. These details far exceed the information Sirius has made public to date[28] and explain how Sirius' departments, managers, and employees worked together to determine the extent of the potential noncompliance and craft solutions to remedy it.

Thus, this information falls under Exemption 4, as it gives a direct view into Sirius' corporate structure and processes, revealing detailed information about specific Sirius products, as well as Sirius' relations with its customers, its internal procedures for assuring regulatory compliance, and its methods and procedures for responding to customer complaints. Moreover,

---

[25] *Id.* at 3.

[26] April 20, 2007 Letter.

[27] FCC June 18 Letter at 5.

[28] Sirius Satellite Radio Inc., Annual Report (Form 10K), at 19, 23 (Mar. 1, 2007).

11

the response to Question 9 reveals details of Sirius' product development process, including the way in which it decides to make running changes to the engineering of its products and the specific nature of some of these changes. Many of Sirius' other competitors in the audio entertainment market are confronting similar issues regarding customer satisfaction with FM modulators, and detailed information about Sirius' actions will provide these competitors with a means to calibrate their own responses against those taken by Sirius.

As explained in the April 20, 2007 Letter, this is proprietary commercial information, the release of which "would jeopardize Sirius' ability to compete in the audio entertainment market" by "giv[ing] competitors a critical window into Sirius' strategic plans and allow[ing] them to refine and develop competitive offerings."[29] The Bureau's determination properly holds that these are legitimate interests, and that the release of "internal documents relating to Sirius' product development and business strategies" would likely result in "substantial competitive harm" to Sirius.[30] As a result, the Bureau's order finds that these documents meet the requirements of Exemption 4. Question 9, in large measure, is simply a narrative summary of the topics covered by these internal documents, and should be redacted consistent with the Bureau's determination to withhold the documents.

More importantly, certain sections of the response to Question 9 identify specific individuals by job title or organizational role, and describe the actions taken by these individuals. For the reasons set forth above in discussing the need to maintain confidentiality of the identities of the individuals disclosed in Question 2, the descriptions of individual actions in Question 9 also meet the requirements of FOIA Exemption 7. Just as with the response to Question 2, the

---

[29] April 20, 2007 Letter at 12.

[30] FCC June 18 Letter at 3.

12

response to Question 9 represents Sirius' identifications of individuals who played some role in the design, manufacture and distribution of non-compliant equipment, but does not include any attempt to identify with specificity the level of knowledge or intent possessed by each of these individuals. This was necessary to provide as complete a narrative as possible of Sirius' corporate activities, which are of necessity a composite of the actions taken by a number of individual employees. Public disclosure of this sort of detailed account of the conclusions reached through a company's internal review process may jeopardize future enforcement proceedings by creating disincentives both for companies required to undertake internal investigations and for the employees asked to cooperate with such investigations. Therefore, releasing this information could impact ongoing and future investigations or unfairly tarnish the reputations of these persons, without any corresponding public interest benefit.

The portions of the narrative response to Question 9 that contain information which has not been publicly disseminated is therefore entitled to protection under Exemptions 4 and 7. There are, however, some parts of the response to Question 9 that contain public or previously disclosed information. Sirius thus proposes redacting the entirety of the response to Question 9 *except*: 1) the last two sentences of the first paragraph on page 6; 2) the first sentence of the second paragraph after the first three words, starting with "our inquiries revealed"; and 3) the last two paragraphs of the response on page 8.

## CONCLUSION

For the foregoing reasons, the July 12 and August 14 Letters should be further redacted in the manner set forth above before being released pursuant to NAB's FOIA request.

13

Respectfully Submitted,

Barbara Van Gelder
Robert L. Pettit
Joshua S. Turner

**Wiley Rein LLP**
1776 K Street, N.W.
Washington, DC 20006
202.719.7000

*Counsel to Sirius Satellite Radio Inc.*

14

# ATTACHMENT
# E



# The CommLaw Group

HELEIN & MARASHLIAN, LLC
1483 Chain Bridge Road
Suite 301
McLean, Virginia 22101

Telephone: (703) 714-1300
Facsimile: (703) 714-1330
E-mail: mail@CommLawGroup.com
Website: www.CommLawGroup.com

Writer's Direct Dial Number
703-714-1301

Writer's E-mail Address
chh@commlawgroup.com

March 5, 2008

**VIA U.S. MAIL AND FACSIMILE**
Fax:  202-418-7290

Ms. Karen Mercer
FCC Enforcement Bureau
Spectrum Enforcement Division
Room 3-A325
445 12th Street, S.W.
Washington, D.C. 20554

    Re:  FOIA Control No. 2008-190

Dear Ms. Mercer:

    U.S. Electronics, Inc. ("USE") hereby submits its comments and opposition to the responses submitted on February 29, 2008 by Sirius Satellite Radio, Inc. ("Sirius"), XM Radio Inc. ("XM") and "Three Unnamed Employees of XM Radio Inc." ("XM Employees") (Collectively, the "Respondents") to the letters of Kathryn S. Berthot dated February 14, 2008 seeking the positions of the Respondents on the Freedom of Information Request submitted by USE on January 25, 2008 ("USE's FOIA Request").

    Respondents raise a number of objections to the granting of USE's FOIA Request.  As shown herein, the Respondents' objections are without merit.

    Although Respondents provide citations to decisions justifying denials of other FOIA requests, those decisions are inapposite to USE's FOIA Request.  The decisions are a collection of legal truisms without any relevance to the facts underlying and justifying USE's FOIA Request.  In general, those decisions involve risks that disclosure would result in competitive harms, would discourage voluntary disclosures to the Commission, and would violate the expectation to and rights of privacy of individuals.  None of these risks is applicable USE's FOIA Request.

The information sought by USE vitally affects the qualifications of the Applicants to be licensees of public spectrum; and in particular, is directly relevant to the justification or lack thereof for the extraordinary relief the Applicants seek for the consolidation of their licenses – a step that has been expressly prohibited by the Commission for over the past decade. The information being sought also inherently affects the public interest in the enforcement of the Commission's statutory responsibilities as well as its rules and policies.

The Respondents' claim to confidentiality based on competitive concerns is disingenuous because the facts regarding interoperability, violations of emission standards and violations of authorized locations for sitting terrestrial repeaters are in no way competitively meaningful to what they characterize as their "other audio entertainment competitors." It is equally disingenuous for the Respondents to assert confidentiality for the manufacturing entities (Wistron and KRI) in regard to which they have no standing to interpose any objections. Nor are any of the individuals (the XM Employees) entitled to an expectation of privacy for revealing what they know and to what extent they participated in violations of Commission rules. For the same reasons, it is disingenuous to argue that disclosure of information and activities that relate to and may be proof of violations of Commission rules would retard the voluntary submission of information to the Commission. The Commission has ample compulsory means to obtain such information that would not be submitted voluntarily.

As for the defense that Commission investigations are allegedly involved, the Commission began its investigation into violations of the emission standards and the mis-siting of repeaters almost two years ago. An on-going enforcement action, if any, during which the Applicants requested their extraordinary relief from the bar against consolidation of their licenses, should not perpetually bar disclosure of information important to the public interest. In addition, the Commission apparently has never investigated the Applicants' non-compliance with the interoperability mandate.

Ignoring all of these critical facts, the Applicants cite the action taken in regard to a similar FOIA request made months ago by the NAB. The Enforcement Bureau granted NAB's request in part only to have disclosure blocked by the Applicants' Applications for Review of the Bureau's decision. Inexplicably, no action on those Applications for Review has been taken despite their pendency for over 9 months. Nor has any explanation been provided as to how such a delay complies with the timetable imposed by the FOIA on the agency's duty to respond to FOIA requests. In this connection, the Commission should take official notice that Congress has passed and the President has recently signed into law "The OPEN Government Act of 2007" (Pub. L. No. 110-75) that, among other things, tightens the time limits for agencies to act on FOIA requests.

In conclusion, the generalized concerns offered by Respondents cannot and do not outweigh the reality that by asking the Commission for permission to merge, they have squarely put these compliance issues in contention, and have made the materials they submitted indispensable to the public comment process. The Commission should grant USE's FOIA

Request and allow the requested information into the record for consideration of its impact on the public interests affected by the proposed merger.

Respectfully submitted,
U.S. Electronics, Inc.

By    *Charles H. Helein* (sa)

Charles H. Helein
Counsel of Record

Cc:
Office of the Chairman
Offices of the Commissioners

Robert L. Pettit
Joshua S. Turner
Wiley Rein LLP
Counsel for Sirius Satellite Radio Inc.

Scott Blake Harris
Harris, Wiltshire & Grannis LLP
Counsel for XM Radio Inc.

Dimple Gupa
Covington & Burling LLP
Counsel for Three Unnamed Employees of XM Radio, Inc.

Office of General Counsel
Matthew Barry
General Counsel

# ATTACHMENT
# F



1776 K STREET NW
WASHINGTON, DC 20006
PHONE 202.719.7000
FAX 202.719.7049

7925 JONES BRANCH DRIVE
McLEAN, VA 22102
PHONE 703.905.2800
FAX 703.905.2820

www.wileyrein.com

March 12, 2008

**VIA FIRST CLASS MAIL AND FACSIMILE**

Karen Mercer
Federal Communications Commission
Enforcement Bureau
Spectrum Enforcement Division
Room 3-A325
445 12th Street, S.W.
Washington, DC  20554

Re:     *FOIA Control No. 2008-190*

Dear Ms. Mercer:

      On behalf of Sirius Satellite Radio Inc. ("Sirius"), this letter responds to the March 5, 2008 letter of U.S. Electronics, Inc. ("USE") concerning the FOIA proceeding noted above.[1]

      In that letter, USE claims that the Enforcement Bureau's decision with respect to the FOIA request of the National Association of Broadcasters ("NAB")[2] is "inapposite" to USE's current FOIA request.[3]  Contrary to this assertion, the Enforcement Bureau's decision with respect to NAB's FOIA request is directly relevant to, and dispositive of, the USE FOIA Request.  Among the documents that USE seeks are precisely the same documents that NAB sought in its request: material that Sirius submitted to the Commission as part of the EB-06-SE-250 proceeding.  Request No. 5 in the USE FOIA Request asks for "each non-exempt, non-privileged document relating to Sirius' . . . compliance with equipment authorization rules governing emission limitations for satellite radio receivers, including without limitation, those matters raised and considered in connection with File No. EB-06-SE-250."[4]

---

[1]    Letter from Charles H. Helein, Esq., Helein & Marashlian, LLC, Counsel for USE, to Karen Mercer, Spectrum Enforcement Division, FCC (March 5, 2008) ("USE FOIA Response").

[2]    FOIA Control No. 2007-235.

[3]    USE FOIA Response at 1.

[4]    USE FOIA Request at 2.



Karen Mercer
March 12, 2008
Page 2

Robert L. Pettit
202.719.7019
rpettit@wileyrein.com

These documents are exactly the same documents that were covered by the NAB FOIA request.[5] There, NAB sought the response of Sirius (and any documents submitted therewith) to the Commission's letters of inquiry regarding "compliance with Commission rules of FM modulators/transmitters used by Sirius in connection with its Digital Audio Radio Service . . . radios."[6] Although NAB did not identify the proceeding number in its FOIA request, these letters of inquiry and Sirius' response were part of the EB-06-SE-250 proceeding.

Because USE seeks the same documents that were sought by NAB, the Enforcement Bureau's decision[7] granting confidential treatment for the majority of these documents and denying in large part NAB's request is not "inapposite," but is instead dispositive. The Commission's Rules provide a rigorous process for determining whether materials submitted to the agency should be afforded confidential treatment and withheld from public inspection.[8] The FCC may defer ruling on confidentiality requests until a request for inspection of the records is submitted.[9] That is precisely what occurred with the documents submitted as part of the EB-06-SE-250 proceeding; the Enforcement Bureau deferred ruling on Sirius' requests for confidentiality until it received a FOIA request covering the relevant documents. The June 18 Letter constituted the Bureau's determination that the majority of these documents *should* be afforded confidential treatment under the terms of Rule 0.459(b). That ruling was also not "a collection of legal truisms" but a considered opinion specifically addressing the documents at issue after a series of legal arguments presented by NAB, Sirius, and XM Satellite Radio Holdings Inc. ("XM").[10]

---

[5]    Letter from to David H. Solomon, Wilkinson, Barker, Knauer, LLP, Counsel for NAB, to Anthony J. Dale, Managing Director, FCC (March 22, 2007) ("NAB FOIA Request").

[6]    *Id.* at 1. In its FOIA request, NAB identified letters of inquiry dated June 20, 2006 and August 25, 2006 and a response of Sirius dated July 12, 2006. *See id.* at 1-2.

[7]    Letter from Kathryn S. Berthot, Chief, Spectrum Enforcement Division, FCC, to David H. Solomon, Wilkinson Barker Knauer, LLP, Counsel for NAB, File No. EB-06-SE-250 – Sirius Records (June 18, 2007) ("June 18 Letter Ruling")

[8]    47 C.F.R. § 0.459.

[9]    47 C.F.R. § 0.459(d)(1).

[10]    As noted in its response to the USE FOIA Request, Sirius did not agree with all aspects of the June 18 Letter Ruling and filed a timely petition for reconsideration of certain discrete aspects of the Ruling. That Application remains pending, and pursuant to the Commission's Rules the information subject to that Application "will be accorded confidential treatment...until the

2



Karen Mercer
March 12, 2008
Page 3

Robert L. Pettit
202.719.7019
rpettit@wileyrein.com

Nothing in the Commission's Rules contemplates revisiting whether documents should be afforded confidential treatment pursuant to Section 0.459 each time a new FOIA request is filed. While the Commission's Rules do allow the agency, in specific circumstances, to order the release even of exempt documents after weighing the facts and circumstances surrounding release,[11] it is not at all clear that USE is asking that the Bureau exercise this discretionary authority, since its request is limited to "non-exempt" documents.[12] Even if USE were seeking release of this exempt information, the Bureau decided in response to NAB's FOIA request that release of this exempt material was *not* justified given the facts and circumstances surrounding these documents.

USE has provided no reason for the Bureau to reach a decision different from the one that it made in response to NAB's FOIA request. The only justification that USE offers for its request is the claim that the documents may have a bearing on the proposed Sirius/XM merger.[13] This is precisely the same argument for disclosure of the same documents that was advanced by NAB. The Enforcement Bureau expressly considered and rejected this justification when offered by NAB, and USE can provide no reason why the outcome should be any different now.[14] Because the Bureau has already decided that these documents meet the test for confidentiality and are thus exempt from FOIA disclosure, and because it has

---

(Continued . . .)

Commission acts on the confidentiality request *and all subsequent appeal and stay proceedings have been exhausted.*" 47 C.F.R. § 0.459(d)(1). It should be noted that NAB, which devoted considerable effort to its FOIA Request, and which, like USE, has vigorously contested the Sirius/XM merger, did not contest the June 18 Letter Ruling.

[11]    47 U.S.C. § 0.461(f)(4).

[12]    Letter from Robert L. Pettit, Wiley Rein LLP, Counsel for Sirius, to Karen Mercer, Spectrum Enforcement Division, FCC (Feb. 29, 2008) at 3 n.9 ("Sirius Response to USE FOIA Request").

[13]    USE FOIA Request at 4; USE FOIA Response at 2.

[14]    June 18 Letter Ruling at 6 ("We disagree that there is a compelling public interest in disclosing information regarding Sirius' potential rule violations . . . because such information has a direct bearing on the public interest considerations raised in the pending XM/Sirius merger application.").

3



Karen Mercer
March 12, 2008
Page 4

Robert L. Pettit
202.719.7019
rpettit@wileyrein.com

further concluded that there is no reason to disclose these exempt documents, it would be arbitrary and capricious for the Bureau to treat them differently now.[15]

In addition to the documents produced in EB-06-SE-250, USE also seeks a number of other categories of documents. Contrary to USE's claim, there is nothing "disingenuous" about Sirius' request that the Bureau exercise its own discretionary authority to treat as confidential those documents that cover the exact same subjects as the EB-06-SE-250 documents, but which were submitted by third parties.[16] The Bureau has determined that the documents submitted by Sirius are exempt from FOIA disclosure because they contain sensitive commercial and financial information, and it is clear that documents submitted by a third party containing the same information are equally sensitive and equally deserving of confidential treatment. Similarly, to the extent that the documents submitted by third parties may be covered by other exemptions that are the subject of Sirius' Application for Review, these documents should also be treated as confidential until a decision on that Application is reached and all appeals are exhausted.[17] Finally, in its response, USE has offered no reason to release the material covered by the protective orders in the merger proceeding. This request should also be denied, for the reasons set forth in Sirius' original response.[18]

---

[15]     El Rio Santa Cruz Neighborhood Health Center, Inc. v. Dept. of Health and Human Svcs., 300 F. Supp. 2d 32, 42 (D.D.C. 2004) ("It is axiomatic that "an agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so.") (quoting Indep. Petroleum Ass'n of Am. v. Babbitt, 92 F.3d 1248, 1258 (D.C.Cir.1996)).

[16]     USE FOIA Response at 2.

[17]     USE suggests in its Response that the time limits for consideration of appeals for full agency consideration of a FOIA Request have been tightened as a result of the OPEN Government Act of 2007, Pub. L. 110-175, 121 Stat. 2524 (2007). Even if USE had standing to object to the agency's process with respect to Sirius' Application for Review, which it does not, and even if the Enforcement Bureau were the proper place to lodge such an objection, which it is not, the time limit provision of this Act does not take effect until December 31, 2008, and thus it has no bearing whatsoever on either Sirius' pending Application for Review or USE's FOIA request. See OPEN Government Act of 2007, Pub. L. 110-175 at § 6(a)(2), 121 Stat. 2524 (2007) ("The amendment made by this subsection shall take effect 1 year after the date of enactment of this Act.").

[18]     Sirius Response to USE FOIA Request at 4-6.

4



Karen Mercer
March 12, 2008
Page 5

Robert L. Pettit
202.719.7019
rpettit@wileyrein.com

     Please contact me at the telephone number above should you have any further questions or require additional information.

Sincerely,

Robert L. Pettit
Joshua S. Turner

5

# ATTACHMENT
# G



Federal Communications Commission
Washington, D.C. 20554

March 21, 2008

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**AND FACSIMILE AT (703) 714-1330**

Charles H. Helein, Esq.
Helein & Marashlian, LLC
Counsel of Record
U.S. Electronics, Inc.
1483 Chain Bridge Road
Suite 301
McLean, Virginia 22101

Re: FOIA Control No. 2008-190 – Sirius Records

Dear Mr. Helein:

This is in response to your January 25, 2008, Freedom of Information Act ("FOIA") request filed on behalf of the U.S. Electronics, Inc. ("USE"). You seek copies of "non-privileged, non-exempt" documents supplied to the Commission by "applicants, respondents, or other non-Commission employees" and relating to any of the following: the petition filed July 5, 2007, in MB Docket No. 07-57; the certifications required of Satellite Digital Audio Radio Service ("SDARS") operators "that their systems include a receiver that will permit end users to access al licensed SDARS systems that are operational or under construction"; Interoperable Technologies, LLC; the compliance of Sirius Satellite Radio, Inc. ("Sirius") and XM Radio, Inc. ("XM"), with the equipment authorization rules governing emission limitations for satellite receivers, "including without limitation those matters and considered in connection with File No. EB-06-SE-250"; and Sirius' and XM's compliance with their respective authorizations for terrestrial repeaters.

For administrative convenience, we are addressing your FOIA request separately with respect to Sirius and XM. This letter deals with the portion of your FOIA request relating to Sirius. Your FOIA request seeks documents which are the subject of pending requests for confidentiality from Sirius pursuant to FOIA Exemptions 4 and 7(A). We accordingly served your FOIA request on Sirius and gave it an opportunity to provide additional support for its requests for confidentiality.[1] Sirius submitted a supplemental confidentiality request on February 29, 2008.[2] On March 5, 2008, USE submitted a

---

[1] See 47 C.F.R. § 0.461(d)(3). See also Letter from Kathryn S. Berthot, Chief, Spectrum Enforcement Division, Enforcement Bureau, to Robert L. Pettit, Esq., Wiley Rein LLP (February 14, 2008).

[2] See Letter from Robert L. Pettit, Esq., Wiley Rein LLP, to Kathryn S. Berthot, Chief, Spectrum Enforcement Division, Enforcement Bureau (February 29, 2008) ("February 29, 2008, letter").

2

Charles H. Helein, Esq.

response to the February 29, 2008, supplemental confidentiality request filed by Sirius.[3]
On March 12, 2008, Sirius submitted a response to USE's February 29, 2008, response.[4]

Most of the requested documents that we have located were also the subject of a
prior FOIA request, FOIA Control No. 2007-235. We ruled upon that FOIA request and
the associated confidentiality requests on June 18, 2007.[5] Sirius argues that we should
withhold some of the materials we decided to release in the June 18, 2007 ruling pending
resolution of its application for review of that ruling.[6] We disagree. We will not
withhold any materials found to be non-exempt in our June 18, 2007, ruling. Of course,
we will not furnish any materials whose release is being contested until after a final
ruling. Similarly, to the extent that USE is seeking any materials found to be exempt
from disclosure in our June 18, 2007, ruling, we will not release such materials in the
absence of a final ruling requiring their release. Accordingly, the determinations and
analysis below closely follow the determinations and analysis in our June 18, 2007
ruling.

**Category 1.** Category 1 of your FOIA request seeks documents provided by
sources outside the Commission relating to the petition filed July 5, 2007, in MB Docket
No. 07-57. There are no documents responsive to this part of your request.[7]

**Category 2.** Category 2 of your FOIA request seeks documents provided by
sources outside the Commission relating to the certifications required of SDARS
operators "that their systems include a receiver that will permit end users to access all
licensed SDARS systems that are operational or under construction." There are no
documents responsive to this part of your request.[8]

**Categories 3 and 4.** Categories 3 and 4 of your FOIA request seek documents
provided by sources outside the Commission relating to Interoperable Technologies,
LLC. There are no documents responsive to this part of your request.[9]

---

[3] See Letter from , Charles H. Helein, Esq., Helein & Marshalian, LLC, to Kathryn S. Berthot, Chief,
Spectrum Enforcement Division, Enforcement Bureau (March 5, 2008).

[4] See Letter from Robert L. Pettit, Esq., Wiley Rein LLP, to Kathryn S. Berthot, Chief, Spectrum
Enforcement Division, Enforcement Bureau (March 12, 2008)

[5] Letter from Kathryn S. Berthot, Chief, Spectrum Enforcement Division, Enforcement Bureau, to Robert
L. Pettit, Esq., Wiley Rein LLP (June 18, 2001) ("June 18, 2007 ruling"), application for review pending.

[6] February 29, 2008, letter at 6.

[7] Sirius has submitted certain documents that may be responsive to USE's FOIA request in MB Docket No.
07-57 pursuant to protective orders. We note that USE has access to these documents pursuant to the
protective orders and therefore are construing USE's FOIA request not to request these documents.

[8] See n. 7.

[9] See n. 7.

3

Charles H. Helein, Esq.

**Categories 5, 6, 7, and 8.** Categories 5, 6, 7 and 8 of your FOIA request seek documents provided by sources outside the Commission relating to Sirius's compliance with the equipment authorization rules governing emission limitations for satellite receivers, "including without limitation those matters and considered in connection with File No. EB-06-SE-250"; and Sirius' compliance with its authorizations for terrestrial repeaters. We have located the following documents that are responsive to these parts of your request: responses to Letters of Inquiry submitted by Sirius totaling 3,784 pages ("LOI Responses"); approximately 83 pages of documents pertaining to settlement negotiations between the Enforcement Bureau and Sirius; approximately 210 pages of documents pertaining to Sirius' proposed technical solutions and comprehensive compliance plan; approximately 157 pages of test reports submitted by Sirius in conjunction with equipment authorization applications for satellite radio receivers and the accompanying transmittal e-mails; and approximately 52 pages of interference complaints. As explained below, we are releasing approximately 97 pages of LOI Responses, some with redactions, and are withholding approximately 3,687 pages of the LOI Responses. We are withholding the settlement documents and the documents pertaining to Sirius' proposed technical solutions and comprehensive compliance plan. We are releasing the test reports and the accompanying transmittal e-mails. We are also releasing the interference complaints, some with redactions.

Sirius asked us to withhold its LOI Responses in their entirety under FOIA Exemption 7(A). FOIA Exemption 7(A), 5 U.S.C. § 552(b)(7)(A), applies to "records or information compiled for law enforcement purposes ... to the extent that the production of such law enforcement records or information ... could reasonably be expected to interfere with enforcement proceedings." Sirius asserted that all of the materials it has produced qualify for protection under Exemption 7(A) because they were indisputably compiled for law enforcement purposes and their release would interfere with pending and future related enforcement proceedings.

We conclude, as we did in the June 18, 2007 ruling, that Sirius' LOI Responses should not be withheld from disclosure under Exemption 7(A). All of the materials in question are in Sirius' possession and known to it. In *Wireless Consumers Alliance*, the Commission concluded that the release of information already known to the target of an investigation would not be expected to result in interference to the investigation.[10] Furthermore, in this instance, we do not believe that release of these materials will result in interference to any other pending investigations or similar future investigations. In this connection, we note that it has been publicly known for over a year that the Commission is investigating the compliance of various entities with the Commission's rules regarding FM modulators.[11]

---

[10] 20 FCC Rcd 3874, 3881-82 (2005).

[11] We note that Sirius and various other companies have disclosed pending investigations into their compliance with the Commission's rules regarding FM modulators in their filings with the Securities and Exchange Commission ("SEC").

4

Charles H. Helein, Esq.

Sirius also requested confidential treatment of its LOI Responses in their entirety under FOIA Exemption 4. FOIA Exemption 4, 5 U.S.C. § 552(b)(4), applies to "trade secrets and commercial or financial information obtained from a person and privileged or confidential." Under *National Parks and Conservation Ass'n v. Morton*,[12] commercial or financial materials are considered confidential if disclosure of the information is likely: (1) to cause substantial hardship to the competitive position of the submitter, or (2) to impair the government's ability to obtain necessary information in the future.[13]

Sirius argued that its LOI Responses contain trade secrets and privileged commercial or financial information and that the disclosure of this information would result in irreparable harm to its competitive position. In particular, Sirius argued that disclosure of such information would allow competitors to gain insight into Sirius' business processes and commercial strategies as well as its relationships with customers, harm Sirius' relationships with its suppliers and its ability to work with distributors, and assist competitors in developing, producing, marketing and selling future products and services that compete with those offered by Sirius. Sirius further argued that the release of such information would impair the Commission's ability to obtain necessary information in the future.

We find, as we did in the June 18, 2007, ruling, that Sirius has demonstrated that substantial competitive harm is likely to result from the release of some of the requested information and therefore will withhold that information from disclosure. Specifically, we will withhold from disclosure the following: contracts and agreements between Sirius and other entities regarding the design, manufacture and distribution of satellite DARS radios (approximately 992 pages), and internal documents relating to Sirius' product development and business strategies, including e-mail messages, test data and product descriptions (approximately 2,479 pages). We agree with Sirius that disclosure of these commercial materials would allow competitors to gain insight into Sirius' business processes, commercial strategies and product development and harm its relationships with its vendors. In addition, we will redact portions of Sirius' LOI Responses dated July 12 and August 14, 2006. The information redacted from the LOI Responses includes data concerning the number of units of satellite DARS radios manufactured, imported, sold, activated by consumers, at factories and at distributors and retailers; proposed technical solutions to FM modulator interference; and Sirius' proposed comprehensive compliance plan. The various data concerning the number of units of radios would be invaluable to Sirius' competitors in understanding the relationship between Sirius' manufacturing, sales and activation volumes. Further, the proposed technical solutions and comprehensive compliance plan would allow competitors to gain insight into its business processes and commercial strategies. *See, e.g., National Parks & Cons. Ass'n v. Kleppe*, 547 F.2d 673, 684 (D.C. Cir. 1976); *Timken Co. v. U.S. Customs Serv.*, 491 F. Supp. 557, 559-60 (D.D.C. 1980) (both holding that business strategies and marketing plans are exempt from disclosure under Exemption 4); *Fisher v. Renegotiation Bd.*, 355

---

[12] 498 F.2d 765, 770 (D.C. Cir. 1974) ("*National Parks*").

[13] *See also Critical Mass Energy Project v. NRC*, 975 F.2d 871 (D.C. Cir. 1992).

Charles H. Helein, Esq.                                                                                   5

F. Supp. 1171, 1174 (D.D.C. 1973) (sales information, including pricing data, net sales, costs and expenses, exempt from disclosure under Exemption 4); *International Satellite, Inc.*, 57 RR 2d 460, 462-63 (1984) (withholding of business marketing plans under Exemption 4). Moreover, Sirius' proposed technical solutions and comprehensive compliance plan are the subject of ongoing settlement discussions and therefore may also be withheld under the settlement privilege of FOIA Exemption 5, 5 U.S.C. § 552(b)(5). *See The Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc. d/b/a Heatway Systems*, 332 F. 3d 976 (6th Cir. 2003) ("*Goodyear Tire*").

We find, however, as we did in the June 18, 2007 ruling, that Sirius has not demonstrated that substantial competitive harm is likely to result from the release of other materials. Accordingly, we will release these materials. Specifically, we are releasing the unredacted portions of Sirius' LOI Responses dated July 12 and August 14, 2006 (approximately 29 pages), which include information identified by Sirius as publicly available, the identities of Sirius' distributors and equipment manufacturers, and the actions taken by Sirius to correct its potential noncompliance with the technical requirements of Part 15. Sirius states in its April 20, 2007 letter that the identity of its distributors "is not, in all cases, publicly available information." We note, however, that all of the Sirius distributors identified in its LOI Responses are identified as Sirius distributors in news releases, annual reports, and other documents that are publicly available on Sirius' website. Similarly, all of the manufacturers identified in Sirius' LOI Responses are identified as Sirius manufacturers in news releases, annual reports and other documents that are publicly available on its website or in test reports submitted as part of equipment authorization applications that are publicly available in the Commission's Equipment Authorization Database. The corrective actions taken by Sirius have been reported in a publicly available filing it made with the SEC.[14] In addition, we are releasing the confidentiality requests submitted by Sirius with the LOI Responses (approximately 18 pages), a publicly available user manual (approximately 5 pages), and documents relating to a complaint made by National Public Radio to Sirius about FM modulator interference (37 pages). We are further releasing in their entirety supplemental LOI Responses (without the attached documents) from Sirius dated July 26, August 2, August 23, August 30, September 11, 2006 (approximately 10 pages). These letters are simply cover letters transmitting additional documents responsive to the LOIs and do not themselves include any commercial information.

Sirius also requested confidential treatment of information regarding when it became aware of potential non-compliance of its satellite DARS radios, what modifications were made to the radios, and the names and titles of Sirius employees who were involved in the decision to make such modifications or were aware of potential non-compliance. Sirius argued that this information is proprietary commercial information whose disclosure "would allow competitors to gain insight into Sirius's highly confidential business processes and commercial strategies as well as its corporate organization and decision-making structure." Sirius also argued that the information furnished in its response to those questions would be "of inestimable value to Sirius' competitors in understanding Sirius' internal organization …" and that its disclosure

---

[14] *See* Sirius Satellite Radio, Inc., Form 8-K (filed July 12, 2006).

6

Charles H. Helein, Esq.

"could give other entities a competitive advantage over Sirius by allowing them to review Sirius's decision-making processes and benchmark Sirius' internal organization."

We find, as we did in the June 18, 2007 ruling, that these arguments are unpersuasive and therefore will not redact this information from Sirius' LOI Responses. We note that the Sirius employees in question are executive and senior-level employees whose names and titles are publicly known. Indeed, Sirius conceded that "individual job titles are a matter of public knowledge." Regarding the information as to when Sirius became aware of potential non-compliance, we note that Sirius stated in its April 20, 2007, letter that the fourth paragraph of its July 12, 2006, LOI Response "consists of information that has been disclosed in Sirius' filings to the SEC, and thus is publicly available information." Since the fourth paragraph specifies when Sirius became aware of potential non-compliance, we find that this information is not confidential. Further, we find that information as to what modifications Sirius made to its radios after they were authorized by the Commission is not commercial information entitled to confidential treatment. In this connection, Section 0.457(d)(1)(ii) of the Rules, 47 C.F.R. § 0.457(d)(1)(ii), states that applications for equipment authorizations and materials relating to such applications are not routinely available for public inspection prior to the effective date of the authorization, but will be made available for inspection following the effective date. The fact that Sirius apparently made modifications to its radios without seeking Commission authorization should not afford protection for information that would not otherwise be entitled to confidential treatment under Section 0.457(d)(1)(ii).

Moreover, we find that the release of this information would not impair the Commission's ability to obtain necessary information in the future. The impairment prong of Exemption 4 "traditionally has been found to be satisfied when an agency demonstrates that the information at issue was provided voluntarily and that submitting entities would not provide such information in the future if it were subject to public disclosure."[15] Sirius was required to provide this information in response to Commission LOIs, and as a Commission licensee, Sirius can be compelled to provide such information in response to Commission inquiries in the future.[16]

We are withholding in their entirety consent decree proposals and associated e-mails submitted by Sirius (approximately 78 pages) and tolling agreements and tolling agreement extensions (approximately 5 pages) executed by Sirius in conjunction with ongoing settlement discussions. These materials may be withheld under the settlement privilege of Exemption 5. *See Goodyear Tire*, 332 F. 3d 976.

---

[15] *See, FlightSafety Services Corporation. v. Department of Labor*, 326 F.3d 607, 612 (5th Cir. 2003).

[16] *See* 47 U.S.C. §§ 154(i), 154(j), 308(b) and 403; *see also People for the Ethical Treatment of Animals v. United States Department of Agriculture*, No. 03-195, 2005 WL 1241141, at *5-6 (D.D.C. May 24, 2005) (Not reported in F.Supp.2d) (finding that USDA's ability to obtain information in the future would not be impaired by disclosure of the withheld documents because federal regulations *require* borrowers and lenders to submit the information).

Charles H. Helein, Esq.

We have also located approximately 210 pages of responsive documents that include presentations made to Commission staff and an associated confidentiality request. We are releasing the confidentiality request (3 pages) but are withholding the presentations in their entirety (approximately 207 pages). The presentations address proposed modifications to Sirius radios with FM modulators and include technical design information and equipment compliance techniques. We find that this information is proprietary commercial information, the disclosure of which will result in substantial competitive harm to Sirius, and therefore will withhold it pursuant to Exemption 4. Additionally, these presentations are the subject of ongoing settlement discussions and therefore may also be withheld under the settlement privilege of Exemption 5. *See Goodyear Tire,* 332 F. 3d 976.

We are releasing approximately 156 pages of test reports submitted by Sirius in conjunction with equipment authorization applications for satellite radio receivers and the accompanying transmittal e-mails, which are publicly available in the Commission's Equipment Authorization Database.

Finally, we are releasing approximately 52 pages of interference complaints against Sirius.[17] Some of these documents are e-mails from listeners of the complaining stations. We have redacted the senders' e-mail addresses and other identifying information from those e-mails pursuant to FOIA Exemption 7(C), 5 U.S.C. § 552(b)(7)(C). and Section 0.457(g)(3) of the Commission's rules. FOIA Exemption (7)(C) and Section 0.457(g)(3) of our rules permit nondisclosure of information in investigatory records compiled for law enforcement purposes, to the extent that production of such information "could reasonably be expected to constitute an unwarranted invasion of personal privacy.". In addition, we redacted the fax number of a Commission field facility from two pages of documents on the basis of FOIA Exemption 2 and Section 0.457(b) of the Commission's Rules, 47 C.F.R. § 0.457(b). FOIA Exemption 2 and Section 0.457(b) of our rules permit nondisclosure of materials that are related solely to the internal personnel rules and practices of the Commission. The fax numbers of Commission field facilities are not routinely available to the public.

To the extent that we are denying in part your FOIA request in this letter, we disagree that there is a compelling public interest in disclosing information regarding Sirius' compliance with FCC requirements, even if we determine that Sirius has met its burden of demonstrating that specific records fall within an Exemption, because such information has a direct bearing on the public interest considerations raised in the pending XM/Sirius merger application.

We are releasing the confidentiality requests, complaints and publicly available information. The remaining information we have decided to release will not be made available until after the disposition of any applications for review and any judicial appeals. If no application for review is filed, the material will made available after the expiration of the filing deadline.

---

[17] Approximately 29 of the approximately 52 pages are also against XM Radio, Inc., and are included in the 30 pages released by our XM records letter of March 21, 2008.

8

Charles H. Helein, Esq.

You are classified under Section 0.470(a)(2) of the Commission's Rules, 47 C.F.R. § 0.470(a)(2), as a commercial requester and, therefore, we will assess charges that recover the full, reasonable direct cost of searching for, reviewing and duplicating the records sought under the FOIA. The charges for search and review are as follows: $1220.62 for 17 hours and 15 minutes by GS-15 and Senior Level employees ($71.92 per hour); $122.28 for 2 hours by a GS-14 employee ($61.14 per hour); $43.51 for one hour by a GS-12 employee ($43.51 per hour); and duplication costs of $107.10 for 630 pages of records ($.17 per page).[18] The Financial Operations Division of the Office of the Managing Director of the FCC will bill you for the total amount of $1,493.51 under separate cover. Payment is due 30 days after receipt of the bill with checks made payable to the FCC.

The undersigned official is responsible for the partial denial of your FOIA request. If you believe the partial denial of your FOIA request is in error, you may file an application for review of this decision with the Commission's Office of General Counsel within 10 working days pursuant to Section 0.461(i)(2) of the Commission's Rules, 47 C.F.R. § 0.461(i)(2).

Besides ruling on the FOIA request, this letter also constitutes a ruling on Sirius' confidentiality requests. We are providing to Sirius copies of its LOI responses showing which portions of those responses we have determined to be confidential. If Sirius believes our treatment of its request for confidential treatment of documents is in error, it may file an application for review of this action with the Office of General Counsel pursuant to Section 0.461(i)(2) of the Commission's Rules within 10 working days of the date we furnish the above-mentioned copies.

Sincerely,

Kathryn S. Berthot
Chief, Spectrum Enforcement Division
Enforcement Bureau

cc:    Robert L. Pettit, Esq.

---

[18] These charges are the total charges for reviewing and duplicating the records sought in your FOIA request with respect to both Sirius and XM. We note that the duplication cost only applies to the documents that are released with this response. You may incur additional duplication charges for any documents that we may release after the disposition of any appeals filed by Sirius and/or XM.



Federal Communications Commission
Washington, D.C. 20554

March 21, 2008

<u>**VIA CERTIFIED MAIL**</u>
<u>**RETURN RECEIPT REQUESTED**</u>
<u>**AND FACSIMILE AT (703) 714-1330**</u>

Charles H. Helein, Esq.
Helein & Marashlian, LLC
Counsel of Record
U.S. Electronics, Inc.
1483 Chain Bridge Road
Suite 301
McLean, Virginia 22101

                              Re: FOIA Control No. 2008-190– XM Records

Dear Mr. Helein:

        This is in response to your January 25, 2008, Freedom of Information Act
("FOIA") request filed on behalf of the U.S. Electronics, Inc. ("USE"). You seek copies
of "non-privileged, non-exempt" documents supplied to the Commission by "applicants,
respondents, or other non-Commission employees" and relating to any of the following:
the petition filed July 5, 2007, in MB Docket No. 07-57; the certifications required of
Satellite Digital Audio Radio Service ("SDARS") operators "that their systems include a
receiver that will permit end users to access al licensed SDARS systems that are
operational or under construction"; Interoperable Technologies, LLC; the compliance of
Sirius Satellite Radio, Inc. ("Sirius") and XM Radio, Inc. ("XM"), with the equipment
authorization rules governing emission limitations for satellite receivers, "including
without limitation those matters and considered in connection with File No. EB-06-SE-
250"; and Sirius' and XM's compliance with their respective authorizations for terrestrial
repeaters.

        For administrative convenience, we are addressing your FOIA request separately
with respect to Sirius and XM. This letter deals with the portion of your FOIA request
relating to XM. Your FOIA request seeks documents which are the subject of pending
requests for confidentiality from XM and two groups of XM employees. XM submitted
earlier requests for confidentiality pursuant to FOIA Exemptions 4 and 6. We
accordingly served your FOIA request on XM and gave it an opportunity to provide
additional support for its requests for confidentiality.[1] XM submitted a supplemental

---

[1] *See* 47 C.F.R. § 0.461(d)(3). *See also* Letter from Kathryn S. Berthot, Chief, Spectrum Enforcement
Division, Enforcement Bureau, to James S. Blitz, Esq., Vice President and Regulatory Counsel, XM Radio,
Inc. (April 9, 2007).

Charles H. Helein, Esq.                                                    2

confidentiality request on February 29, 2008.[2] On February 29, 2008 we received additional confidentiality requests from "Three unnamed employees of XM Radio, Inc."[3] and "Four XM employees"[4] pursuant to FOIA Exemptions 6 and 7(C). On March 5, 2008, USE submitted a response to the February 29, 2008, supplemental confidentiality request filed by XM and to the February 29, 2008, confidentiality request filed by "Three Unnamed employees of XM Radio, Inc.[5] On March 7, 2008, USE submitted a response to the February 29, 2008, confidentiality request filed by "Four employees."[6]

Most of the requested documents that we have located were also the subject of a prior FOIA request, FOIA Control No. 2007-235. We ruled upon that FOIA request and the associated confidentiality requests on June 18, 2007.[7] XM argues that we should withhold some of the materials we decided to release in the June 18, 2007 ruling pending resolution of its application for review of that ruling.[8] The "Three unnamed employees of XM Radio, Inc.," also argue that we should withhold some of the materials we decided to release in the June 18, 2007, pending resolution of its application for review.[9] Likewise, the "Four XM employees" argue that we should defer or deny USE's FOIA request for some of materials we decided to release in the June 18, 2007 ruling pending resolution of the application for review.[10] We disagree with XM and both groups of XM employees. We will not withhold any materials found to be non-exempt in our June 18, 2007 ruling. Of course, we will not furnish any materials whose release is being contested until after a final ruling. Similarly, to the extent that USE is seeking any materials found to be exempt from disclosure in our June 18, 2007, ruling, we will not release such materials in the absence of a final ruling requiring their release. Accordingly, the determinations and

---

[2] *See* Letter from Scott Blake Harris, Esq., Harris, Wiltshire & Grannis, LLP, to Karen Mercer, Spectrum Enforcement Division, Enforcement Bureau (February 29, 2008) ("February 29, 2008, XM Letter").

[3] *See* Letter from Lanny L. Breuer, Esq., Covington & Burling, LLP, to Karen Mercer, Spectrum Enforcement Division, Enforcement Bureau (February 29, 2008) ("February 29, 2008, Three Employees Letter").

[4] *See* Letter from Lori J. Searcy, Esq., Searcy Law Offices, to Karen Mercer, Spectrum Enforcement Division, Enforcement Bureau (February 29, 2008) ("February 29, 2008, Four Employees Letter").

[5] *See* Letter from Charles H. Helein, Esq., Helein & Marashlian, LLC, to Karen Mercer, Spectrum Enforcement Division, Enforcement Bureau (March 5, 2008).

[6] *See* Letter from Charles H. Helein, Esq., Helein & Marashlian, LLC, to Karen Mercer, Spectrum Enforcement Division, Enforcement Bureau (March 7, 2008).

[7] Letter from Kathryn S. Berthot, Chief, Spectrum Enforcement Division, Enforcement Bureau, to Robert L. Pettit, Esq., Wiley Rein LLP (June 18, 2001) ("June 18, 2007 ruling"), *application for review pending.*

[8] February 29, 2008, XM Letter at 2.

[9] February 29, 2008, Three Employees Letter at 2. The "Three unnamed employees of XM Radio, Inc.," request that we "maintain" our "confidential treatment" of those materials. In fact, in our June 18, 2007, ruling, we denied the request for confidential treatment of those materials.

[10] February 29, 2008, Four Employees Letter at 1.

Charles H. Helein, Esq.

analysis below closely follow the determinations and analysis in our June 18, 2007 ruling.

**Category 1.** Category 1 of your FOIA request seeks documents provided by sources outside the Commission relating to the petition filed July 5, 2007, in MB Docket No. 07-57. There are no documents responsive to this part of your request.[11]

**Category 2.** Category 2 of your FOIA request seeks documents provided by sources outside the Commission relating to the certifications required of SDARS operators "that their systems include a receiver that will permit end users to access all licensed SDARS systems that are operational or under construction." There are no documents responsive to this part of your request.[12]

**Categories 3 and 4.** Categories 3 and 4 of your FOIA request seek documents provided by sources outside the Commission relating to Interoperable Technologies, LLC. There are no documents responsive to this part of your request.[13]

**Categories 5, 6, 7, and 8.** Categories 5, 6, 7 and 8 of your FOIA request seek documents provided by sources outside the Commission relating to XM's compliance with the equipment authorization rules governing emission limitations for satellite receivers, "including without limitation those matters and considered in connection with File No. EB-06-SE-250"; and XM' compliance with its authorizations for terrestrial repeaters. We have located the following documents that are responsive to these parts of your request: responses submitted by XM to Letters of Inquiry (LOIs) regarding the compliance with Commission rules of FM modulators/transmitters used by XM in connection with its satellite DARS radios (collectively, "FM Modulator Responses") totaling approximately 2,725 pages; the responses submitted by XM to LOIs regarding XM's compliance with the Commission's rules and authorizations relating to its terrestrial repeaters (collectively, "Repeater Responses") totaling approximately 25 pages; approximately 81 pages of documents pertaining to settlement negotiations between the Enforcement Bureau and XM; approximately 17 pages of documents pertaining to XM's proposed technical solutions and comprehensive compliance plan; and approximately 30 pages of interference complaints. As explained below, we are releasing approximately 409 pages of FM Modulator Responses, some with redactions, and withholding approximately 2,316 pages of documents. We are releasing the Repeater Responses. We are withholding the settlement documents and the documents pertaining to XM's proposed technical solutions and comprehensive compliance plan. We are releasing the interference complaints.

---

[11] XM has submitted certain documents that may be responsive to USE's FOIA request in MB Docket No. 07-57 pursuant to protective orders. We note that USE has access to these documents pursuant to the protective orders and therefore are construing USE's FOIA request not to request these documents.

[12] *See* n. 11.

[13] *See* n. 11.

4

Charles H. Helein, Esq.

We are releasing XM's confidentiality requests (approximately 17 pages), the portions of XM's FM Modulator Responses dated May 26, June 26, June 27, July 21, August 11, October 17, and October 27, 2006 for which it has not requested confidential treatment (approximately 47 pages), and a privilege log submitted with XM's October 17, 2006, LOI Response (approximately 2 pages). In addition, we are releasing documents provided by XM with its August 21, 2006, LOI Response for which it has not requested confidential treatment, including copies of equipment certifications, user guides, confidentiality requests submitted with equipment authorization applications, Telecommunications Certification Body ("TCB") letters, and pictures of devices (approximately 326 pages).[14]

XM sought confidential treatment of certain portions of its FM Modulator Responses and the documents submitted therewith pursuant to FOIA Exemption 4. FOIA Exemption 4, 5 U.S.C. § 552(b)(4), applies to "trade secrets and commercial or financial information obtained from a person and privileged or confidential." Under *National Parks and Conservation Ass'n v. Morton*,[15] commercial or financial materials are considered confidential if disclosure of the information is likely: (1) to cause substantial hardship to the competitive position of the submitter, or (2) to impair the government's ability to obtain necessary information in the future.[16]

XM requested that the following materials be accorded confidential treatment under Exemption 4: data concerning the number of units of satellite DARS radios manufactured, imported, sold, activated by consumers, at factories and at distributors and retailers; a contract with a manufacturer; block diagrams, schematics and other information regarding the design of XM's radios; bills of materials relating to its radios; and correspondence (including e-mail) among XM employees and between XM and third parties, such as equipment manufacturers, testing bodies, and TCBs. XM asserts that these materials constitute trade secrets and confidential commercial information and that disclosure of this information would cause substantial hardship to XM's competitive position. Specifically, XM asserted that these materials provide commercial information regarding the terms of its contractual agreements with manufacturers and vendors and satellite radio sales and manufacturing statistics. XM also asserted that these materials contain trade secrets regarding the satellite radios' design. XM maintained that release of this information would compromise its position in negotiation with manufacturers and provide competitors with an in-depth review of its core business processes and key relationships.

We find, as we did in the June 18, 2007, ruling , that XM has demonstrated that substantial competitive harm is likely to result from the release of these materials and therefore will withhold them from disclosure. Specifically, we will withhold from

---

[14] Although XM did not request confidentiality of any portion of these documents, we are redacting a name of a private citizen and telephone numbers from one of these documents pursuant to FOIA Exemptions 6 and 7(C), 5 U.S.C. §§ 552(b)(6) and 552(b)(7)(C).

[15] 498 F.2d 765, 770 (D.C. Cir. 1974) ("*National Parks*").

[16] *See also Critical Mass Energy Project v. NRC*, 975 F.2d 871 (D.C. Cir. 1992).

Charles H. Helein, Esq.                                                                                   5

disclosure under Exemption 4 the following documents submitted by XM with its May 26, August 11 and October 17, 2006 LOI Responses: diagrams, schematics and other information regarding the design of XM's receivers (approximately 451 pages); a contract between XM and a manufacturer (approximately 74 pages); bills of materials relating to receiver equipment (approximately 667 pages), which include information regarding the parts used in XM's radios and the cost of those parts; and correspondence (including e-mail) among XM employees and between XM and third parties (approximately 1,096 pages), which include information regarding XM's product design and development, corporate strategies and business processes. The diagrams, schematics and related information contain trade secrets regarding the design of XM's radios. Release of the contract, bills of materials and correspondence would result in competitive harm by revealing proprietary information regarding the design of XM's receivers, compromising XM's position in negotiation with manufacturers and providing competitors with insight into its core business processes and key relationships. In addition, we have redacted from XM's LOI Responses dated May 26, June 26, June 27, July 21, August 11, August 21 and October 17, 2006 data concerning the number of units of satellite DARS radios manufactured, imported, sold, activated by consumers, at factories and at distributors and retailers. These data would be invaluable to XM's competitors in understanding the relationship between XM's manufacturing, sales and activation volumes. *See, e.g., National Parks & Cons. Ass'n v. Kleppe*, 547 F.2d 673, 684 (D.C. Cir. 1976); *Timken Co. v. U.S. Customs Serv.*, 491 F. Supp. 557, 559-60 (D.D.C. 1980) (both holding that business strategies and marketing plans are exempt from disclosure under Exemption 4); *Fisher v. Renegotiation Bd.*, 355 F. Supp. 1171, 1174 (D.D.C. 1973) (sales information, including pricing data, net sales, costs and expenses, exempt from disclosure under Exemption 4); *International Satellite, Inc.*, 57 RR 2d 460, 462-63 (1984) (withholding of business marketing plans under Exemption 4).

XM also sought confidential treatment under Exemption 4 of information in its August 21 and September 6, 2006 LOI Responses regarding when it became aware of potential non-compliance of its satellite DARS radios, what modifications were made to the radios, and the names and titles of XM employees who were involved in the decision to make such modifications or were aware of potential non-compliance.[17] XM asserted that disclosure of this information would reveal commercially sensitive information which would be of substantial value to XM's competitors and thus cause XM competitive harm. In particular, XM asserted that disclosure of the names and titles of XM employees and executives involved in the design and production of XM's radios would be of value to companies seeking access to employees in a highly competitive high-tech industry. XM further asserted that disclosure of this information would impair the Commission's ability to obtain necessary information in the future. In this regard, XM

---

[17] We note that in the confidentiality requests submitted with its August 21, 2006 and September 6, 2006 LOI responses, XM did *not* request confidentiality of the information as to when XM became aware of potential non-compliance and what modifications XM made to its radios. Further, this information was *not* redacted in the confidential, redacted versions of the August 21, 2006 and September 6, 2006 LOI responses that XM submitted to the Enforcement Bureau. In its April 20, 2007 letter, XM states that it did request confidentiality of this information, but does not explain how disclosure of this information would cause it competitive harm.

Charles H. Helein, Esq.
6

stated that the willingness of potential witnesses to participate in XM's investigation or in a potential enforcement proceeding would suffer if they feared their responses would be disclosed to the public.

We find, as did in the June 18, 2007, ruling, that XM has not demonstrated that it would likely suffer substantial competitive injury from disclosure of this information. While XM claimed that disclosure of the names and titles of XM employees and executives involved in the design and production of its radios would be of value to companies seeking access to employees in a highly competitive high-tech industry, we note that the XM employees in question are executive and senior-level employees whose names and titles are publicly known. In addition, two of the named individuals are no longer employed by XM. Accordingly, we do not consider this adequate justification for confidentiality under Exemption 4. Further, we find that information as to when XM became aware of potential non-compliance and what modifications XM made to its radios after they were authorized by the Commission is not commercial information entitled to confidential treatment. In this connection, Section 0.457(d)(1)(ii) of the Rules, 47 C.F.R. § 0.457(d)(1)(ii), states that applications for equipment authorizations and materials relating to such applications are not routinely available for public inspection prior to the effective date of the authorization, but will be made available for inspection following the effective date. The fact that XM apparently made modifications to its radios without seeking Commission authorization should not afford protection for information that would not otherwise be entitled to confidential treatment under Section 0.457(d)(1)(ii).

Moreover, we do not believe that disclosure of this information will impair the Commission's ability to obtain similar information in the future. The impairment prong of Exemption 4 "traditionally has been found to be satisfied when an agency demonstrates that the information at issue was provided voluntarily and that submitting entities would not provide such information in the future if it were subject to public disclosure."[18] XM was required to provide this information in response to Commission LOIs, and as a Commission licensee, XM can be compelled to provide such information in response to Commission inquiries in the future.[19]

XM also requested confidential treatment of the names and titles of XM employees who were involved in the decision to make modifications to its satellite DARS radios or were aware of potential non-compliance pursuant to FOIA Exemption 6. XM argued that disclosure of the names and titles of the XM employees and executives would constitute an "unwarranted invasion of personal privacy." XM further argued that

---

[18] See *FlightSafety Services Corporation. v. Department of Labor*, 326 F.3d 607, 612 (5th Cir. 2003).

[19] See 47 U.S.C. §§ 154(i), 154(j), 308(b) and 403; *see also People for the Ethical Treatment of Animals v. United States Department of Agriculture*, No. 03-195, 2005 WL 1241141, at *5-6 (D.D.C. May 24, 2005) (Not reported in F.Supp.2d) (finding that USDA's ability to obtain information in the future would not be impaired by disclosure of the withheld documents because federal regulations *require* borrowers and lenders to submit the information).

Charles H. Helein, Esq.

revealing this information could subject the named individuals to "public speculation, industry prejudice, and potential harassment."

We are unpersuaded that the names and titles of XM employees who were involved in, or aware of, the company's potential non-compliance can be protected from disclosure under FOIA Exemption 6. FOIA Exemption 6, 5 U.S.C. § 552(b)(6), protects from disclosure information about individuals in "personnel and medical files and similar files" when the disclosure of such information "would constitute a clearly unwarranted invasion of personal privacy." Assuming that the names and titles of these XM employees could be characterized as personnel or similar files, we find that XM has not demonstrated that their release would result in "a clearly unwarranted invasion of personal privacy." XM is a publicly-traded corporation and the employees at issue are executives and other high-level employees. As such, these employees have no reasonable expectation of privacy as to their business decisions concerning potential violations of the FCC's rules.[20] Further, in balancing any minimal privacy interests of XM employees and the public's interest in knowing their identities and conduct, we find that the mere possibility that high-level XM employees may be the subject of public scrutiny or speculation does not outweigh the public's interest in understanding the agency's enforcement proceedings. Accordingly, we will not redact the names and titles of the XM executives and employees who were involved in the decision to make modifications to its satellite DARS radios or were aware of potential non-compliance of those radios. We will, however, redact these employees' direct business telephone numbers. Thus, we are releasing XM's LOI Responses dated August 21 and September 6, 2006 (approximately 16 pages) with the redactions indicated above.

XM sought confidential treatment of the entirety of its Repeater Responses,[21] with the exception of that part of an Exhibit that has been put into the record in another proceeding,[22] under FOIA Exemption 4. XM asserted that the text of the Repeater Responses contain explicit descriptions of its internal business processes, including analysis of and information about XM's network architecture and its strategic approach to repeater deployment. In addition, XM asserted that the Repeater Responses provide names and job-related information about current and former XM employees who were involved in the decisions to deploy or modify its terrestrial repeaters at variance or who were aware of such deployment or modification. XM requested confidential treatment of the entire text of its Repeater Responses because portions of the text cannot effectively be redacted or omitted from that letter. XM argued that disclosure of this information will cause substantial hardship to its competitive position. XM also argued that disclosure would impair the Commission's ability to obtain necessary information in the future.

---

[20] *McConnell*, 18 FCC Rcd at 26372-73 (redacting names of lower-level employees but releasing publicly known names).

[21] XM requests confidential treatment of the entire text of its Repeater Responses, asserting that "portions of the text cannot effectively be redacted or omitted."

[22] A portion of XM's Exhibit to its March 12, 2007 letter is included in a request for Special Temporary Authority filed by XM with the International Bureau. *See* File No. SAT-STA-20061002-00114 (filed October 2, 2006).

Charles H. Helein, Esq.

8

    We find that XM has failed to demonstrate that substantial competitive harm will
result from disclosure of the text of its Repeater Responses. While XM asserted that the
Repeater Responses contain explicit descriptions of its internal business processes,
including analysis of and information about XM's network architecture and its strategic
approach to repeater deployment, we note that this information is substantially the same
information that has already been publicly disclosed in the STA request that XM filed
with the International Bureau.[23] Further, XM has not shown how substantial competitive
injury will result from disclosure of the names and job-related information about current
and former XM employees who were involved in the decisions to deploy or modify its
terrestrial repeaters at variance or who were aware of such deployment or modification.
For the reasons stated above, we also do not believe that disclosure of this information
will impair the Commission's ability to obtain similar information in the future.

    Regarding the Exhibits to its Repeater Responses, XM sought confidential
treatment under Exemption 4 of the portion of the Exhibits that have not been placed into
the public record in the pending STA proceeding. XM stated that this "new" information
provides previously undisclosed details about its repeater network, the disclosure of
which would reveal sensitive business information that could harm XM's competitive
position. This information includes data as to whether the listed repeaters are currently
operating, whether each listed repeater was initially deployed at variance or subsequently
modified, the date of the variance, and the date variant operation ceased. We do not
believe that XM has demonstrated that it will suffer substantial competitive injury if this
information is released. We note that XM's STA request specifically identifies which of
the listed repeaters it has turned off. Thus, it is already a matter of public record whether
the listed repeaters are currently operating. The STA request also indicates what actions
XM took to bring certain repeaters into compliance and the date on which it began such
actions. Further, we do not see how disclosure of the date of the variances will harm
XM's competitive position.

    XM also asserted that Exemption 6 protects from disclosure the text of the
Repeater Responses to the extent that the Responses provide names and job-related
information about current and former XM employees who were involved in the decisions
to deploy or modify its terrestrial repeaters at variance or who were aware of such
deployment or modification. For the reasons explained above with respect to XM's FM
Modulator Responses, we find that the Repeater Responses cannot be protected from
disclosure under Exemption 6.

    Moreover, XM sought confidential treatment under Exemption 4 of the
Declaration accompanying its March 12, 2007, LOI response, noting that the Declaration
details the internal processes through which XM obtained the facts needed to respond to
the Commission's LOI. This Declaration, however, states only in very general terms that
the Declarant interviewed various unnamed current and former XM employees in order to
respond to the Commission's LOI. We therefore find that it is not protected from

---

[23] *See* File No. SAT-STA-20061002-00114, Declaration of Jeffrey Snyder.

Charles H. Helein, Esq.

disclosure under either Exemption 4. XM also asked that we withhold this Declaration under Exemption 6. We note, however, that the Declaration does not identify any of the employees interviewed by the Declarant by name or provide any personal information about these employees. Thus, we do not believe that XM has demonstrated that disclosure of the Declaration "would constitute a clearly unwarranted invasion of personal privacy." Accordingly, we will release the Repeater Responses, including the confidentiality request, Exhibits and Declaration, in their entirety (approximately 25 pages).

We are withholding in their entirety consent decree proposals and associated e-mails submitted by XM (approximately 76 pages) and tolling agreements and tolling agreement extensions (approximately 5 pages) executed by XM in conjunction with ongoing settlement discussions. These materials may be withheld under the settlement privilege of Exemption 5. *See Goodyear Tire,* 332 F. 3d 976. Finally, we are redacting from XM's October 27, 2006, LOI Response a paragraph discussing a proposed consent decree and are withholding in its entirety a consent decree proposal submitted by XM (approximately 10 pages). These materials may be withheld under the settlement privilege of FOIA Exemption 5, 5 U.S.C. § 552(b)(5). *See The Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc. d/b/a Heatway Systems,* 332 F. 3d 976 (6th Cir. 2003).

We have also located approximately 17 pages of responsive documents that include presentations made to Commission staff. The presentations address proposed modifications to XM radios with FM modulators and include equipment compliance techniques. We find that this information is proprietary commercial information, the disclosure of which will result in substantial competitive harm to XM, and therefore will withhold it pursuant to Exemption 4. Additionally, these presentations are the subject of ongoing settlement discussions and therefore may also be withheld under the settlement privilege of Exemption 5. *See Goodyear Tire,* 332 F. 3d 976.

Finally, we are releasing approximately 30 pages of interference complaints against XM.[24] Some of these documents are e-mails from listeners of the complaining stations. We have redacted the senders' e-mail addresses and other identifying information from those e-mails pursuant to FOIA Exemption 7(C), 5 U.S.C. § 552(b)(7)(C), and Section 0.457(g)(3) of the Commission's Rules. FOIA Exemption (7)(C) and Section 0.457(g)(3) of our rules permit nondisclosure of information in investigatory records compiled for law enforcement purposes, to the extent that production of such information "could reasonably be expected to constitute an unwarranted invasion of personal privacy.". In addition, we redacted the fax number of a Commission field facility from two pages of documents on the basis of FOIA Exemption 2 and Section 0.457(b) of the Commission's Rules, 47 C.F.R. § 0.457(b). FOIA Exemption 2 and Section 0.457(b) of our rules permit nondisclosure of materials that are related solely to the internal personnel rules and practices of the Commission. The fax numbers of Commission field facilities are not routinely available to the public.

---

[24] All but one of the approximately 30 pages are also against Sirius Satellite Radio, Inc., and are included in the 52 pages released by our Sirius records letter of March 21, 2008.

Charles H. Helein, Esq.                                                      10

To the extent that we are denying in part your FOIA request in this letter, we disagree that there is a compelling public interest in disclosing information regarding XM's potential rule violations, even if we determine that XM has met its burden of demonstrating that specific records fall within an Exemption, because such information has a direct bearing on the public interest considerations raised in the pending XM/Sirius merger application.

We are releasing the confidentiality requests, complaints and the portions of the LOI Responses and documents for which XM does not request confidentiality concurrently with this letter ruling. The remaining information that we have decided to release will not be made available until after the disposition of any applications for review and any judicial appeals. If no application for review is filed, the material will made available after the expiration of the filing deadline.

You are classified under Section 0.470(a)(2) of the Commission's Rules, 47 C.F.R. § 0.470(a)(2), as a commercial requester and, therefore, we will assess charges that recover the full, reasonable direct cost of searching for, reviewing and duplicating the records sought under the FOIA. The charges for search and review are as follows: $1220.62 for 17 hours and 15 minutes by GS-15 and Senior Level employees ($71.92 per hour); $122.28 for 2 hours by a GS-14 employee ($61.14 per hour); $43.51 for one hour by a GS-12 employee ($43.51 per hour); and duplication costs of $107.10 for 630 pages of records ($.17 per page).[25] The Financial Operations Division of the Office of the Managing Director of the FCC will bill you for the total amount of $1,493.51 under separate cover. Payment is due 30 days after receipt of the bill with checks made payable to the FCC.

The undersigned official is responsible for the partial denial of your FOIA request. If you believe the partial denial of your FOIA request is in error, you may file an application for review of this decision with the Commission's Office of General Counsel within 10 working days pursuant to Section 0.461(i)(2) of the Commission's Rules, 47 C.F.R. § 0.461(i)(2). Besides ruling on the FOIA request, this letter also constitutes a ruling on XM's confidentiality requests. We are providing to XM copies of its LOI responses showing which portions of those responses we have determined to be confidential. If XM believes our treatment of its request for confidential treatment of

---

[25] These charges are the total charges for reviewing and duplicating the records sought in your FOIA request with respect to both Sirius and XM. We note that the duplication cost only applies to the documents that are released with this response. You may incur additional duplication charges for any documents that we may release after the disposition of any appeals filed by Sirius and/or XM.

Charles H. Helein, Esq.                                            11

documents is in error, it may file an application for review of this action with the Office of General Counsel pursuant to Section 0.461(i)(2) of the Commission's Rules within 10 working days of the date we furnish the above-mentioned copies.

Sincerely,

Kathryn S. Berthot
Chief, Spectrum Enforcement Division
Enforcement Bureau

cc:     James S. Blitz, Esq.
        Scott Blake Harris, Esq.
        Lori J Searcy, Esq.
        Lanny A. Breuer, Esq.

# ATTACHMENT H

Application for Review FOIA Control No. 2008-190
USE Exhibit H

**XM-Sirius Merger Banal-ysis**
By Gigi Sohn
March 30, 2008 - 10:02pm

As has been well documented, Public Knowledge did not take a position on the merits of the antitrust law issues arising out of the XM-Sirius merger. But one need not be an antitrust expert to be a bit shocked at last week's perfunctory three-page decision by the Department of Justice approving the merger. After over a year of deliberation, the Department concluded that the merger would not lessen competition and that the parties could not profitably increase prices because 1) the parties did not compete with each other in important market segments; 2) there are alternative services available to consumers and technological change is expected to make those alternatives increasingly attractive; and 3) efficiencies are likely to flow from the merger that could benefit consumers.

Now these might be very reasonable conclusions supported by the evidence presented to the Department. But we will never know, because the decision is nothing more than a string of conclusions couched as "analysis." The Department states on a number of occasions that "the evidence demonstrates...," or "[d]ata analyzed by the Department shows...." without the slightest mention of what that evidence or data might be. We are just supposed to take their word for it. Given the intense opposition to this merger by broadcasters, consumer groups and others, wasn't the public owed more than this?

In particular, one conclusion the Department reached had me shaking my head. It found that there is no competition between the companies for existing subscribers because

> satellite radio equipment sold by each company is customized to each network and will not function with the other service. XM and Sirius made some efforts to develop an interoperable radio capable of receiving both sets of satellite signals. Depending on how such a radio could be configured, it could enable consumers to switch between providers without incurring the costs of new equipment. The [DoJ's] investigation revealed, however, that no such interoperable radio is on the market and that such a radio likely would not be introduced in the near term.

Recall that one of the arguments made *against* this merger was that the companies had promised to develop and market an interoperable radio, but to this day have not done so. So in essence, the Justice Department has *rewarded* the companies for failing to keep their promise. This is perverse.

Given that the FCC is unlikely to reject the merger in the face of the DoJ's approval, the merger conditions that PK proposed become all the more critical to ensure that consumers are protected. Specifically, the condition that

> **the new company should make the technical specifications of its devices and network open and available to allow device manufacturers to develop, and consumers to use, any device they choose without interference.** Pursuant to the Commission rules, these devices must be certified by the FCC for receiving signals on the frequencies licensed to the merged entity and be subject to a minimum "do-no-harm" requirement

would ensure greater competition in satellite radios by eliminating the exclusive deals that the companies now have with device manufacturers, but would likely also lead to the development of that long-promised but elusive interoperable radio.

# EXHIBIT

# F



# The *CommLaw* Group

HELEIN & MARASHLIAN, LLC
1483 Chain Bridge Road
Suite 301
McLean, Virginia 22101

Telephone: (703) 714-1300
Facsimile: (703) 714-1330
E-mail: mail@CommLawGroup.com
Website: www.CommLawGroup.com

Writer's Direct Dial Number
703-714-1301

Writer's E-mail Address
chh@commlawgroup.com

May 5, 2008

**VIA EMAIL AND FIRST CLASS MAIL**
Laurence.schecker@fcc.gov

Laurence Schecker
Office of General Counsel
Federal Communications Commission
445 12th Street, S.W.
Washington, D.C. 20554

      Re: **FOIA Request of U.S. Electronics, Inc.**

Dear Mr. Schecker:

On March 31, 2008, U.S. Electronics, Inc. ("USE") filed an Application for Review of the March 21, 2008 Ruling to the extent it denied its FOIA Request (Control No. 2008-190) filed January 25, 2008 ("USE Request").

On April 3, 2008, Ki Ryung Electronics Company, Ltd. ("KRI") filed an Application for Review of the March 21, 2008 Ruling to the extent it granted USE's FOIA Request (Control No. 2008-197) filed January 28, 2008.

On April 4, 2008, the following parties whose documents and information are the subject of USE's Request filed Applications For Review of the March 21, 2008 Ruling to the extent it granted USE's Request – Sirius Satellite Radio Inc. ("Sirius"), XM Radio, Inc. ("XM"), a group of individuals designated as "Sirius John Does," and a group of individuals designated as "4 XM Employees."

Pursuant to 5 U.S.C. § 552(a)(6)(A)(ii), the Commission was required to make its determinations with respect to the several Applications for Review as follows:

            April 28, 2008 for USE's Application for Review
            May 1, 2008 for KRI's Application for Review

May 2, 2008 for Sirius's Application For Review
May 2, 2008 forXM's Application For Review
May 2, 2008 for Sirius John Does' Application For Review
May 2, 2008 for 4 XM Employees' Application for Review

      To date, the Commission has not acted on any of these Applications for Review.  USE is therefore advising the Commission that despite the fact that USE's request has been outstanding for three months, and decisions were made by Commission Staff to grant USE's request in part, final action has not been taken to affirm the rulings to release certain documents or to overturn the rulings denying disclosure.  Most importantly, Commission action on the disclosure of the documents and information USE seeks is extremely time sensitive involving matters before the Commission in MB Docket 07-57, a decision on which is reportedly imminent.

Respectfully submitted,
U.S. Electronics, Inc.

By _____
Charles H. Helein
Its Counsel

2

# EXHIBIT

# G

## Charles H. Helein

| | |
|---|---|
| **From:** | Charles H. Helein [chh@commlawgroup.com] on behalf of Charles H. Helein |
| **Sent:** | Friday, May 09, 2008 12:29 PM |
| **To:** | laurence.schecker@fcc.gov |
| **Subject:** | FW: Freedom of Information Act - FCC FOIA Notice |
| **Attachments:** | FCC FOIA Notice Letter (5-5-08).pdf |

Dear Mr. Schecker:

On Monday of this week, May 5, 2008, on behalf of our client, U.S. Electronics, Inc. we emailed a letter advising your office that the time for Commission action on the Applications For Review (AFR) of the March 21, 2008 decisions on the FOIA Requests Control Nos. 2008-190 and 2008-197 had expired. A copy of that letter is attached hereto as well.

Because of the time sensitivity surrounding the disposition of the AFRs, USE once again urges the Commission to act on them as soon as possible.

If there are any questions, please contact us.

Respectfully submitted,

Charles H. Helein
Helein & Marashlian, LLC
The *CommLaw* Group
Washington, D.C.

Counsel of Record for U.S. Electronics, Inc.

Mailing address:
1483 Chain Bridge Road, Suite 301
McLean, VA  22101-5703
Telephone: 703-714-1301
Fax: 703-714-1330
After Hours: 703-893-0947
Email: chh@commlawgroup.com
Website: www.commlawgroup.com

Pursuant to Treasury Regulations, any U.S. federal tax advice contained in this communication, unless otherwise stated, is not intended and cannot be used for the purpose of avoiding tax-related penalties.

This message contains confidential information belonging to the sender, which may be legally privileged information. This information is intended only for the use of the addressee. If you are not the addressee, or an employee or agent responsible for delivering it to the addressee, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this message is strictly prohibited. While no tax advice of any kind is intended unless specifically so stated, pursuant to U.S. Treasury Regulations, unless specifically so stated, any federal tax advice provided is not intended and cannot be used for the purpose of avoiding tax-related penalties. If you have received this transmission in error, please advise the sender by return email to sar@commlawgroup.com or mail@commlawgroup.com and delete the message. Thank you.

**From:** Sherry Reese [mailto:sar@commlawgroup.com]
**Sent:** Monday, May 05, 2008 12:22 PM
**To:** laurence.schecker@fcc.gov
**Cc:** chh@commlawgroup.com

**Subject:** Freedom of Information Act - FCC FOIA Notice

Mr. Schecker:


U.S. Electronics, Inc. ("USE"), by its attorneys hereby files a FOIA Notice.

Please direct any questions or comments to the Charles H. Helein.

Thank you,
Sherry A. Reese


---

Sherry A. Reese
Helein & Marashlian, LLC
The *Comm*Law Group
1483 Chain Bridge Road
Suite 301
McLean, VA 22101
Office Tel: 703-714-1315
Office Fax: 703-714-1330
E-Mail: sar@CommLawGroup.com
Website: www.CommLawGroup.com

*Pursuant to Treasury Regulations, any U.S. federal tax advice contained in this communication, unless otherwise stated, is not intended and cannot be used for the purpose of avoiding tax-related penalties.*

*This message contains confidential information belonging to the sender, which is intended to be legally privileged and confidential and/or a purely private communication between the sender and the recipient(s). The information contained herein, including any attachments, is intended only for the use of the recipient(s). If you are not a named recipient(s), or an employee or agent responsible for delivering it to a named recipient, you are advised and placed on notice that any disclosure, copying, distribution, the taking of any action or refraining from an action in reliance on the contents or information contained in this message and any attachment is strictly prohibited and may be legally actionable. If you have received this message or any portion of it in error, please immediately advise the sender by return email to sar@CommLawGroup.com, with a copy to mail@CommLawGroup.com and delete the message and any attachments and destroy any hardcopies made by you or others. If you have forwarded this message or any portion of it to another or others, you must notify us immediately of their proper email or other addresses and you are to notify them of the privileged and confidential nature of this message and to take action to delete the message and its attachments and to destroy any hardcopies. Thank you.*

5/13/2008

**CIVIL COVER SHEET**

JS-44
(Rev.1/05 DC)

---

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| U.S. Electronics, Inc. | Federal Communications Commission |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Charles H. Helein, Helein & Marashlian, LLC, 1483 Chain Bridge Rd. Ste 301, McLean, VA 22101. 703-714-1301

ATTORNEYS (IF KNOWN)

---

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

□ 1 U.S. Government Plaintiff

□ 3 Federal Question (U.S. Government Not a Party)

☒ 2 U.S. Government Defendant

□ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | □ 1 | □ 1 | Incorporated or Principal Place of Business in This State | □ 4 | □ 4 |
| Citizen of Another State | □ 2 | □ 2 | Incorporated and Principal Place of Business in Another State | □ 5 | □ 5 |
| Citizen or Subject of a Foreign Country | □ 3 | □ 3 | Foreign Nation | □ 6 | □ 6 |

---

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| □ A. *Antitrust* | □ B. *Personal Injury/ Malpractice* | □ C. *Administrative Agency Review* | □ D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| □ 410 Antitrust | □ 310 Airplane<br>□ 315 Airplane Product Liability<br>□ 320 Assault, Libel & Slander<br>□ 330 Federal Employers Liability<br>□ 340 Marine<br>□ 345 Marine Product Liability<br>□ 350 Motor Vehicle<br>□ 355 Motor Vehicle Product Liability<br>□ 360 Other Personal Injury<br>□ 362 Medical Malpractice<br>□ 365 Product Liability<br>□ 368 Asbestos Product Liability | □ 151 Medicare Act<br><br>**Social Security:**<br>□ 861 HIA ((1395ff)<br>□ 862 Black Lung (923)<br>□ 863 DIWC/DIWW (405(g)<br>□ 864 SSID Title XVI<br>□ 865 RSI (405(g)<br><br>**Other Statutes**<br>□ 891 Agricultural Acts<br>□ 892 Economic Stabilization Act<br>□ 893 Environmental Matters<br>□ 894 Energy Allocation Act<br>□ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

---

**□ E. *General Civil (Other)* OR □ F. *Pro Se General Civil***

| **Real Property**<br>□ 210 Land Condemnation<br>□ 220 Foreclosure<br>□ 230 Rent, Lease & Ejectment<br>□ 240 Torts to Land<br>□ 245 Tort Product Liability<br>□ 290 All Other Real Property<br><br>**Personal Property**<br>□ 370 Other Fraud<br>□ 371 Truth in Lending<br>□ 380 Other Personal Property Damage<br>□ 385 Property Damage Product Liability | **Bankruptcy**<br>□ 422 Appeal 28 USC 158<br>□ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>□ 535 Death Penalty<br>□ 540 Mandamus & Other<br>□ 550 Civil Rights<br>□ 555 Prison Condition<br><br>**Property Rights**<br>□ 820 Copyrights<br>□ 830 Patent<br>□ 840 Trademark<br><br>**Federal Tax Suits**<br>□ 870 Taxes (US plaintiff or defendant<br>□ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>□ 610 Agriculture<br>□ 620 Other Food &Drug<br>□ 625 Drug Related Seizure of Property 21 USC 881<br>□ 630 Liquor Laws<br>□ 640 RR & Truck<br>□ 650 Airline Regs<br>□ 660 Occupational Safety/Health<br>□ 690 Other<br><br>**Other Statutes**<br>□ 400 State Reapportionment<br>□ 430 Banks & Banking<br>□ 450 Commerce/ICC Rates/etc.<br>□ 460 Deportation | □ 470 Racketeer Influenced & Corrupt Organizations<br>□ 480 Consumer Credit<br>□ 490 Cable/Satellite TV<br>□ 810 Selective Service<br>□ 850 Securities/Commodities/ Exchange<br>□ 875 Customer Challenge 12 USC 3410<br>□ 900 Appeal of fee determination under equal access to Justice<br>□ 950 Constitutionality of State Statutes<br>□ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| ☐ G. *Habeas Corpus/ 2255*<br><br>☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ H. *Employment Discrimination*<br><br>☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☒ I. *FOIA/PRIVACY ACT*<br><br>☒ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ J. *Student Loan*<br><br>☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |
|---|---|---|---|
| ☐ K. *Labor/ERISA (non-employment)*<br><br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ L. *Other Civil Rights (non-employment)*<br><br>☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ M. *Contract*<br><br>☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ N. *Three-Judge Court*<br><br>☐ 441 Civil Rights-Voting (if Voting Rights Act) |

---

**V. ORIGIN**

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ Multi district Litigation   ☐ 7 Appeal to District Judge from Mag. Judge

---

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

FOIA action under 5 U.S.C. Sec. 552 to compel Federal Communications Commission to produce documents requested by Plaintiff.

---

**VII. REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23    **DEMAND $**    Check YES only if demanded in complaint    **JURY DEMAND:** ☐ YES   ☒ NO

**VIII. RELATED CASE(S) IF ANY**    (See instruction)   ☐ YES   ☒ NO    If yes, please complete related case form.

DATE 5-14-08    SIGNATURE OF ATTORNEY OF RECORD    *Charles H. Helein*

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**

Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.